UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAMON CIERCO
C/La Creu Grossa Nº 28
AD500 Andorra La Vella
Principality of Andorra

HIGINI CIERCO
C/La Creu Grossa Nº 31
AD500 Andorra La Vella
Principality of Andorra

SUCCESSORS D'HIGINI CIERCO
GARCIA, S.A.
Carretera De La Comella 11
AD500 Andorra La Vella
Principality of Andorra

CIERCO MARTINEZ 2 2003, S.L.
Carretera De La Comella 11
AD500 Andorra La Vella
Principality of Andorra

     In each Plaintiff's Personal Capacity
     and Derivatively on Behalf of
     Themselves and All Others Similarly
     Situated,

          Plaintiffs,

    v.

JACOB LEW, in his official capacity as
Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

U.S. DEPARTMENT OF THE
TREASURY
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

Civ. No. _15-cv-1641___

JENNIFER SHASKY CALVERY, in her
official capacity as Director of the
Financial Crimes Enforcement Network
PO Box 39
Vienna, VA 22183

FINANCIAL CRIMES ENFORCEMENT
NETWORK
PO Box 39
Vienna, VA 22183

        Defendants,

   -and-

BANCA PRIVADA D'ANDORRA S.A.,
in receivership
Av. Carlemany, 119
AD700 Escaldes-Engordany
Principality of Andorra

        Nominal Defendant.

## <u>VERIFIED COMPLAINT</u>

### Introduction

1.     On March 10, 2015, a bureau of the U.S. Department of the Treasury, the Financial Crimes Enforcement Network ("FinCEN"), sounded the death knell for Banca Privada d'Andorra S.A. ("BPA" or "the Bank"), instantly triggering the government seizure of a healthy, solvent bank with no warning whatsoever.  In a "Notice of Finding" ("NOF") issued that day, FinCEN claims to have "found" that BPA was a bank of "primary money laundering concern."  FinCEN's purported "finding" was made without considering any of BPA's internal audits or compliance files or, indeed, any evidence from BPA at all.  Instead, the NOF was based on cherry-picked incidents of suspicious activity that BPA had detected and reported a year earlier in a detailed letter to Andorran authorities and which BPA had addressed.  Nevertheless, on the

basis of the NOF, FinCEN also issued a Notice of Proposed Rulemaking ("NPRM") proposing that BPA should not be able to process transactions in the United States. Despite having conducted a patently deficient investigation, and despite the fact that the NPRM is nominally only a "proposed" action, FinCEN went even further in the document, "encourag[ing]" other countries and banks to bar BPA from maintaining accounts and to guard against processing BPA's transactions.

2.    Before the issuance of the NOF and NPRM, BPA had banking relationships all over the world. But U.S. banks, subject to their own regulatory requirements and correctly fearful of agency reprisal, terminated their contractual relationships with BPA immediately after the NOF and NPRM were published in the Federal Register on March 13, 2015. See Imposition of Special Measure against Banca Privada d'Andorra as a Financial Institution of Primary Money Laundering Concern, 80 Fed. Reg. 13304 (Mar. 13, 2015) and Notice of Finding that Banca Privada d'Andorra is a Financial Institution of Primary Money Laundering Concern, 80 Fed. Reg. 13464 (Mar. 13, 2015) (collectively the "Notices"). Thus, publication of the Notices effectively and intentionally expelled the Bank from the U.S. financial system, including U.S. dollar transactions and U.S. correspondent bank accounts. This was not just foreseeable, but was in fact FinCEN's intent in issuing the NOF and NPRM. Because a significant amount of BPA's business consists of U.S. dollar transactions, the Notices made BPA's business untenable. The Notices further destroyed BPA's reputation as well as that of its majority shareholders, the Ciercos.

3.    Acting in coordination with FinCEN, immediately after the NOF and NPRM were made public, regulators in Andorra, Panama, and Spain seized BPA and its subsidiaries in Spain and Panama. BPA's Spanish subsidiary has already been liquidated. In Andorra,

regulators and BPA's government-appointed Administrator have commenced a "Resolution" process to liquidate the Bank, citing FinCEN's actions as justification.  In its press release announcing the NOF and NPRM, FinCEN highlighted the two countries' coordination by thanking the Andorran regulators for their cooperation in its actions against BPA.  But as alleged below, Andorra appears to have cooperated under threat.

4.      FinCEN promulgated the NOF and NPRM under § 311 of the USA PATRIOT Act, 31 U.S.C. § 5318A.  The NOF is an adjudication in which FinCEN acted as prosecutor, judge, jury, and executioner.  The NPRM is an assessment of the maximum penalty available under § 311, which FinCEN is imposing without analysis and based on a patently and apparently deliberately inadequate investigation.  From the moment they were issued, the NOF and NPRM have effectively barred BPA from transacting in dollars with U.S. banks, either directly or through third-party financial institutions.

5.      As a leading commentary on § 311 stated, "It is functionally a death sentence for a foreign bank dependent on its ability to clear dollars through U.S. financial institutions. Section 311 gives Treasury the power to drive, unilaterally and secretly, a foreign bank out of business.  Because special measures are imposed through an administrative rather than a judicial proceeding, only Treasury itself knows the quantum and reliability of evidence supporting the government's decision."  Douglas N. Greenburg, John Roth & Katherine A. Sawyer, Special Measures Under Section 311 of the USA PATRIOT Act, 23 Rev. of Banking & Fin. Services, 65, 72-73 (June 2007).

6.      That is precisely what has happened here.  FinCEN did not hold a hearing before a neutral arbiter or even inform BPA that it was under investigation.  So, rather than being a reasoned fact finding based on evidence presented in an adversarial proceeding, the NOF and

resulting NPRM are based on incomplete and inaccurate evidence and apparently derive from FinCEN's frustration with the Andorran government.  The international investigative process had a Keystone Kops quality, with FinCEN initially demanding reforms of the Andorran system, the Andorran regulators failing to answer requests and refusing to make requested systemic changes, and FinCEN issuing the NOF and NPRM to send a message to the Andorran government about the need for reform.  BPA was simply a convenient scapegoat, which FinCEN punished for conduct which BPA had already detected and reported just as it was supposed to do.  Indeed, the U.S. Government has effectively conceded that BPA was merely a pawn to be sacrificed in an international regulatory chess game.  On April 25, 2015, Anton Smith, the Counselor for Economic Affairs, at the U.S. Embassy in Spain, acknowledged that the United States "used the hammer" of § 311 not because of misdeeds by BPA, but because of the failure of the Government of Andorra to be adequately responsive to FinCEN.

7.      Since the issuance of the Notices, FinCEN has declined to provide the information on which it relied in making its Notice of Finding against BPA, and has failed to consider the extensive evidence submitted by the majority shareholders and Chairmen of the Board of Directors of BPA, Plaintiffs Ramon and Higini Cierco ("the Ciercos"), in response to FinCEN's allegations.  The Ciercos offered to meet with FinCEN and to provide even more evidence; however FinCEN, after an initial meeting in which these further offers were made, has declined to respond.  Nor has FinCEN provided an explanation of its choice of the most severe penalty in the NPRM.  Instead, FinCEN has maintained its commitment to the maximum § 311 penalty even when faced with substantial evidence undermining its NOF and its NPRM.  In particular,

a.     The NOF includes no evidence or findings that support the conclusion that BPA is a bank of "primary money laundering concern" or that it deserves the crushing sanction imposed. The NOF relies exclusively on a handful of historic and isolated instances of money laundering, which BPA identified, reported and addressed proactively more than a year before FinCEN's actions. The NOF is devoid of any findings of present or systemic money laundering concerns. Most significantly, the NOF itself all but concedes that FinCEN made no effort to, and did not, consider the impact of its proposed action or the timing of the action on the extensive and vibrant business of BPA.

b.     The NPRM is based entirely on the deficient findings of the NOF and thus reflects that FinCEN failed to consider the necessary § 311 factors. Moreover, the NPRM fails to address how the penalty can possibly be appropriate or proportionate given that other banks with threats that were far more systemic, actively hidden and of far greater threat to national security have been addressed with far less draconian sanctions.

8.     FinCEN's actions against BPA were, moreover, wildly disproportionate. BPA, like every other bank, has in the past been utilized by third parties to complete isolated improper transactions. No bank can assure perfect compliance. The frequency of such problems in the banking system as a whole is reflected in recent settlements against large global financial institutions such as Wachovia, HSBC, Commerzbank and BNP Paribas, among others, for sanctions and money laundering violations. Indeed, those institutions had infractions that were far greater in scope, systemic, intentional and implicated core national security concerns. Yet those banks were not closed by FinCEN. This is not a coincidence. As noted in The Economist,

"It is striking that no 311 measures have been taken against banks in strategically significant Middle Eastern countries where money laundering is a big concern, such as the United Arab Emirates, or against any banks from Western countries, including America itself, that have been caught facilitating money laundering on a large scale or operating with woefully inadequate controls, such as Wachovia and HSBC." A Fearful Number, June 6, 2015, at 67.

9.     Had FinCEN been engaged in a real fact-finding process, it would have learned that between 2002 and 2014, BPA hired KPMG and Deloitte, two of the world's foremost auditing firms, to conduct annual AML audits.  None of the audits reflected systemic anti-money laundering ("AML") issues.  Ironically, Maria Cosan, KPMG's lead auditor who signed the audit of BPA, was made head of the Andorran regulator in 2012 and remains so today.  Upon information and belief, Ms. Cosan either failed to apprise FinCEN that the incidents noted in the NOF had been reported by BPA, which cooperated fully with the relevant authorities, or FinCEN knew this and disregarded it in its investigation.  If FinCEN nonetheless was justified in imposing the maximum penalty under § 311, then banks around the world should be extremely concerned they will be singled out arbitrarily, suddenly, and irrevocably.

10.    The NOF and NPRM are, in short, irreconcilable with the procedural and substantive requirements of the Administrative Procedure Act, as well as with due process under the U.S. Constitution.

**Jurisdiction and Venue**

11.    This suit arises under the Administrative Procedure Act, 5 USC § 500, et seq., the Fifth Amendment to the United States Constitution, and the All Writs Act, 28 USC § 1651. Accordingly, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1651.

12.     In addition, this Court has jurisdiction under 28 U.S.C. § 1346 because the officials and agencies of the United States are defendants in the suit.

13.     Sovereign immunity is waived by 5 U.S.C. § 702.

14.     Venue in this Court is proper under 28 U.S.C. § 1391(e).

### Parties

15.     Plaintiffs Ramon and Higini Cierco are the sole shareholders of Plaintiff Successors D'Higini Cierco Garcia, S.A., a corporation organized under Andorran law.

16.     Plaintiff Higini Cierco is the sole shareholder of Plaintiff Cierco Martinez 2 2003, S.L., a corporation organized under Andorran law.

17.     Together, Successors D'Higini Cierco Garcia, S.A., Cierco Martinez 2 2003, S.L., Plaintiff Ramon Cierco and another Cierco family member own 75% of BPA.  In addition, Plaintiffs Ramon and Higini Cierco have served as non-executive directors of BPA and have served, on a rotating basis, as the Chairman of the Board of Directors of BPA.

18.     Defendant Jacob Lew is sued in his official capacity as Secretary of the Treasury. The Secretary implements and administers § 311 of the USA PATRIOT Act.  Secretary Lew has delegated this authority to the Director of FinCEN.  The Secretary is located in Washington, D.C.

19.     Defendant U.S. Department of the Treasury is the executive agency led by Secretary Lew, which has responsibility for implementing and administering § 311 of the USA PATRIOT Act.  The Department is located in Washington, D.C.

20.     Defendant Jennifer Shasky Calvery is sued in her official capacity as Director of FinCEN.  The Director has been delegated the authority to implement and administer § 311 of the USA PATRIOT Act.  She exercised this authority to promulgate the NOF and NPRM at issue in this lawsuit.  The Director is located in Washington, D.C. and Vienna, Virginia.

21.     Defendant FinCEN is a bureau within the U.S. Department of the Treasury led by Director Shasky Calvery.  FinCEN promulgated the NOF and NPRM at issue in this lawsuit. FinCEN is located in Washington, D.C. and Vienna, Virginia.

22.     Nominal defendant BPA is an international, commercial bank organized under the law of Andorra, which has its principal place of business in Andorra.  Until March 10, 2015, BPA engaged in regular banking business in that country, and through subsidiaries in Spain and Panama.  On March 10, 2015, BPA was seized by the Andorran government and placed in administration.  BPA's Administrator is an independent corporation established by legislation specifically to address FinCEN's actions against BPA.  The Administrator – La Agencia de Resolución de Entidades Bancarias ("AREB") – is directed by a five person board of directors, three of whom are appointed by the Government of Andorra and two of whom are appointed by Andorra's reserve bank.  The actions of the Andorran government were direct, foreseeable and intentional results of FinCEN's § 311 Notices.  On information and belief, they were, moreover, discussed between Andorra and the U.S. in advance of FinCEN's actions and agreed between the governments.  BPA is named as a nominal defendant herein pursuant to Fed. R. Civ. P. 23.1.

**Relevant Non-Parties**

23.     Banco Madrid is a wholly owned subsidiary of BPA operating in Spain.  Banco Madrid was taken over by Spanish regulators immediately after, and as a direct result of, the issuance of the NOF and NPRM by Defendants.  It was a substantial and well regarded institution.  At the time of its closing, Banco Madrid had 25 branches in Spain and had been lauded in the business press as one of the leading banks in Europe for asset management.  It was named "Best Asset Management Company in Spain" by Global Banking and Finance Review, "Best Wealth Manager in Spain," also by Global Banking and Finance Review, and "Best

Private Banking Entity in Spain" by Capital Magazine as recently as 2014.  One of its funds was the most profitable in Spain during 2014, and another was the most profitable for the first quarter of 2015, the quarter in which Banco Madrid was shut down as part of the unjustified coordinated regulatory action.  In addition, among the 3,000 SICAVs in Spain (similar to an open ended mutual fund and the most prevalent investment vehicle in Spain), Banco Madrid has the first and fifth most profitable funds.  In sum, far from being some furtive or dubious institution, BPA was outward focused, steadily and responsibly growing, transparent and successful, but as FinCEN conceded in its NOF and NPRM, FinCEN never considered any of this.

### Allegations Supporting Plaintiffs' Direct and Derivative Standing

24.     As a direct, foreseeable, and intended result of the issuance of the NOF and NPRM, BPA was seized by the Andorran Government and placed in administration.  Under the current circumstances there is no prospect of the bank being returned to the shareholders.  This directly damaged the shareholders by stripping them, without due process or just cause, of a valuable asset – i.e., BPA.  As shareholders directly injured by FinCEN's action, Plaintiffs have standing to bring this action in their personal capacities.

25.     In addition, FinCEN's actions directly damaged BPA by improperly interfering with its contractual relationships with U.S. banks, depriving it of access to the U.S. financial market and U.S. banking services, and causing it to suffer in its business and reputation, and to be downgraded by rating agencies.  As majority shareholders of BPA, Plaintiffs fairly and adequately represent the interests of BPA shareholders, and bring this action on behalf of BPA to enforce BPA's rights.

26.     Plaintiffs were shareholders in March 2015, when FinCEN issued the notices, and remain so as of this filing.  Since that time, Plaintiffs have made numerous requests to BPA's Administrator to discuss the legal interests of BPA, the closure of BPA, and how to maximize the value of the company for all stakeholders consistent with the interests of law enforcement.   All such requests have been refused.   Plaintiffs had one meeting with the Andorran regulators, who explicitly declined to discuss these issues other than to indicate that FinCEN would not understand if they had any substantive discussions with Plaintiffs.

27.     The Government of Andorra has adopted a policy to cooperate with FinCEN and to refuse to take actions to defend BPA.  On June 25, 2015, Cesar Goyache, one of the Directors of BPA's Administrator, addressed the Andorran Parliament and stated that Andorra had decided not to restructure BPA, but rather to engage in a "resolution" in which the shareholders would have no involvement and no residuary interest.   Under Andorran law, a "resolution" indicates that a company is viewed as having no chance of recovery.  The decision to engage in a "resolution" was driven, at least in part, by the fact that FinCEN's views had to be taken into account.  The Administrator is appointed by and represents the interests of the Government of Andorra.   As set forth herein, the Andorran government has been cooperating with the U.S. government in connection with the seizure of BPA.   The Andorran government has an overriding and undeniable interest in accommodating the U.S. Government in order to avoid further actions by the U.S. Government against Andorra as a jurisdiction and/or other Andorran banks, which would be catastrophic to the Andorran banking system and economy in general. Under these circumstances, and for the reasons set forth herein, demand on the Administrator to represent the interests of BPA against Defendants would be futile.

28.     The pleading of this action as a derivative action is not collusive and was not undertaken for the purposes of conferring jurisdiction on this Court that this Court would not otherwise have.

### Origins of BPA

29.     The Ciercos are the sons of the late and revered Higini Cierco (1921 – 2004), a Spanish immigrant from the terrible chaos of the Spanish Civil War who fled to Andorra and established himself as a prominent entrepreneur and philanthropist there.   During the Second World War, the elder Cierco, together with his cousin José Castillo, worked closely with U.S. Intelligence Services.   The elder Cierco helped Jewish families escaping Nazi persecution cross the border from occupied France into Andorra.

30.     The elder Cierco established Renault automobile dealerships in the 1940s and 50s and subsequently launched photography, electronics and other retail businesses catering to the growing tourist population in Andorra.   In the 1980's, the Ciercos joined their father's businesses and contributed to the growth of the family conglomerate. Around this time, the businesses' gains were re-invested in Andorran real estate and hotels, which catered, in large part, to the significant wave of tourists that travel to Andorra primarily for its excellent winter sports.   They also constructed and managed service stations and have a long-standing and extensive commercial relationship with multinational construction, manufacturing and consumer products companies, including large American conglomerates.

31.     During this time, the Cierco family acquired part of Banca Cassany, which later became BPA.   The Cierco family businesses, including BPA, employ more than one thousand people directly and thousands indirectly, principally in Andorra and Spain.   Since the death of

their father in 2004, the Ciercos have acted as directors of the numerous business lines, hiring qualified professionals to manage day-to-day operations.

32.     The Ciercos were not day-to-day managers of BPA; however, they took their duties as directors of BPA seriously.  As directed by the Ciercos, BPA set a general strategy of responsible growth, hired qualified professionals including compliance professionals, and relied on reports of management, third-party auditors, and regulators with respect to appropriate systems and controls.  Far from seeking to avoid scrutiny of their operations by confining their business to a small country like Andorra, BPA was the first Andorran bank to move into the Spanish market, accepting willingly the disclosure, compliance and regulatory requirements expected of financial institutions operating in the European Union.

## Operations, Customers, and Services

33.     BPA is headquartered in and has its primary place of operation in Andorra.  BPA has wholly owned subsidiaries in Spain and Panama.  Approximately 65% of its total assets were located in Spain.  Its growth in recent years has been onshore through its Spanish operations.  When Liquidators recently completed the liquidation of Banco Madrid, despite doing so very rapidly and under extreme distress conditions, there remained an expected capital surplus of some 42 million Euros.  The value of the franchise, had it been managed and sold through an orderly commercial process, would have been a significant multiple of this amount.  An independent valuation expert valued Banco Madrid at the time of closing at 253 million Euros.  In addition, to the Plaintiffs' knowledge, not a single account was blocked by the Liquidators for payment to depositors for money laundering concerns.

34.     BPA's principal client base is in Andorra, Spain and France.  BPA markets itself to customers by emphasizing the high quality of its services.  Its largest customer base outside its core area is in Argentina, which has significant currency volatility.

35.     A significant number of BPA's customers transact business in U.S. dollars. Thus, the ability of BPA to process dollar-denominated transactions is not only crucial to its business model, but to the individuals who rely on BPA to shepherd their funds through the global finance system.   All of this information was known to FinCEN when it "used the hammer" on BPA and issued the Notices.

36.     The Bank offers a wide variety of financial products and services, including corporate and personal banking, loans, funds management and retail services.  All of its customers are subject to Know Your Customer ("KYC") procedures approved by its international accounting firms and the Andorran government.  In connection with the 2011 acquisition, there was an exhaustive audit of BPA's policies, practices and procedures by the Bank of Spain, a major European Union regulator, which approved this highly scrutinized transaction.

**Correspondent Banks**

37.     A correspondent bank is a financial institution that provides services – such as conducting business transactions and accepting deposits – for another financial institution. Banks routinely use correspondent banks to service transactions originating in foreign countries and to act as the domestic bank's agent abroad.  Opening a branch in every country in which it has customers would be impracticable if not impossible, so a domestic bank depends upon correspondent banks to provide the full range of services its customers expect.

38.     BPA is a foreign bank with only a small number of branches and locations around the world and no branches in the United States.  To transact business in U.S. dollars, BPA must use correspondent banks.  A significant proportion of BPA's international transactions involve U.S. dollars, and thus prior to its closing, BPA did substantial business in the U.S.  Losing access to U.S. dollar correspondent accounts left the Bank unable to provide the international financial services that constitute a significant amount of its business.

## U.S. Presence and Property

39.     At the time of the Notices, BPA maintained substantial U.S. dollar correspondent banking relationships with Bank of America, Citibank, HSBC, and Wells Fargo, which it relied on to process financial transactions on behalf of its customers on a daily basis.  BPA thus consistently transacted significant business in the United States until the issuance of the Notices.  BPA was also required to and did provide comprehensive information to its correspondent banks under the USA PATRIOT Act, for certification by the U.S. banks to U.S. regulators.

40.     In order to maintain its correspondent accounts with U.S. banks, BPA, like all foreign banks, was required to subject itself to U.S. regulatory requirements.  For example, BPA was required, pursuant to section 319(b) of the USA PATRIOT Act, 31 U.S.C. § 5318(k), to provide its correspondent banks with the names and addresses of its owners, and the identity of an agent in the United States authorized to receive service of process.  Thus, BPA's accounts were subject to oversight, and BPA agreed to and took affirmative steps to facilitate U.S. jurisdiction for purposes of such oversight.

41.     The Ciercos also own significant real property assets in the United States.

## BPA's Financial Health

42.     BPA and its subsidiaries enjoyed exceptional financial health until March 2015, when FinCEN issued the Notices.  As noted above, its Spanish operations were lauded as top

performers in the financial press and yielded a surplus even under liquidation conditions. Following FinCEN's NOF and NPRM, the Ciercos commissioned an independent valuation which valued BPA and its subsidiaries, as of March 2015, at approximately 482 million Euros, which is approximately $550 million at current exchange rates. Slightly more than 50% of that value was in Spain, with the remainder in Andorra and Panama.

43.     The issuance of the Notices had immediate impact. First, the NOF and NPRM directly caused the Andorran government to seize BPA, stripping the Plaintiffs of a valuable asset. In addition, the Notices directly and immediately caused BPA and Plaintiffs substantial and irreversible reputational and business harm. BPA's U.S. correspondent banks immediately froze BPA's accounts and refused further banking services, thus cutting BPA off from the U.S. dollar market. BPA's non-U.S. dollar banking relationships worldwide also were immediately terminated.

44.     Such action was the expected and intended consequence of the Notices. In effect, the Notices created a broad prohibition on BPA doing business as an international bank. Overnight, and without notice to BPA, FinCEN destroyed BPA's reputation so thoroughly that it de facto shut it down. FinCEN admits, on the face of the NPRM, that this was its stated goal. In discussing whether other nations or multilateral groups would bar BPA from maintaining a correspondent account or processing BPA's transactions, FinCEN wrote that none had yet taken action, but it "encourage[d] other countries to take similar action based on the information contained in this NPRM and the Notice of Finding." NPRM at 13305. FinCEN's rallying cry imploring other countries, banks, and multilateral institutions to bar BPA from the financial markets fully achieved its objective. Yet as alleged below, the information contained in the

NOF and NPRM was old, had been self-reported, and failed to support the draconian conclusions and remedies.

45.     Immediately following the issuance of the NOF and NPRM and FinCEN's declaration that "the Director of FinCEN found that [BPA]…is of primary money laundering concern," NPRM at 13304, in a coordinated effort, local regulators seized BPA, Banco Madrid, and BPA Panama, removed the Board of Directors, including Plaintiffs, and froze all customer accounts.  BPA's approximately 25,000 customers have been unable fully to access their funds since March.  Hundreds of employees lost their jobs and hundreds more will do so in the absence of a proactive approach to preserve the value of the bank from unwarranted expropriation.  BPA's Administrators are now preparing to do exactly that; to liquidate or sell BPA operations at a small fraction of their true commercial value without any value being returned to the Plaintiffs.  The only victors here would be international regulators who would sweep under the carpet the wrongful, unjustified and pretextual actions taken here.

46.     The Notices need not be the end of BPA.  If these baseless and facially defective Notices were rescinded or found to have been improperly issued, BPA could be returned to its shareholders who could resurrect the portions of its business that are still viable.  Andorran regulators have told the Ciercos that such a course of action would require the approval of FinCEN.  Ordinary depositors could have access to their life savings, which have been frozen for more than six months with limited withdrawal rights.  Hundreds of jobs could be saved.  A great wrong could be ameliorated.  A valuable franchise could generate profitable and constructive financial activity into the future.  Alternatively, the imminent liquidation or "resolution" of BPA will needlessly destroy value, kill jobs, ruin lives and lead to the end of what was just six months ago a vibrant, growing commercial institution whose compliance

issues fell well within the range of those experienced by similar banks worldwide, none of which is being targeted by FinCEN.

## Section 311 of the USA PATRIOT Act

47.     Shortly after the attacks of September 11, 2001, the President signed into law the USA PATRIOT Act.  Section 311 of that Act (which is an amendment to the Bank Secrecy Act) authorizes the Secretary of the Treasury to "require domestic financial institutions and domestic financial agencies" to take one or more of five "special measures" against a foreign financial institution that the Secretary of the Treasury has found to be of "primary money laundering concern."  31 U.S.C. § 5318A(a)(1).  The special measures function as penalties against the entity designated a "primary money laundering concern."  The Secretary has delegated to the Director of FinCEN the responsibility for administering § 311.  Section 311 was passed principally in the fight against international terrorism.  It is critical to note that in the NOF and NPRM there are no allegations of terror finance or anything related to terrorism or proliferation of weapons of mass destruction.

48.     Section 311 does not specifically define the term "primary money laundering concern."  Before finding that banks or other financial institutions meet this undefined standard and warrant the imposition of a "special measure," the Secretary of the Treasury must consult with the Secretary of State and the Attorney General, § 5318A(c)(1), and "shall consider in addition such information as the Secretary determines to be relevant," including:

> (i) the extent to which such financial institutions . . . are used to facilitate or promote money laundering in or through [a particular] jurisdiction, including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles;
>
> (ii) the extent to which such institutions . . . are used for legitimate business purposes in the jurisdiction; and

(iii) the extent to which [the special measure] is sufficient to ensure, with respect to . . . institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

§ 5318A(c)(2)(B).

49.     The "special measures" include requiring enhanced recordkeeping and reporting, § 5318A(b)(1); demanding beneficial ownership information on relevant accounts, § 5318A(b)(2); demanding information regarding customers of domestic financial institutions who are permitted to use suspect payable-through accounts, § 5318A(b)(3); and demanding information regarding customers of domestic financial institutions permitted to use suspect correspondent accounts, § 5318A(b)(4).

50.     The most severe measure is the fifth special measure, under which the Secretary can prohibit or otherwise restrict domestic financial institutions and agencies from opening or maintaining correspondent accounts for a designated foreign financial institution. § 5318A(b)(5).  The effect of the prohibition on opening or maintaining correspondent accounts pursuant to the fifth special measure is to sever all ties between all domestic financial institutions or agencies and the institution of "primary money laundering concern."

51.     In selecting which of the five special measures to apply to a financial institution of "primary money laundering concern," the Secretary must consult with certain federal agencies and officials, § 5318A(a)(4)(A), and must consider a series of factors:

(i) whether similar action has been or is being taken by other nations or multilateral groups;

(ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

19

(iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and

(iv) the effect of the action on United States national security and foreign policy.

§ 5318A(a)(2)(B).

52.     The statute allows the first four of the five special measures to "be imposed by regulation, order, or otherwise as permitted by law."  § 5318A(a)(2)(B).  But the fifth special measure "may be imposed only by regulation."  § 5318A(a)(2)(C).  Resorting to the fifth special measure thus triggers rulemaking procedures under the Administrative Procedure Act.  See 5 U.S.C. § 553.

53.     The statute provides "additional considerations" for the Secretary to address in determining which measure to impose, including "the extent to which such institutions, transactions, or types of accounts are used for legitimate business purposes in the jurisdiction." 31 U.S.C. § 5318A(c)(2)(B)(ii).  It also directs the Secretary to consider whether the funds allegedly laundered are in aid of international terrorism or the proliferation of weapons of mass destruction.

**FinCEN's Notice of Finding & Notice of Proposed Rulemaking**

54.     On March 10, 2015, FinCEN issued the Notices.  The NOF states that "reasonable grounds exist" to conclude that BPA is an institution of "primary money laundering concern."  The NPRM proposed, without explanation, to impose against BPA the fifth special measure authorized by § 311.  See NOF at 13464; NPRM at 13304.

55.     The NOF cites certain allegedly improper actions by BPA.  The principal charges are that "several officials of BPA's high-level management in Andorra have facilitated financial transactions on behalf of Third-Party Money Launderers ('TPMLs') providing services for

individuals and organizations involved in organized crime, corruption, smuggling, and fraud." NOF at 13464.  Specifically, the NOF finds that BPA facilitated money laundering and other crimes by:

- Providing substantial assistance to an individual who purportedly worked for Russian criminal organizations engaged in corruption.   This purportedly occurred as part of a scheme to bribe the Mayor of a small Catalan town.   BPA cooperated and blocked funds at the request of Spanish authorities.

- Accepting depositing from a financial adviser who was alleged to be a third-party money-launderer, acting on behalf of public officials in Venezuela and depositing the proceeds of public transactions.  The funds were blocked but BPA was ordered to release them by the Andorran Supreme Court when insufficient evidence was presented.

- A bank officer was alleged to be accepting bribes and processing bulk cash transfers for a Chinese national acting on behalf of a transnational criminal organization.  The money was funneled through the account of a Mr. Pallardo who ran dollar stores in Spain.

- Providing support to trade-based third party financial advisers, whom FinCEN assert were money launderers.   FinCEN indicates that these individuals also had certain relationships with members of the Sinaloa Cartel.  Notably, the NOF does not allege that BPA had knowledge that these individuals had such associations and does not allege that these individuals placed Sinaloa funds with BPA.

There are no allegations that BPA accounts were used in connection with terror financing, SDGT's, weapons proliferation, or state sponsors of terrorism.

56.   The NOF further finds that BPA processed U.S. dollar transactions that listed BPA's Andorran address for the originator's or beneficiary's address. FinCEN explains that "[a]lthough there may be rare occasions when use of the bank's address as a bank customer's address of record is legitimate, the processing of a high percentage of transactions not containing accurate customer address information indicates failure to conduct sufficient due diligence on a customer, failure to adequately monitor transactions, or possible complicity in

money laundering by disguising the origin of funds." NOF at 13466. FinCEN cited no evidence that any one of those transactions was unlawful, or that the transactions in total constituted a "high percentage" of overall transaction volume or that they otherwise were noncompliant with applicable regulations.

57.     As for BPA's "legitimate activity," the NOF acknowledges that FinCEN failed to weigh this factor, stating, "[i]t is difficult to assess on the information available the extent to which BPA is used for legitimate business purposes." Id. FinCEN made no reference to what information it accessed or whether it reviewed the copious public information regarding BPA's business activities. This is not an isolated incident. In fact, FinCEN routinely fails to consider a target bank's legitimate business, claiming an inability to access information that it is statutorily required to consider and accordingly ignoring its obligation to make this enumerated statutory finding in good faith. This deliberate indifference to mitigating information is an intentional breach of FinCEN's statutory obligations.

58.     That FinCEN is deliberately giving this factor short shrift is evident from the way that FinCEN "cuts and pastes" virtually identical conclusory language concerning the purported difficulty of assessing this factor into Notice after Notice. For example, in its finding on Banco Delta Asia ("BDA"), FinCEN's discussion of the second factor – a mere three sentences long – begins by stating "[i]t is difficult to determine the extent to which [BDA] is used for legitimate purposes." Finding that Banco Delta Asia SARL is a Financial Institution of Primary Money Laundering Concern, 70 Fed. Reg. 55214 (Sept. 20, 2005). FinCEN posits that BDA "likely engages in some legitimate activity" and then concludes that such unspecified legitimate activity is "significantly outweighed by its use to promote or facilitate money laundering and other financial crimes." Id. at 55216.

59.     Similarly, in its finding on Lebanese Canadian Bank SAL ("LCB"), FinCEN
again acknowledged that the bank conducted legitimate business, but failed to investigate or
quantify it in order to weigh it against the instances of money laundering.  Finding that Lebanese
Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern, 76 Fed.
Reg. 9403 (Feb. 17, 2011).  After noting a high volume of transactional activity that was likely
to be legitimate business, FinCEN concluded that, based on the "numerous instances" of illicit
funds passing through LCB, "any legitimate use of LCB is significantly outweighed by the
apparent use of LCB to promote or facilitate money laundering."  Id. at 9406.

60.     To the same effect, in its Finding that JSC CredexBank Is a Financial Institution
of Primary Money Laundering Concern, 77 Fed. Reg. 31434, 33147 (May 25, 2012), FinCEN
begins by stating that the lack of transparency and transactional activity with shell corporations
"makes it difficult to assess the extent to which Credex is engaged in legitimate business."
FinCEN concludes: "Thus, any legitimate use of Credex is significantly outweighed by the
apparent use of Credex to facilitate or promote money laundering and other financial crimes."
Id.

61.     FinCEN, which apparently has no difficulty obtaining evidence of purported
wrongdoing, repeatedly acknowledges that it is incapable of obtaining and evaluating evidence
of a bank's legitimate business – that is, the business reported on a bank's financial statements,
its website, and in regulatory reports.  The NOF notes  that BPA "provides services in private
banking, personal banking, and corporate banking" which includes "typical bank products such
as saving accounts, corporate accounts, credit cards, and financing."  Id.  But FinCEN makes no
effort to quantify these activities, and as with the banks discussed above, the nebulous is
invariably outweighed by the specific wrongdoing that FinCEN chooses to particularize.

Nowhere does FinCEN demonstrate that it has engaged in the required type of fact-finding investigation and evaluation to determine the extent of BPA's legitimate business.  It provides no discussion of legitimate clients of the Bank, the volume of legitimate business transactions conducted by the Bank, or the proportion of legitimate business as compared to the referenced instances of anti-money laundering failures by a few bank officials.  Rather, FinCEN simply concludes with the ipse dixit that BPA's legitimate business activity is "at high risk of being abused by money launderers."  Id.

62.     Based on these preliminary findings, deduced from incomplete and inaccurate information, FinCEN prevented BPA from accessing the U.S. financial system by imposing the prohibition of the "fifth special measure" under § 311 and effectively closed the Bank.

63.     FinCEN's "Notice of Finding" declaring BPA an institution "of primary money laundering concern," is a final agency action.  Certainly, FinCEN evinces no intent to amend it and other than through the present action there is no procedural path to appeal it.  While FinCEN characterizes the NPRM as a "Proposed Notice," it also is de facto a final action due to its crushing – and deliberate – effects.  FinCEN views the NPRM as sufficiently final to encourage international governments and banking institutions to blackball BPA.  And the effect of the Notices was immediately to cause all U.S. correspondent banks to sever their relationships with BPA, regulators to oust the Board of Directors and seize the bank, freeze the accounts of the Bank's shareholders, and fire hundreds of Bank employees across Andorra, Spain, and Panama.  So long as the NOF and NPRM are in place, with the functionally irrelevant Final Rule potentially looming ahead, BPA can no longer operate.

64.     FinCEN has a pattern and practice of very long and uncertain delays in issuing Final Rules, and thus any mistake that could have potentially been corrected after issuance of the

NOF becomes a fait accompli through deliberate delay.  Just last week, FinCEN rescinded its §

311 Notice of Proposed Rulemaking against Lebanese Canadian Bank because it has become

moot.  After a four year delay, Lebanese Canadian Bank no longer exists and therefore its ability

to access U.S. dollars is irrelevant.  Eight of nineteen § 311 Notices of Proposed Rulemaking

have been rescinded, presumably because a final rule was ultimately unnecessary.  The

indefinite delay between the issuance of an NPRM and a Final Rule allows FinCEN to take what

amounts to final action without legal accountability.

65.    In sum, FinCEN has issued a Final Notice of Finding and what is a de facto final

rule and can now delay as long as it wishes before issuing a Final Rule, thereby depriving

institutions such as BPA of any meaningful or effective relief.

### BPA's Public Comments On The Notice Of Finding

66.    Counsel submitted a public comment ("Comment") on behalf of Ramon and

Higini Cierco on May 6, 2015.  The Comment described (1) numerous steps the Bank had taken

for years prior to FinCEN's Notice to evaluate its AML and compliance program, (2) the results

of those evaluations, and (3) evidence showing the Andorran government's certification of

BPA's AML program. The Comment quoted analyses and reviews conducted by two highly

respected audit firms – KPMG and Deloitte – which found that BPA's AML compliance

program was adequate.  In December 2013, Deloitte noted:

- BPA had successfully implemented procedures for face-to-face meetings with new customers.

- A strengthening of BPA's internal AML detection systems through broader use of the Siron AML system, which was acquired at significant cost through the well-known German compliance company Tonbeller.[1]

---

[1]  In January 2015, Tonbeller was acquired by FICO, a publicly listed U.S. company.

- BPA responded to emerging challenges, such as fiscal fraud in Spain, by adopting timely modifications in its procedures as needed.

In March 2013, KPMG noted:

- Since 2008, BPA has successfully obtained adequate documentation for pre-2000 accounts thereby reaching a high standard of account-justifying documentation.

- In order to reduce the risk of money laundering, in 2012 BPA successfully implemented new procedures and review processes for cash payments in excess of 25,000 euros, the buying and selling of credit instruments between clients, and cash deposits.

- In 2012, BPA increased the number of reports for high-risk clients and complex accounts, with each report including detailed information in relation to the client, the origin of funds, and proposed transactions. 2013 saw an additional increase in such reports.

- BPA instituted internal controls to ensure that employees were up-to-date on AML procedures and standards.

67.     BPA also held quarterly AML meetings where high-level executives, including the Compliance Officer, reviewed all new clients deemed to be high risk. If the necessary documentation justifying the existence of funds was lacking, the prospective new client was rejected.

68.     The Financial Intelligence Unit of Andorra ("UIF") conducts periodic reviews of Andorran financial institutions in order to confirm compliance with Andorran AML and anti-terrorist financing regulations and BPA has received positive confirmations after each review. The most recent findings regarding BPA were issued on September 17, 2012, covering the time period of 2009-2011. In this finding, the Head of the UIF, Carles Fiñana Pifarré certified:

- [BPA] strictly complies with the legal precepts contained in the [Andorran AML] Law, having furthermore been subjected to successive external audits, that certify not only the foregoing, but also that it has the necessary mechanisms for training and prevention.

- I can furthermore confirm that in the last three years BANCA PRIVADA D'ANDORRA S.A. has not been object of any corrective action or penalizing measures on money laundering and terrorism financing.[2]

69.     Similarly, approximately three years earlier in 2009, the same review, this time covering the time period 2006 – 2008, was conducted by Josep Maria Francino Batile of the Andorran Financial Intelligence Unit, and stated:

- That BANCA PRIVADA D'ANDORRA is subject to supervision regarding money laundering and terrorism financing by this Unit.

- That each year BANCA PRIVADA D'ANDORRA sends this Unit an audit in which the internal procedures on money laundering and terrorism financing are reviewed and their adaptation to the standards of Andorra. From those audits it is deduced that BANCA PRIVADA D'ANDORRA complied with the requirements of Andorra law on money laundering and terrorism financing.[3]

70.     The characteristic lack of specificity in the NOF made it impossible for the Ciercos to directly respond to FinCEN's allegations, and therefore they could not do so in the Comment.  As the Court noted in FBME Bank Ltd. v. Lew, No. 15-cv-01270 (CRC), 2015 WL 5081209, *8 (D.D.C. Aug. 27, 2015), "To fulfill its obligation to provide adequate notice, an agency must 'make available to the public, in a form that allows for meaningful comment, the data the agency used to develop [its] proposed rule.'" Am. Med. Ass'n, 57 F.3d at 1133 (quoting Chamber of Commerce v. SEC, 443 F.3d 890, 899 (D.C. Cir. 2006)). Agencies are required to make these disclosures in order to "allow[] the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it." Id. (quoting Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1121 (D.C. Cir. 1984)).

---

[2]  Original and Translation of Certification of Financial Intelligence Unit, Principality of Andorra (Sept. 17, 2012).

[3]  Original and Translation of Certification of Money Laundering Unit, Principality of Andorra (Jan. 12, 2009).

71.     Despite requests, FinCEN has thus far been unwilling to provide additional specificity or a complete file of unclassified underlying documents that served as the evidentiary basis for the charges, in order to afford Plaintiffs the opportunity to provide a comprehensive response before the closure of the Notice and Comment period on May 6, 2015.   While the Ciercos continue to make requests to FinCEN, as evidenced by the letters attached hereto as Attachments A, B, and C, FinCEN has as yet refused to comply with its statutory and Constitutional obligations to share the basis for the charges levied against BPA or the remedies adopted.   In sum, FinCEN will neither provide the information on which it relied nor accept additional information from the Ciercos.

72.     The findings of the NOF are based on misinformation and reflect a failure by FinCEN to consider facts that do not support its conclusions.   The Ciercos made clear in the Comment their commitment to addressing AML concerns involving the Bank:

> Each of the incidents described in the Notice refers to what are standard practices in the wealth management business: investment of funds through third-party professionals—financial advisors, accountants and lawyers.   These professionals are referred to in the Notice as "Third Party Money Launderers." Again, the Cierco Brothers had no knowledge that these professionals were laundering money.   It may well be the case that the ultimate principals of these intermediaries had been involved in improper activity, but the obvious solutions to this problem would be: i) to further strengthen investigation of the intermediaries' business; ii) to demand additional detailed information from the intermediaries about their principals; and iii) to limit the introduction of clients through such intermediary channels.   As the reports referenced above make clear, that is precisely what BPA was doing and would have continued to do had they been alerted to problems with intermediaries and the bank been permitted to remain open.

73.     As deliberately opaque as FinCEN's NOF is, it is clear that only a handful of specific transactions are cited, and all of them were previously identified by BPA and addressed. There is no indication of a systemic AML problem.   As the leading commentators have noted, "the imposition of Section 311's most powerful special measures must be limited to situations in

which the threat is great and then only when a strong evidentiary record, based on credible evidence that can be made public, supports the action."  Greenburg et al., supra at 75.  That is not the case here.  Instead, FinCEN appears to have chosen a small bank in a small place with small issues in order to make a larger point to the Government of Andorra and regarding international AML standards generally.

### The Ciercos' Additional Submissions to FinCEN

74.     To supplement the Comment, the Ciercos, through counsel, met with FinCEN on July 15, 2015, and made a presentation regarding BPA's demonstrated commitment to AML. The Ciercos, through counsel, then submitted two additional letters, on July 22, 2015 (Attachment A) and September 4, 2015 (Attachment B), respectively.  On September 16, 2015 (Attachment C), BPA again wrote to FinCEN requesting another in-person meeting.

75.     Through the July 15 meeting and the additional correspondence, the Ciercos elaborated on BPA's commitment to AML.  BPA spent more than $7 million to engage KPMG and Deloitte to provide annual audits, including an audit of the AML program, and presented the results of these audits to Andorran regulators.  The auditors were provided with open files and access to all documentation and personnel and no evidence was concealed from them.

76.     In addition, the Ciercos demonstrated their willingness to engage with and respond proactively to Andorran regulators regarding BPA's AML program, self-identifying problems and, when necessary, taking corrective actions such as terminating staff.

77.     Counsel further informed FinCEN that in March 2014, BPA had identified and reported to the Andorran regulators in a detailed letter all three specific instances of alleged money laundering that were cited in FinCEN's NOF issued a full year later and offered to provide the letter.  That offer has neither been accepted nor rejected.

78.     Furthermore, counsel informed FinCEN that in 2010, BPA had commissioned KPMG to conduct an investigation into one of the cases cited in the NOF.  KPMG's investigation found no irregularities in the account. In 2013, BPA reported to the Andorran government an attempt by the customer identified to evade an order blocking that account by using a nominee accountholder and BPA refused to allow this to occur.

79.     Each of the specific cases cited by FinCEN in the NOF were the subject of legal proceedings in Andorra or Spain.  BPA was fully transparent and cooperative at all times with Andorran regulators prior to and during the course of these proceedings.

80.     In a July 22, 2015 letter to FinCEN, the Ciercos, through counsel, offered their full cooperation, suggesting that they provide FinCEN with certain documents, and formally asking FinCEN a number of follow up questions. Over two months have passed since that correspondence and there has been no response from FinCEN.  See Attachment A.

81.     On September 4, 2015, the Ciercos, through counsel, again wrote to FinCEN requesting a withdrawal of the NPRM.  See Attachment B.

82.     On September 16, 2015 (See Attachment C), the Ciercos' counsel again wrote to FinCEN requesting a meeting.  FinCEN finally provided a generic response, stating only the following:

> Thank you for your letters dated September 4, 2015 and July 22, 2015.  In accordance with the Administrative Procedure Act, these letters will be made available to the public through publication on www.regulations.gov, along with other comments received during the comment period, unless you inform us in writing that you object to publication of any portions of these letters or their attachments. This objection may be based, for example, on your assertion that the letters or their attachments contain confidential business information, proprietary business information, or trade secrets. Please let us know any such objection by September 30, 2015 and specify the reason for it. If a specific response to your letters is appropriate, you will receive it by a separate communication.

83.     Through that correspondence, the Ciercos have tried to point out the numerous mistakes made by FinCEN and the Andorran authorities and have asked FinCEN to take steps to correct the manifest unfairness.  These efforts have been met by silence and delay, the essence of arbitrary and capricious administrative action in violation of the rights of BPA and the Ciercos.  And as set forth below, there is strong evidence that FinCEN's action was meant as a shot across Andorra's bow, with BPA absorbing the fatal blow.

**Communication Failures between the Andorran Government and FinCEN**

84.     On or about August 26, 2014, the U.S. Embassy in Spain sent a "verbal note" to the Andorran government citing certain AML recommendations that Andorra should adopt.

85.     On September 22, 2014, the Andorran authorities responded to the U.S. Embassy in Spain, informing them that they were confident of their regulatory policies and practices and declining to adopt the cash transaction reporting measures, which had been raised by the U.S. Embassy in the August 26, 2014 communication.  Cash transaction reporting is a critical international issue in AML coordination, where different countries have different standards, and Andorra has committed to implementing certain standards in 2017 but not sooner.

86.     Upon information and belief, FinCEN again contacted the Andorran authorities concerning regulation concerns on January 6, 2015, and received no response.

87.     Upon information and belief, this proximately resulted in the issuance of the NOF and NPRM on March 10, 2015 and immediate seizures of BPA in Andorra and Panama and Banco Madrid in Spain by the regulators of each country.  While the sequence of events is strongly suggestive of a bilateral breakdown, a U.S. Government official's inadvertent honesty confirmed it.

88.     In April 2015, at a conference in Spain, Anton Smith, Counselor for Economic Affairs at the U.S. Embassy in Madrid said, "With respect to Andorra, last year we signaled our discomfort with an official report identifying problems in the system there. I will not say that they did not realize it, but they did not react with the appropriate vigor and we had to use the hammer."   The U.S. Embassy denied the comment was made, but it was caught on video. (http://youtu.be/j2aPNwxlp-w). Clearly, the "hammer" was a reference to the NOF and NPRM against BPA.

89.     In other words, the Andorran government was in the U.S.' view inexcusably non-responsive to serious sector-wide concerns, ultimately forcing FinCEN to "use the hammer" to demonstrate its authority and concern.  Possibly as an attempt to conceal its true motivation, or possibly to signal collusion between the two governments, FinCEN thanked the Andorran government for its cooperation in the press release announcing the Notices. BPA ultimately became the scapegoat, or possibly the sacrificial lamb,  for broader failings in the Andorran regulatory regime and its inability to engage constructively with FinCEN.

90.     Once it took control of BPA, the Andorran government hired Pricewaterhouse Coopers (PWC) to conduct a full audit of every account at BPA. That review has been ongoing since March 2015 and is not yet complete.  It has been reported that this investigation has already cost in the range of 20 million Euros and over 100,000 hours. Upon information and belief, PWC has applied an undisclosed formula not based on Andorran requirements and has engaged in a microscopic examination of every document and every account to identify some basis to support the draconian actions taken.  On October 2, it was reported that PWC had left the job without issuing a report due to improper pressure from the Andorran government.

91.     Upon information and belief, much to the chagrin of the Andorran authorities, PWC has not found evidence of systemic money laundering at BPA that would conceivably justify what has occurred.

**FinCEN's Disregard of Less Extreme Sanctions Available Under § 311**

92.     FinCEN failed to consider whether a less extreme special measure would address its concerns about BPA before proposing the crushing fifth special measure.  Section 311 requires that FinCEN consider the extent to which a special measure will impact legitimate business activity in the jurisdiction of the Bank, and to also consider the extent to which the Bank's overall business was conducted for legitimate purposes. As the Court held in FBME v. Lew, 2015 WL 5081209, at *10, "FinCEN's authority to impose conditions was an obvious potential alternative to a full prohibition on opening or maintaining correspondent accounts on behalf of FBME. Indeed, the statute provides for this authority on its face, in the same subsection in which it provides for the authority to fully prohibit such accounts."  Instead, FinCEN applied the requirements on an inconsistent and politically expedient basis based upon the size and impact of the particular jurisdiction and its institution. As reported in The Economist, "FinCEN does not use this nuclear option often: in 13 years it has been dropped on just over a dozen financial firms and four countries (it can be applied to an entire jurisdiction if the authorities are deemed to be complicit in the misconduct). When it does, the target is generally small or strategically unimportant."  A Fearful Number, The Economist, supra, at 67.

93.     In sum, both the NOF and the NPRM reflect that FinCEN failed to consider BPA's legitimate business activity or the impact that the fifth measure would have on that activity.  It appeared to have a collateral agenda to "use the hammer" unrelated to the substance or gravity of BPA's actual conduct.  A variety of other measures that would have adequately

addressed FinCEN's concerns, including the appointment of an outside AML monitor, the termination of any involved staff, the hiring of new compliance staff and other measures. Even if the allegations were true and had not been self-reported, the action would still be unjustified.

94.     The imposition of the fifth special measure was disproportionate and excessive, especially as compared to other recent enforcement actions involving far more egregious circumstances, including terror finance, in which FinCEN imposed only a fine. Because there was no systemic money laundering at BPA, and because all of the instances cited by FinCEN are years old and had been addressed by BPA, a lesser sanction would have been far more congruent with FinCEN's practice and with any underlying issues. But without legal justification or explanation, FinCEN instead chose to propose the most drastic part of the most severe measure, knowing full well that there would be immediate and irreparable damage and that BPA would have no opportunity to persuade FinCEN otherwise.

**Foreign Regulators Are Poised To Pursue Liquidation or Sale of The Bank**

95.     Based on the NPRM, regulators are now poised to liquidate or sell what remains of BPA. Once this happens, BPA will be irretrievably lost to its shareholders and the value of BPA will be irrevocably diminished. BPA's Administrator is now poised, through a "resolution" process, to move the remaining assets of BPA into another financial institution and ultimately to sell those assets at a fraction of their value in a liquidation scenario. As the Administration has conceded, the resolution process has been selected precisely because it disregards the interests of BPA's shareholders.

96.     The Ciercos have sent the Andorran government several letters stating their desire to participate in a process to allow all stakeholders to preserve the value of the Bank and the jobs of employees consistent with the interests of law enforcement. These advances have all

been rebuffed.  The Andorran authorities claim to be unable to engage in such a process given

the interests of FinCEN.  The Ciercos would fully support restructuring the small but viable

portion of BPA's business that still remains.  Plaintiffs believe that the movement of BPA's

assets and its ultimate sale will destroy what remains of the bank.

## COUNT I – ADMINISTRATIVE PROCEDURE ACT

(FinCEN's finding that BPA was a financial institution of primary money laundering
concern was arbitrary and capricious).

97.     Plaintiffs repeat, reallege, and incorporate the allegations of fact in the preceding

paragraphs.

98.     The Administrative Procedure Act provides that a "reviewing court shall . . . hold

unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.

99.     An agency finding is arbitrary and capricious if, among other things, the agency

(1) made its findings without examining the relevant data and articulating a satisfactory

explanation for its action; (2) failed to consider an important aspect of the problem; (3) offered

an explanation for its decisions that runs counter to the relevant evidence; and/or (4) defies the

text of a statute or reflects an unreasonable interpretation thereof.  FinCEN's action fails on each

criterion.

100.     In this case, FinCEN found BPA to be a financial institution of primary money

laundering concern without examining its legitimate business or reviewing BPA's compliance

measures, whether BPA was operating in accordance with all applicable legal regimes, whether

BPA had reported these problems and actively cooperated and whether, compared to other

banks, BPA was exceptionally ineffective in enforcing anti-money laundering measures.  This

information bears directly on whether BPA was properly found to be an institution of "primary

money laundering concern" and further whether it was deserving of § 311's harshest sanction. FinCEN's failure to consider this information renders the Notices unlawful for failure to comply with the statutory requirements.

101.    Moreover, the evidence upon which FinCEN based its conclusion is inaccurate, incomplete, and outdated.  FinCEN made no effort to consider evidence submitted by BPA and requested no information from it.   FinCEN ignored that BPA reported money laundering incidents to authorities, hired the best independent auditors in the world, and modified and improved its protocols in response to their findings.  FinCEN failed to supply all of the non-classified evidence on which the NOF and NPRM were based.  FinCEN also appears to have based its action on an undisclosed and improper collateral factor:  the need to bring the non-responsive Andorran regulators into line with FinCEN's regulatory agenda.

102.    The Notices reflect FinCEN's failure to consider the requisite § 311 factors or explain why BPA is of "primary money laundering concern."  Nothing in the Notices suggests that BPA exists primarily to launder funds or that it otherwise meets the standard of "primary money laundering concern" (which FinCEN has never defined).  To the contrary, the NOF makes clear that FinCEN did not examine the legitimate business of BPA or the extent to which FinCEN's Notices would impact the legitimate business of the Bank, relying on the legally insufficient assertion "[i]t is difficult to assess on the information available the extent to which BPA is used for legitimate business purposes."  NOF at 13466.  Section 311 does not excuse compliance based on professed "difficulty" encountered in following its dictates.  For FinCEN to propose the harshest possible sanction under § 311 without explaining how the facts of its investigation could satisfy the statutory predicates was arbitrary and capricious.

103.    FinCEN also failed to adequately account for the other factors that § 311 requires the agency to consider before deeming an organization to be of "primary money laundering concern" and proposing to impose the fifth special measure, such as the extent to which it was used for legitimate business and whether money laundering incidents supported terrorism or weapons proliferation.

104.    Relatedly, FinCEN further transgressed its authority to the extent that it actively encouraged global financial institutions and other governments to penalize BPA when it had yet to complete its own investigation.

105.    FinCEN has also proposed an excessive and disproportionate penalty while failing to explain why that penalty was adopted and why obvious alternatives were insufficient.  The mere fact of having made the proposal effectively foreclosed BPA from conducting business, especially as FinCEN's Notices implored Andorran regulators, and indeed all entities with whom BPA had a connection, to take the measures FinCEN had merely proposed, and which it was legally prohibited from enforcing itself.  FinCEN cannot attempt to be the world's AML policeman and then disclaim responsibility for the damaging and erroneous actions it puts in motion.

106.    For these reasons, the Notices are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, all in violation of the Administrative Procedure Act, and Plaintiffs accordingly request this Court to make such a finding and set aside the NPRM and rescind the accompanying Notice of Findings.

107.    Alternatively, the Court should order FinCEN to provide the documentary evidence that served as the basis for its decision to label BPA a "primary money laundering concern" and to impose the fifth special measure against FinCEN, as required by law, so that

BPA has full notice of the charges against it and the basis for those charges. The Court should also order that BPA be permitted an opportunity to file a response and be heard after receiving the evidence to which it is entitled.

## COUNT II – ADMINISTRATIVE PROCEDURE ACT

(FinCEN failed to follow the procedures required by the Administrative Procedure Act)

108.    Plaintiffs repeat, reallege, and incorporate the factual allegations in the preceding paragraphs.

109.    The Administrative Procedure Act requires a federal agency to notify interested parties of any regulation it proposes adopting. The notice must include enough detail of the factual and legal bases for the regulation to allow for meaningful and informed comment by interested parties. An agency's failure to reveal the factual basis underlying a regulation constitutes procedural error.

110.    FinCEN failed to provide adequate notice and meaningful opportunity for the BPA and/or Plaintiffs to respond to the charges against BPA, both before and after the issuance of the NOF and NPRM. Neither Plaintiffs nor the BPA was provided with notice of the NOF and NPRM before they were issued. The NOF and NPRM accuse BPA of a variety of misconduct; however the factual allegations are so vague that Plaintiffs could neither investigate nor adequately respond to them. The Ciercos, through counsel, repeatedly requested that FinCEN provide specifics of the accusations against BPA; however, FinCEN refused to provide this information or the evidence underlying the accusations.

111.    FinCEN relied on its unsupported accusations to designate BPA as an institution of "primary money laundering concern" deserving of the harshest special measure available.

Plaintiffs were unable to meaningfully comment on FinCEN's findings due to FinCEN's failure to provide the required information.

112.    The NOF and NPRM were thus issued without observance of the procedures mandated by the Administrative Procedure Act.

### COUNT III – DUE PROCESS

(FinCEN's actions deprived BPA and Plaintiffs of both property and liberty
in violation of the Fifth Amendment)

113.    Plaintiffs repeat, reallege, and incorporate the factual allegations in the preceding paragraphs.

114.    The Due Process Clause of the Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property without due process of law."  U.S. Const. amend. V. As such, due process demands that, prior to the loss of property or liberty, a person be given notice of the intended deprivation and an opportunity to contest it.

115.    The opportunity to be heard must, barring exceptional circumstances not present here, occur before the deprivation.

116.    The NOF is final.  The NPRM, however denominated, has the effect of a final rule.  The fact of their issuance, based on premature and unsupported conclusions, effectively deprived BPA of the right to its property, including its U.S. property – the correspondent accounts – without due process of law.  The Notices also deprived the Plaintiffs of property interests as directors and shareholders of BPA.

117.    In addition to causing the closing of the correspondent accounts, the NOF and NPRM caused BPA and Plaintiffs substantial and irreparable reputational harm.  By branding BPA is an institution of "primary money laundering concern," FinCEN sent a strong message that BPA is not a reputable business partner.  FinCEN further precluded BPA from doing

business as a bank in the United States and elsewhere by destroying BPA's reputation and encouraging government entities, including Andorran regulators, to take action against BPA. These actions deprived BPA and Plaintiffs of liberty without due process of law.  As a result of FinCEN's actions, BPA no longer has the liberty to transact business in the United States or elsewhere, or even to operate as a bank.

118.    Neither Plaintiffs nor BPA was provided with advance notice of the NOF issued by FinCEN, nor did any of them have notice of FinCEN's intention to issue an NPRM calling for imposition of the fatal fifth special measure.  Plaintiffs and BPA accordingly were not afforded a hearing or any other opportunity to voice their objections to the NOF or the publication of the NPRM, both of which resulted in the immediate loss of Plaintiffs' and BPA's U.S. property and liberty.  The risk of erroneous deprivation is particularly high in these circumstances where a financial institution is labeled of "primary money laundering concern" without any notice and where the impact of this label is virtually certain to cause the financial institution's operations to cease.

119.    For these reasons, Plaintiffs request that this Court rescind the NOF and set aside the NPRM on the basis that they unlawfully deprived BPA and the Plaintiffs of due process of law in violation of the Fifth Amendment of the U.S. Constitution.

120.    Alternatively, the Court should order FinCEN to provide the documentary evidence that served as the basis for its decision to label BPA a "primary money laundering concern" and impose the fifth special measure against BPA, as required by law, so that Plaintiffs and BPA have full notice of the charges against BPA and the basis for those charges.  The Court should also order that BPA and the Plaintiffs be permitted an opportunity to file a response and be heard after receiving the evidence to which they are entitled.

**COUNT IV – FINCEN EXCEEDED THE SCOPE OF ITS DELEGATED AUTHORITY**

(FinCEN was not authorized to issue a 311 notice
without examination of BPA's legitimate business)

121.    Plaintiffs repeat, reallege, and incorporate the factual allegations in the preceding paragraphs.

122.    Judicial review is permitted where an agency has exceeded the scope of its delegated authority, even where applicable statutes do not provide for a cause of action.

123.    FinCEN was required to consider, <u>inter alia</u>, the extent of BPA's legitimate business operations.

124.    FinCEN admits in the NOF that it did not ascertain the extent of BPA's legitimate business operations because, in its view, such operations were "difficult to assess."

125.    FinCEN thus exceeded the scope of its delegated authority by issuing the Notices without examining BPA's legitimate business operations or the extent to which the issuance of the § 311 Notices would impact BPA's legitimate business.  Had it done so, it would have seen tens of thousands of legitimate, compliant financial transactions that reflect thoughtful and rigorous compliance controls.

126.    Plaintiffs thus request that this Court find that FinCEN acted in excess of its delegated authority and rescind the accompanying NOF and set aside the NPRM.

**COUNT V – FINCEN EXCEEDED THE SCOPE OF ITS
DELEGATED AUTHORITY**

(FinCEN has failed to comply with its obligation to provide Plaintiffs
with the materials which serve as the basis for the charges)

127.    Plaintiffs repeat, reallege, and incorporate the factual allegations in the preceding paragraphs.

128.     Judicial review is permitted where an agency has exceeded the scope of its delegated authority, even where applicable statutes do not provide for a cause of action.

129.     The Administrative Procedure Act requires a federal agency to notify interested parties of any regulation it proposes adopting.   The notice must include enough detail of the regulation's content, and of its factual and legal bases, to allow for meaningful and informed comment by interested parties.   An agency's failure to reveal portions of the factual basis underlying a regulation constitutes procedural error.

130.     Defendants failed to provide adequate notice and a meaningful opportunity for the Plaintiffs to comment before BPA was labeled an institution of "primary money laundering concern."   In the NOF, FinCEN found that BPA was responsible for a variety of misconduct, including facilitating a handful of incidents of money laundering.   The NOF makes critical factual findings concerning how BPA operates, but offers only vague generalizations about BPA's misconduct and business practices.   Plaintiffs cannot properly investigate the claims or respond to them, since there is only speculation as to their significance.   Plaintiffs have repeatedly requested that FinCEN provide specifics of the accusations against BPA that would enable Plaintiffs to identify the alleged misconduct – but FinCEN has refused to supply this information.   FinCEN has yet to share the supposed evidence underlying these findings. Without such information, the Plaintiffs have been unable to comment meaningfully on FinCEN's findings.

## COUNT VI – MANDAMUS

131.    Plaintiffs repeat, reallege, and incorporate the factual allegations in the preceding paragraphs.

132.    After more than six months, FinCEN has declined to provide explanations, to rescind the defective rule or to issue a Final Rule.  FinCEN's failure to act is causing continuing harm to Plaintiffs and preventing Plaintiffs from mitigating their losses.

133.    To the extent that the NOF and NPRM are deemed, despite the significant and irreparable harm they have already caused, to not constitute final action subject to review, Plaintiffs submit that FinCEN should be ordered pursuant to the authority conferred on this Court by the All Writs Act, 28 U.S.C. § 1651, to issue a Final Order within thirty days of service of this Complaint so that its conduct can then be subject to full judicial review.

### Prayer for Relief

Wherefore, Plaintiffs request judgment be entered in their favor as follows:

A.    An order holding unlawful and rescinding the NOF and setting aside the NPRM.

B.    An order enjoining FinCEN from promulgating a Final Rule.

C.    Should the Court decline to rescind the NOF and set aside the NPRM, an order requiring FinCEN to provide Plaintiffs with the documents underlying its decision to issue the NOF and NPRM.

D.    Should the Court decline to rescind the NOF and set aside the NPRM on the grounds that they do not constitute final agency action, an order requiring FinCEN to either withdraw the NOF and NPRM or issue a final rule within thirty days of service of the complaint.

E.      An award of costs and attorneys' fees under any applicable statute or authority.

F.      A grant of such additional or different relief as the Court deems just and proper.


Dated:   Washington, DC
         October 7, 2015

                              LEWIS BAACH PLLC


                         By: s/ Eric L. Lewis
                              Eric L. Lewis (DC Bar #394643)
                              *eric.lewis@lewisbaach.com*
                              A. Katherine Toomey (DC Bar # 426658)
                              *katherine.toomey@lewisbaach.com*
                              LEWIS BAACH PLLC
                              1899 Pennsylvania Avenue, NW, Suite 600
                              Washington, DC 20006
                              (202) 833-8900


                              Aaron T. Wolfson *(pro hac* pending*)*
                              *aaron.wolfson@lewisbaach.com*
                              LEWIS BAACH PLLC
                              405 Lexington Avenue, 62nd Floor
                              New York, NY 10174
                              (212) 826-7001


                              *Attorneys for  Plaintiffs*

## **VERIFICATION**

I, Higini Cierco, hereby declare as follows:

I am a Plaintiff in the present case.  I have read the Verified Complaint.  Based upon discussions with and reliance upon my counsel and their investigation, and as to those facts of which I have personal knowledge, the Verified Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October __6__, 2015

_____
Higini Cierco

## VERIFICATION

I, Ramon Cierco, hereby declare as follows:

I am a Plaintiff in the present case.  I have read the Verified Complaint.  Based upon discussions with and reliance upon my counsel and their investigation, and as to those facts of which I have personal knowledge, the Verified Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October, 6th, 2015

_____
Ramon Cierco