# ATTACHMENT B

# Lewis | Baach pllc

Eric L. Lewis
202 659 7203
eric.lewis@lewisbaach.com

September 4, 2015

**VIA ELECTRONIC AND FIRST CLASS MAIL**

Ms. Jennifer Shasky Calvery
Director
Financial Crimes Enforcement Network
P.O. Box 39
Vienna, VA  22183

      **Re:  Banca Privada d'Andorra**

Dear Ms. Shasky Calvery:

As you know, this firm represents Ramon and Higini Cierco ("the Cierco Brothers"), the non-executive co-chairmen of the Grupo Banca Privada d'Andorra ("BPA Group"), who collectively are the controlling shareholders in the BPA Group. We write further to our letter of May 7, 2015, in response to the March 6, 2015 Notice of Finding regarding Banca Privada d'Andorra ("BPA"), as well as further to our letter of July 22, 2015 to Stephanie Brooker (copy attached hereto for convenience), to which we have to date received no response.

You will of course be aware of the Preliminary Injunction entered by Judge Cooper of the United States District Court for the District of Columbia on August 27, 2015 in the case of *FBME Bank Ltd.* v Lew, Case No. 15-cv 01270 (CRC). Judge Cooper found in pertinent part that FinCEN had failed to comply with the requirements of the Administrative Procedure Act, ("APA") in two material respects. First, FinCEN failed to provide all the public information on which it relied in issuing its final rule, which found that FBME was an institution of "primary money laundering concern," and second, FinCEN failed to explain why potentially viable but less drastic alternative penalties were not imposed rather than the fifth special measure, which prohibited domestic financial institutions from maintaining correspondent bank accounts with FBME. For the reasons discussed below, we submit that the FBME Preliminary Injunction has direct applicability to BPA and creates an opportunity for FinCEN to assess the exercise of its discretion under the very different context that has emerged since the issuance of the Notice of Finding against BPA on March 6, 2015.

We note that the FBME Notice of Finding contained specific findings of money laundering activity that was far more widespread and raised far more grave national security concerns than the specific findings made in the Notice with respect to BPA. The FBME Notice and Final Rule found, *inter alia*: i) money laundering on behalf of a financier for Lebanese Hezbollah, ii) financial transactions on behalf of companies that were fronts for a sanctioned

# Lewis | Baach pllc

Ms. Jennifer Shasky Calvery
September 4, 2015
Page 2

Syrian proliferator of weapons of mass destruction ("WMD"), iii) transactions on behalf of another company that was subject to international sanctions, and iv) transactions involving proceeds of foreign corruption offenses perpetrated by the President of Equatorial Guinea. Moreover, it appears from the record in the FBME matter that these violations were not self-reported by FBME, but were discovered by government officials through classified investigations.

The position is entirely different with respect to BPA. You will be aware from our various communications that the three principal cases cited by FinCEN in the Notice of Proposed Rulemaking were reported *by BPA* to the Andorran regulator a year before the issuance of the Notice. These matters were all the subject of governmental action in which BPA was fully cooperative. Your office commended and thanked the Andorran government for its cooperation, yet it appears that the Andorran regulators failed to inform FinCEN that BPA had reported these matters voluntarily long before the issuance of the Notice of Proposed Rulemaking. This was part of a pattern of reckless misfeasance and non-responsiveness by the Andorran regulators, which, as noted by Mr. Anton Smith of the United States Embassy in Spain, led FinCEN to "use the hammer" of a Section 311 Notice and proposed imposition of the most severe sanctions, the fifth measure, against BPA.

Invoking the FinCEN Notice, the Andorran regulators, in an attempt to deflect attention from their own failures, have expropriated the bank and appear poised to dispose of it in a manner that is devoid of transparency, will waste hundreds of millions of euros of value, cause thousands of depositors to lose money and put hundreds of people out of work. Andorran regulators have also refused to allow meaningful participation by the Ciercos in the resolution of BPA assets, again invoking the FinCEN Notice. We view it as essential that FinCEN take responsible steps to stop the chain of injustice that Andorra put in motion with its misfeasance and for which the Ciercos are paying the price, both financially and reputationally. We accept that BPA may have had certain compliance issues, as does any bank. But there is no suggestion of any connection to terrorism or weapons of mass destruction or any other core issue of national security. Stated simply, these issues did not provide a predicate for imposition of the fifth special measure, effectively closing the bank. The issues identified by FinCEN in the Notice i) were reported by BPA; ii) must be considered in the context that the Board of BPA was receiving clean financial and AML audits from the world's leading auditors; and iii) did not rise even close to the severity of FBME or indeed to those of any of numerous financial institutions such as Wachovia, HSBC and others, who were merely fined. Thus, the imposition of the most severe sanction, the fifth measure, is entirely unexplained and appears to be wholly unjustified by evidence or precedent. As noted in the Ciercos' comments, the actions of the Directors of the Board of BPA, in voluntarily seeking out a EU regulatory regime through expansion into Spain, in its employment of and responsiveness to its auditors, and its steady growth into the asset management business primarily through Spain, are indicative of a responsible and transparent institution, not an institution seeking opaque or improper business. The Andorran regulators were unambiguous in noting BPA's proactive approach. The Head of the Andorran Financial Intelligence Unit, Carles Fiñana Pifarré stated in his most recent certification:

# Lewis | Baach pllc

Ms. Jennifer Shasky Calvery
September 4, 2015
Page 3

> [BPA] strictly complies with the legal precepts contained in the [Andorran AML] Law, having furthermore been subjected to successive external audits, that certify not only the foregoing, but also that it has the necessary mechanisms for training and prevention.

> I can furthermore confirm that in the last three years BANCA PRIVADA D'ANDORRA S.A. has not been object of any corrective action or penalizing measures on money laundering and terrorism financing.[1]

Similarly, an earlier review conducted by Josep Maria Francino Batile of the Andorran Money Laundering Unit, stated:

> That each year BANCA PRIVADA D'ANDORRA sends this Unit an audit in which the internal procedures on money laundering and terrorism financing are reviewed and their adaptation to the standards of Andorra. From those audits it is deduced that BANCA PRIVADA D'ANDORRA complied with the requirements of Andorra law on money laundering and terrorism financing.[2]

Had Andorran regulators identified *any concerns whatsoever* the Cierco Brothers would have insisted that BPA executives address those concerns. The regulators said nothing. It now is clear that FinCEN may have had systemic concerns with the Andorran regulators and the Andorran financial system. But BPA operates within the Andorran system. And systemic concerns require systemic solutions resolved on a government-to-government basis, not "using the hammer" on a single bank as was done here.

We would respectfully submit that Judge Cooper's ruling imposes certain requirements on FinCEN, but more importantly creates important opportunities with respect to the wise use of FinCEN's discretion with respect to BPA. We would request that FinCEN withdraw its March 6, 2015 Notice of Finding and reconsider whether any action, or different action, is required in view of intervening developments that wholly transform the context and evidentiary basis of the earlier Notice:

- It now appears clear that FinCEN based its action on the failure to cooperate of the Andorran authorities in making necessary systemic reforms to money laundering legislation and enforcement, as well as incomplete and inaccurate information provided by the Andorran government.

---

[1] Original and Translation of Certification of Financial Intelligence Unit, Principality of Andorra (Sept. 17, 2012).

[2] Original and Translation of Certification of Money Laundering Unit, Principality of Andorra (Jan. 12, 2009).

# Lewis | Baach pllc

Ms. Jennifer Shasky Calvery
September 4, 2015
Page 4

- BPA disclosed information regarding the cases to its own regulators about money laundering issues it detected and that BPA's self-disclosure was in turn *not* revealed by Andorra to FinCEN.

- In March 2014, more than a year *before* the FinCEN action, BPA sent a letter to its regulators proactively reporting to the Andorran regulators three instances of money laundering, all of which became the subject of criminal proceedings. (Letter attached) These three cases were the three cases cited by FinCEN in its notice a year later, without any acknowledgment that it was *BPA* that had reported these incidents to its regulators, which is exactly what it was supposed to do.

- It now appears that Andorra failed to share the March 2014 letter with FinCEN and failed to tell FinCEN that BPA had indeed reported these incidents and taken all necessary action. *In other words, it appears that FinCEN took its action based upon an egregious failure to disclose by Andorra, leading FinCEN to the conclusion that BPA was hiding money laundering rather than the opposite and correct position—that BPA was proactive in reporting incidents for regulatory follow up.*

- Andorra was asked to improve procedures with respect to cash reporting. Andorra gave the request no serious consideration and was unresponsive generally to FinCEN requests. Mr. Anton Smith, Economic Counselor at the US Embassy to Spain confirmed that the US was seeking cooperation from Andorra with respect to various AML measures, including most importantly reporting requirements on cash transactions. He stated, "With respect to Andorra, last year, we signaled our discomfort with an official report identifying problems in the system there. I will not say that they did not realize it but they did not react with appropriate vigor and *we had to use the hammer*." The hammer was the 311 Notice, reflecting, in diplomatic language, Andorra's refusal to be responsive to US requests for action on its banking sector. BPA, however, was designated as the victim, despite numerous incidents of drug money laundering by other Andorran banks, which were *not* self-reported.

- At the time of its shutdown BPA had a value of 600 million Euros. Andorra now puts a negative value on the bank, so that it can justify its wasting of assets on fruitless searches for money laundering activities within BPA. PwC has been investigating for six months, has been paid tens of millions of dollars, has invested more than 100,000 hours investigating BPA, and has found no material money laundering issues. In the interim, Andorra is taking steps to quickly and irresponsibly arrange a non-transparent low-ball sale to purchasers who will cooperate in covering up what happened.[3]

- The Andorran authorities have indicated that the rationale for a "resolution" scenario rather than a reconstruction was because FinCEN would not accept a less draconian outcome.

---

[3] After seeking a dialogue for months with the Andorran government, Agencia Estatal de Resolució d'Entitats Bancàries ("AREB"), has finally agreed to meet, but only on the condition that the Ciercos sign a Confidentiality Agreement that would effectively place a veil of secrecy over all of AREB's actions and deprive the Ciercos of the opportunity to take any effective action based on information obtained.

# Lewis | Baach pllc

Ms. Jennifer Shasky Calvery
September 4, 2015
Page 5

- The transfer of the assets to a "bridge bank" as contemplated over the next few weeks would be a potentially irreversible step with devastating consequences.
- We would respectfully request that FinCEN exercise its important authority to bring rationality, balance and fairness to the process.

We would submit that withdrawal of the Notice would be an appropriate and prudent course in view of these developments. FinCEN can then reconsider whether a Notice is required based upon an accurate record and, if it concludes that a Notice is required, it can consider what sanction is appropriate in view of the very different set of circumstances now evident. This would allow FinCEN to focus on the critical systemic issues it has identified in Andorra. We would also ask that as part of its dialogue with the Andorran authorities, FinCEN urge the Andorran authorities not to rush to judgment with the plan of resolution and that it encourage the authorities to engage all stakeholders to avoid a long, contentious and wasteful process. At the very least, FinCEN should withdraw the Notice and issue a revised Notice that meets the requirements set forth by Judge Cooper under the APA: i) disclosure of all non-classified material that was considered in issuing the Notice, with an opportunity to respond by BPA; and ii) a comprehensive discussion of the consideration of lesser penalties and the reasons why such penalties were not selected.

We would respectfully submit that Andorra's lack of responsiveness has precipitated a state of affairs that is as awkward for FinCEN as it is unjust for the Ciercos and other stakeholders in BPA. The situation can and should be corrected before any further time or resources are expended on a rulemaking that is fatally flawed. Because AREB has threatened to take the potentially irrevocable step of proceeding to implement its illegal resolution plan in the next few weeks, we would respectfully request a response to this letter by September 21, 2015.

Sincerely,

Eric L. Lewis
Manuel S. Varela
Aaron T. Wolfson

# Lewis | Baach pllc

Eric L. Lewis
202 659 720?
eric.lewis@lewisbaach.com

July 22, 2015

Stephanie Brooker, Esq.
Director, Enforcement Division
Financial Crimes Enforcement Network
1801 L Street NW
Washington, D.C. 20006

### RE: BPA - Ramon and Higini Cierco

Dear Ms. Brooker:

Thank you again for taking the time for you and your team to meet with us on July 15, 2015. As we discussed at our meeting, and recognizing that this matter is the subject of ongoing administrative proceedings, we are putting in writing our request to FinCEN to accept certain information, described below, that we submit is material to the proposed rulemaking involving Banca Privada d'Andorra ("BPA"). We also ask that FinCEN communicate to the Andorran government that it does not object to the Ciercos' participation in the resolution of the remaining BPA assets. Finally, we also request certain information which we hope FinCEN will be in a position to provide.

As discussed, the Ciercos were not involved in the day-to-day operation of BPA. The Ciercos relied on banking professionals to manage the bank, and authorized the engagement of KPMG and Deloitte to report on significant compliance issues, including anti-money laundering ("AML") compliance. The AML audit reports that KPMG and Deloitte delivered consistently confirmed that BPA maintained proper AML controls. In addition, the Ciercos understood that BPA management proactively made required reports of suspicious activity to regulators and responded appropriately to requests for information. As we emphasized, the Ciercos had a record of taking appropriate action, including termination of employees, and would have cooperated fully with regulatory authorities had that request been made prior to the announcement of the Section 311 Notice. On their behalf, we reiterate their offer to meet and cooperate with FinCEN and other foreign authorities to help ensure that all legitimate law enforcement objectives are fulfilled and in the hope that the assets of the valuable BPA franchise are not wasted.

## The March 24, 2014 Letter to INAF

The bona fides of our representations are confirmed, significantly, by a March 24, 2014 letter that BPA addressed to Maria Cosan, head of the Andorran INAF. In the letter, BPA self-identified and reported each of the specific alleged instances of money laundering alleged in the March 10, 2015 Section 311 Notice. Indeed, BPA's disclosure came five months prior to the initial contact between the U.S. Embassy and Andorran government in August 2014, and a year before FinCEN's issuance of the Section 311 Notice. Notably, after it submitted the March 24, 2014 letter, BPA received no follow-up questions or feedback from the Andorran regulators.

# Lewis | Baach pllc

We request that FinCEN agree to accept a copy of the March 24, 2014 Letter.  We submit that BPA's self-identification and self-reporting of these matters is inconsistent with the conclusion that BPA was an institution with inadequate AML controls.  Indeed, given that BPA's own report may well have initiated the very matters that formed the Section 311 Notice predicate, we submit that BPA could not be labeled an organization of primary money laundering concern based upon these cases.  To the extent that the Andorran regulators failed to provide FinCEN the March 24, 2014 Letter, this supports our contention that Andorran regulators acted with recklessness or willful blindness, and may have spurred FinCEN into precipitous and irreversible actions based on erroneous premises.

**FinCEN's Non-objection to the Ciercos' Participation in the Resolution of BPA.**

We also request that FinCEN communicate to the Andorran government that FinCEN does not object to the Ciercos' participation in plans to resolve the BPA assets.

Since the FinCEN's issuance of the Section 311 Notice, the Ciercos have made repeated formal requests to the Andorran government for information regarding the Andorran government's seizure of BPA and to commence a dialogue with respect to proposed actions.  Nevertheless, the Andorran government has neither documented nor otherwise told the Ciercos why they were ousted from the BPA Board of Directors and have excluded them from all processes related to BPA's resolution.

At our meeting, we represented to FinCEN that the Ciercos were told informally by Andorran government representatives that the Andorran government will neither communicate directly with the Ciercos nor consider their input with respect to the resolution of the BPA assets because the Andorran government fears FinCEN's potential disapproval or reprisal.  You suggested that we document the source of such communication.  On June 25, 2015, Mr. Cesar Goyache, the CEO of AREB (the Andorran organization set up to handle BPA post-Section 311 Notice) was asked by the Andorran parliament to report to its Economy & Finance Commission.  In a question and answer session, Mr. Goyache was asked why AREB had not communicated with the Ciercos, and if the Ciercos could remain shareholders in the new, resulting financial entity once BPA is restructured.  In response, Mr. Goyache stated in substance that, while it was true that original shareholders are usually part of the "restructuring" process, the Ciercos would not be in this case.  Mr. Goyache asserted that the Section 311 Notice evidenced FinCEN's distrust of the Ciercos because they are ultimately responsible for the bank's management.  Consequently, according to Mr. Goyache, it would not make sense for the Ciercos to be part of the process, and it would be impossible for them to be shareholder of the new, resulting entity.  As Mr. Goyache stated, "Let's look at it with the perspective of trust, let's put ourselves in FinCEN's shoes."  (See http://www.consellgeneral.ad/ca/videos/compareixences-publiques/2015-06-25-comissio-de-finances-i-comissio-especial-de-vigilancia-i-prevencio-de-risc-per-a-l2019estabilitat-financera-conjuntament, minutes 59 through 68)

We submit that, to the extent the Andorran government fears FinCEN disapproval or reprisal, the Andorran government is mistaken.  It defies common sense to conclude that FinCEN would express a position to another regulator one way or the other regarding who should control a re-organized banking institution.  Indeed, for the reasons explained below, there is no legitimate reason why the Ciercos should not participate in the bank's resolution, and every reason why they should do so.  Nevertheless, to the extent that the Andorran government misunderstood or misrepresented FinCEN's

# Lewis | Baach pllc

position with respect to the Ciercos, we submit that it is fair and proper that FinCEN should correct it by communicating directly to the Andorran government that it has no objection to the Ciercos' participation in the resolution of the BPA assets. Moreover, as referenced at our meeting, it would be in the interest of all stakeholders, including regulators, that the BPA situation be resolved in a professional and responsible manner to preserve commercial value consistent with the relevant law enforcement interests.

Indeed, we submit that the event chronology strongly supports the conclusion that one of FinCEN's primary concerns was the Andorran government's failure to respond and cooperate with FinCEN. The Ciercos, on the other hand, want to cooperate (as evidenced by their request to provide FinCEN the March 24, 2014 Letter). Nevertheless, the Ciercos are excluded from BPA's reorganization not because of anything that they have done or not done, but apparently because the Andorran government fears FinCEN's reaction. This is a wholly unsatisfactory state of affairs that should properly be resolved. We understand that it is not FinCEN's role to interfere in internal Andorran politics; we ask merely that FinCEN state that position with certainty, and confirm that it has no objection to the Ciercos' playing a rule in their resolution.

The Ciercos have the knowledge, financial sophistication and motivation to put together a viable commercial plan to preserve BPA's value in a responsible manner. They can and should be part of the solution. The Ciercos wish to work jointly with the relevant authorities to make sure that the value in the bank is preserved and maximized without risk to the Andorran financial system or to relevant law enforcement interests. In addition, the Ciercos are entitled to realize some of the value in the bank through fair payment or passive shareholder participation in a new or restructured institution. They are entitled to have their reputations cleared and their interests respected.

## Proposals

As discussed in our July 15, 2015 meeting and outlined in our presentation provided to you, on behalf of the Cierco's we put forth the following three proposals and ask for FinCEN's public support for, or private communication to the Andorran government that it has no objection to, one of these proposals, and the Ciercos' proposed role in its realization.

*Proposal #1: Support the Ciercos' participation in the resumption of operations of BPA under previous ownership with strict conditions and supervision*

We request that FinCEN support (or take no objection to), the return the bank to the control of the Ciercos under strict conditions and supervision. The Ciercos will ensure that:

a. An Independent Monitor for all international wire transactions is hired for a proscribed period of time. This is done routinely in U.S. and international institutions with far larger problems (e.g. Wachovia, HSBC, BNPP).

b. Prohibition on cash deposits above *de minimis* threshold.

3

# Lewis | Baach pllc

    c.   Monthly AML risk reports to FinCEN and regulators.

    d.   Install new senior management subject to pre-approval by monitor.

    e.   Annual KYC Review of all clients maintaining balances over $100,000.

    f.   Bank will employ international best practices for AML as dictated by US standards and subject to active monitoring.

We submit that the above proposal would provide far more assurance of effective oversight and AML prevention than is currently the case with respect to any other Andorran financial institution, while allowing a solvent, dynamic institution to continue to serve its core depositor base, with its loyal existing staff and new, professional management.

*Proposal #2 – Support for Commercial Sale of BPA to Another Financial Institution*
Alternatively, we request that FinCEN support (or take no objection to) the Ciercos involvement in the sale of BPA to another bank.

    a.   The Ciercos will participate in a transparent process that ensures that the assets of the bank are sold to another financial institution in an orderly commercial manner and reasonable timeframe with independent professional advisors charged with maximizing value.
    b.   The Ciercos would be permitted to play a constructive part in the sale negotiations to maximize value.
    c.   The Ciercos would be compensated for their interest in the bank when it is sold.

This option would enable the Ciercos to bring their knowledge of the relevant market to facilitate an orderly, commercial sale at market value and to prevent either waste of assets in the sales process by the Andorran authorities or a windfall to a prospective purchaser if the process is not transparent, orderly and commercial.

*Proposal #3 – Support Restructuring of BPA into a New Venture*

Alternatively, we request that FinCEN support (or take no objection to) the Cierocs constructive participation in the restructuring of BPA into a new venture. That venture could take the form of a cooperative or social bank where depositors and employees take ownership interests, a model which has worked extremely well in similar markets. The Ciercos would take no active management role in the new venture and would be shareholders in the new venture.

# Lewis | Baach pllc

## Follow up Questions

There are numerous questions that have arisen based upon the actions of the Andorran government and the comments by representative from the US Embassy in Madrid regarding this matter. Below we respectfully submit some of our outstanding questions.

1. Did the Andorran Government make FinCEN aware of BPA's March 24, 2014 letter and active cooperation in the matters cited in the Section 311 Notice?

2. Was FinCEN aware of the ongoing legal proceedings with respect to these matters?

3. Were there other cases or matters that were not disclosed that would warrant a Section 311 Notice or does FinCEN rely principally on these previously disclosed cases as discussed in the March 24, 2014 letter?

4. Why was BPA the subject of "the Hammer" when the Andorran government itself appears to have acted with willful neglect and denial of systemic issues? By "the Hammer" we refer to the statement made by Mr. Smith, Economic Counselor of the U.S. Embassy in Madrid, when he stated at an AUSBANC conference on April 21, 2015, "With respect to Andorra, last year we signaled our discomfort with an official report identifying problems in the system there. I will not say that they did not realize it but they did not react with the appropriate vigor and we had to use the hammer." (*See* http://youtu.be/j2aPNwxlp–w, minute 57)

5. It is our understanding that BPA does business under rules and in a manner that is similar to other Andorran banks. Were there factors which distinguished BPA from other Andorran banks that led to the Section 311 Notice against BPA? Was those factors reflected in the notice? Were other measures considered?

6. Was the US Government concerned with the Andorran financial system as a whole? Or were there separate discussions with Andorran officials specific to BPA before "the Hammer" was used?

7. At what point and why did FinCEN's attention turn from the Andorran financial system to BPA?

8. The Andorran government's response did not seriously address the issues in the August 2014 communication and rejected the critical suggestions made by FinCEN regarding cash transaction reporting. Did the U.S. government try to impress upon Andorra the need to reform its system?

9. Were there other communications between August 2014 and March 2015 regarding BPA with the Andorran government? Did FinCEN specifically discuss the possibility of a Section 311 Notice with the Andorran authorities? Was there a discussion about a Section 311 against more than one Andorran Bank? Against all banks in Andorra?

5

# Lewis | Baach pllc

10. What is the content of the January 6, 2015 communication to the Andorran government?

11. The Ciercos believe that there is strong prima facie evidence that BPA paid the price for the Andorran government's failure to respond with due expedition and diligence to U.S. requests. Are they right or wrong?

Our clients wish to be fully cooperative with FinCEN in this investigation and are prepared to offer any additional information in their possession. We look forward to hearing from you and would be pleased to meet with you again at your convenience.

Sincerely,

Eric L. Lewis

6



### BANCA PRIVADA D'ANDORRA

Escaldes-Engordany, 24 March 2014

Ms. María Cosan Canut
Managing Director
Institut Nacional Andorrà de Finances
c⁄ Bonaventura Armengol, 10
Ed. Montelar, bl. 2/4
AD500 Andorra la Vella

Ref. Communiqué EB 02/2014 - Requirement for information concerning significant
facts which may have an impact on the reputational risk of the Andorra financial system

Dear Madam,

Further to the Communiqué issued by your Institut Nacional Andorrà de Finances
(hereinafter "INAF") number EB 02/2014 - Requirement for information concerning
significant facts which may have an impact on the reputational risk of the Andorra
financial system, by means of which the institutions were requested to report any fact
that could have a significant impact on the reputational risk of the institutions that
operate in the Andorra financial system or of the group which this heads and/or the
actual Andorra financial system, below there follows a description of the cases
registered at Banca Privada d'Andorra S.A. (hereinafter "BPA").

## A. BANCA PRIVADA D'ANDORRA, SA

### 1. Operation Norman Danilo PUERTA VALERA

**Background**

On the 16 August 2007 a declaration of a suspicious operation was submitted to the
Financial Intelligence Unit relating to clients Tulio Antonio Hernández Hernández and
Gabriel Ignacio Gil Yáñez, and also the company North Hilton Investments, Inc., *inter
alia*.

The reasons for submitting the declaration of suspicion (DOS) are that Mr. Gil was
making cash deposits and was submitting the entry of funds in Spain as supporting
documents. BPA required him to submit the complementary papers that evidenced the
origin of the funds but these were not provided. The identity documents which these
gentlemen submitted were Venezuelan diplomatic passports.

The UIF carried out its enquiries and sent the dossier to the Public Prosecutor:
preliminary proceedings DP- 3876-3/07 were opened on the 20 December 2007 and by
writ of 7 March 2008, it was ordered to block the funds.

Mr. Puerta visited Andorra and was arrested; he testified to the judge on the 15-06-2010 and as consequence of this, the judge ordered the arrest of Mr. Pablo Lapiana, of Ms. Mariela Prieto, of Mr. Antonio Zalvador and of Ms. Cristina Lozano.

On the 18-06-2010 Mr. Pablo Lapiana testified to the judge, who ruled a writ invalidating the arrest and no charges were presented against him.

In the next few days Ms. Isabel Sarmiento Fuertes and Mr. Xavier Mayol testified to the police and/or the judge, both declaring as witnesses.

Finally, the Judge ordered the release of Mr. Puerta and he returned to Venezuela.

On the 27-09-2011 Mr. Puerta came back to Andorra and was arrested until the 1-11-2011. In the writ of provisional release the trial judge considers that the participation of BPA "(...) *has not simply been that of receiving money from unknown persons and reporting the procedure for receiving the transfers as suspicious, as originally appeared in the declaration of suspicion of the Bank's Department of Compliance, but that another department of the bank, the one dedicated to the international expansion, is the one which decides to attract this capital, transferring personnel to the actual Venezuela, that these people receive the money and that the actual bank creates the mechanisms to make it possible to transfer capital from Venezuela to Andorra"*.

The possibility that the Trial Judge could consider that the actions of the bank institution may constitute a money laundering offence can be deduced from the above transcript; it can therefore be said that according to the information which the Public Prosecutor has available, at this date there has been no request to accuse the bank institution as legal entity and there are few possibilities of it doing so.

**Present situation**

At this date, we have not received any further communiqué from the judicial authorities since 27-9-2011.

The accounts are blocked and the investigation of the case has not yet concluded.

The sum of the blocked balances amounts to approximately EURO 863,000.

## 2. CASE TC- 126-3/11, BPA/CALVENTE

**Background**

On the 1 September 2011, BPA filed an accusation against Mr. Antoni Calvente, manager of the Private Banking Department, because various irregularities had been detected regarding a number of different clients' accounts. Mr. Calvente was carrying out irregular operations and without consent with the clients of his own portfolio, all of them non-residents in the Principality of Andorra, and he managed to recover, in his favour, and for an unknown final destination, a fraudulent amount in the order of six million euros.

The total cost which BPA considers Mr. Calvente had evaded was EURO 5,187,487.04.

The bank's insurance company met the payment of EURO 4.363.584. The damage which the bank has suffered has been EURO 823.902.14.

Mr. A. Calvente was convicted to a three year prison sentence and to a fine of EURO 350.000 and to pay the court costs, in a judgement ruled by the Supreme Court of 5 September 2013, for being responsible as perpetrator of major crime of qualified embezzlement and of minor offences for creating and using non-authentic document.

Mr. Calvente's defence filed an appeal against the said judgement and on the 23 January 2014 the Superior Court ruled a judgement partly allowing the appeal and convicting Mr. Calvente to a 30 month prison sentence and to pay a fine of EURO 250.000 with official declaration to pay the court costs incurred, for being criminally liable as perpetrator of the major crime of qualified embezzlement and of the minor offences of creating and using a non-authentic document.

**Present situation**
The bank's insurance company has covered the fraud orchestrated by Mr. Calvente for a sum of EURO 4.363.584. The loss amounts to EURO 823.902.14 reserving civil actions to file a civil claim against this person.

## 3. PETROLI OPERATION

### Background
Investigation of the UIF initiated on 13-04-2010 - Ref. 423/10 INV with the request for information concerning HIGHLANDS ASSETS CORP. On 09-09-2010 - Ref. 476/10 INV the UIF requested information about Omar FARIAS LUCES, WESTSHORE INTERNATIONAL MILITED and MEMOSER INSURANCE COMPANY. On the 3-10-2011 - Ref. 745/11 INV, the UIF asked for information about LOMOND.

On the 25-9-2012 the UIF unified all the requests in three records, references no. 346-12, 347-12, 348-12 and they were forwarded to the Public Prosecutor.

Judge Ms. Canòlich Mingorance Cairat, through the police court on the 30-11-2012 (DP- 3434-12), ordered the blocking of funds relating to Luis Mariano Rodríguez Cabello, Estíbaliz Basoa de Rodríguez, Diego José Salazar Carreño, Rosycela Díaz Gil, Omar Jesús Farias Luces, José Luis Zabala and José Enrique Loungo Rotundo.

The total blocked funds amount to approximately EURO 192,000.000, a part of which have been transferred to the INAF by order of the Judge, and the remainder has been invested.On the 17-12-12 the UIF carried out an inspection in situ of our bank and required documentation of records 346-12, 347-12, 348-12 from the 25 September 2012 until the 30 November 2012.

The UIF carried out a new inspection in situ on the 27-12-2012 and requested additional documentation concerning the persons object of investigation in the above-mentioned records.

Lastly, on the 31-01-2013 the UIF notified us of the opening of the penalising record no. 01-13 PRO ADM on Banca Privada d'Andorra with regard to those records.

The Judge has received the documentation of the operations and has taken a statement from the manager, Pablo Laplana.

## Present situation

In the framework of the penalising record 01-13 PRO ADM, the UIF is taking a statement from the employees who have been involved with the Venezuela clients, whether as managers or as members of the Department de Compliance, BPA Serveis or as members of the PBC or CAC Committee.

In addition, and as regards the administrative record opened by the UIF and considering that we are at the preliminary investigation of the case, in which the formalities that the examining body has made have been the communication/notification of the sentence for preliminary proceedings and taking statements from the people who have been managers of the clients and of the members that formed or that form the Money Laundering Committee of BPA, at this date, the reputational and economic risk that its opening may involve cannot be assessed with certitude, since at this date what the examining judge has done has been to take evidence that it has considered suitable to clarify the facts object of the opening of the proceedings. And it will be in view of the evidence taken when it will draw up a statement of objections, in which it will make a recital of the formal charges, the legal precepts infringed and the proposed penalty, in accordance with the provisions of article 57 and concordant ruling of the current Law on international penal cooperation and on securities or money laundering, product of international crime and against the financing of terrorism. In accordance with that regulation, the infractions may be mild, serious and very serious. The penalties vary between a written reprimand and a fine of EURO 600.000 and the temporary or final suspension of the leaders of the bank institution or of the professional in question.

Consequently, and considering the procedural situation in which the administrative record opened by the UIF is found, no assessment can be made about whether the examining judge will in the end draw up a statement of objections or not. Any approximation about the legal, reputation risk or another, in our opinion could prove erroneous.

In addition, the Judge is waiting to receive a reply to the letters rogatory sent to third countries. He is specifically waiting to receive a reply from the United States of America. Presumably the blocking will be lifted in 2014.

## 4. EMPERADOR OPERATION

### Background

Arrest in Spain of a Chinese network presumably dedicated to money laundering of different crimes. Order to arrest a manager of BPA, Mr. Sergi Fernández, accused as collaborator of that network in Spain.

The judge authorised a search at the personal and work address of Sergi Fernández. He also authorised telephone tapping for one month. There is no judicial investigation regarding accounts in Andorra and, at the request of BPA, the Judge drafted us a document in which he made it clear that there is no other investigation in progress in Andorra that could affect BPA in this matter. Enclosed you will find a copy of the document.

The UIF at the same time initiated an investigation about these clients in the year 2012 with record number 494-12 EX, in which it asks us to report if there are movements.

**Present situation**

After the accounts were blocked, Mr. Rafa Pallardo (father of the accused) and joint holder of the account with his son, has opened a new account and has transferred 50% of the balances. This operation was reported to the UIF, the case was resumed and was finally sent to the Public Prosecutor on 20 December 2013.

On the 10 March 2014, the Judge informed us that the funds of Mr. Pallardo's accounts had been blocked.

Regarding the court case in Spain, Mr. Sergi Fernández was charged and made a statement at the National Court and was released without bail with the obligation to report to the court every fortnight and to reside in Spain.

## 5. CLOTILDE OPERATION

**Background**

An international letters rogatory, the CRJ-022-3/13 dated 25 January 2013, from Spain requesting the blocking of funds relating to two clients of Russian nationality who were arrested in Lloret de Mar for an alleged money laundering offence.

It should be mentioned that, in the framework of the enquiry in Spain, the Spanish judge authorised telephone recordings of Mr. Pablo Laplana. These talks were sent to the Andorra judge in the framework of the Emperador Case in the event that they could be useful for the enquiry.

It should be observed, for the appropriate legal effects, that the affected persons, Mr. De Rosselló and Mr. Campos, filed an appeal to the court and, on the 13 March 2014, the Constitutional Court ruled a judgement in which it has allowed the appeal for protection filed by the parties and has resolved the retraction of the writs to the time when the infringement took place, namely to the 10 July 2013, which was the date on which the 'Tribunal de Corts' ruled the writ declaring that the affected persons did not have the right to file an appeal against the writ that agreed to the telephone tapping of the affected persons.

In addition, it should be stated that the significant facts described in the preceding paragraph were brought to the notice of this Instituto Nacional Andorrano de Finanzas in notifications on the 7 and 27 August 2013 and on the 2 September 2013.

**Present situation**
We have no information about whether preliminary proceedings have been opened in Andorra although it should be observed that it has been requested that the funds be deposited in the account of the INAF. The total amount of funds affected amounts to USD 63,148,063 with an equivalent value of approximately EURO 59,465,152.

## 6. BLACK HOUSE WORDWIDE SECURITY

**Background**
On the 19 February 2014, a call was received from a person by the name of Mr. Dimitar, who was phoning on behalf of the company Black House Wordwide Security, and who explained that he was in possession of private information about various clients of the bank, contacts of clients, account numbers, movements and that he wanted to speak to the director.

On the 21 February a mail was sent to Mr. Dimitar to inform him that we were interested in the information but that it was also necessary to have a specimen of the information.

On the 22 February 2014, Mr. Dimitar informed us by e-mail that he had spoken to the confident of Antoni Calvente and that according to the information he had given him, he is in possession of 54 contracts (Spanish and French) and of a file with 300 accounts with balances, investments and names. Consequently, in order to be able to make the trip to meet with Mr. Antoni's representative, they had to deposit 4,000 euros, before Monday, in an account which he would provide and which should be sent via Western Union o MoneyGram to Ukraine in the name of Georgi Kostadinov, Dimov.

The facts were reported from the very start to the Police Service and in a verbal communiqué by the Managing Director to the Directorate General of the INAF. Later, Mr. Jesús Jiménez's legal counsel entered an appearance for and on behalf of Banca Privada d'Andorra SA in case 3069-4/13 and gave us a copy of the actions which the court was carrying out regarding the case, considering that there was another entity affected for the same facts and the same people.

**Present situation**
At the moment we have no contact with Mr. Dimitar and, after a valuation of the agents involved, it is considered that the declarations made by Mr. Dimitar were not true.

On the other hand, we would like to state that this is the situation of relevant facts of BPA and that there are no other relevant facts that affect the other entities that form the

BPA Group either in Andorra or abroad, where the Group is carrying out activities. Nor is there any member of the Senior Executive who is affected by a disciplinary procedure opened by a supervisory authority in Andorra or abroad and which could imply a reputation al risk for the bank or for the Group which this heads.

**7. Appeal filed at the Government of Andorra against the Decision of the Government for infringement of article 15.4 of the Law on indirect tax regarding the provision of bank and financial services, concerning the bank and financial services for the year 2011**

**Background**

On the 2 February 2012, Banca Privata d'Andorra SA filed a request at the Ministry of Finance for exemption from ISBF for the year 2011, in the sense of not adding the provisions for bank services made by its subsidiary, Bacon Madrid, to the self-settlement for IBSF.

On the 5 October 2012, the Ministry of Finance and Public Function resolved the request of 2 February 2012 arguing that, in accordance with the provision set out in article 15.4 of the Law on ISBF, the provisions of services of Banco Madrid should be added and consequently a correction should be made in the self-settlement for IBSF that had previously been submitted. An additional settlement quota is derived from that correction that has to be increased and which amounts to EURO 201,318.

Against this Decision of the Ministry, on the 24 October 2012 BPA filed an appeal for reconsideration to the Government of Andorra, which was overruled by Decision number 128739/2012 that is now challenged, and which was notified on the 25 January 2013.

On the 13 February 2013, BPA filed a claim against the Decision ruled by the Government on the 23 January 2013, which dismisses the appeal for reconsideration filed against the notification of the Ministry of Finance which required BPA to pay EURO 201,318.

**Present situation**

On the 3 December 2013, the Court of Andorra ruled a judgement overruling the claim filed by BPA and declaring the Decision of the Government to be in accordance with the law, due to lack of evidence.

On the 3 February 2014, BPA filed an appeal against the judgement that had been ruled and the case is now at the stage of submitting conclusions.

On the other hand, it should be observed that the facts were reported to this Institute in a communiqué dated the 19 February 2013 and completed on the 5 December 2013..

**8. Appeal filed at the Government of Andorra against the communiqué from the Ministry of Finance, of 17 September 2013, which requires Banca Privada d'Andorra SA to correct the declaration-settlement of indirect tax on the provision of bank and financial services relating to the year 2012**

**Background**

On the 28 March 2013, BPA filed the consolidated tax settlement-declaration for ISBF (Model 221) concerning the year 2012, from which a liquidation quota of EURO 4,459,784.44 was derived. In this liquidation-declaration, ISPF was liquidated without adding the provisions of bank services of its subsidiaries, Bacon de Madrid, S.A., Inter din Bolas SV, S.A., mainly (hereinafter, "Spanish bank group"), since the requirements set out in article 15.4 of the Law on tax of bank and financial services were fulfilled (hereinafter "ISBF").

On the 20 September 2013 the requirement ruled by the Ministry of Finance dated 17 September 2013 was notified, by reason of which BPA was urged to correct the settlement-declaration it had filed, because it had not evidenced that the requirements had been fulfilled to reduce the VI variable in accordance with what is set out in article 15.4 of the Law on ISBF. Consequently, the correction urged by the Administration was exclusively based on the fact that BPA had not proved that the Spanish bank Group fulfilled the requirements set out in article 15.4 of the Law on ISBF, for not having to add the provisions of bank services which the subsidiary carries out in Spanish territory for the effects of paying ISBF in Andorra.

On the 8 October 2013, BPA filed an appeal against this requirement. In its appeal, BPA defended that the tax settlement made in the year 2012 complied with the provisions set out in that law and, in this respect, it was evidenced by means of the expertise report prepared by KPMG that the Spanish bank group fulfilled the four requirements that were demanded in article 15.4 of the Law on ISBF filed by BPA and, consequently, that the settlement-declaration for ISBF which had been filed regarding the year 2012 was correct.

**Present situation**

On the 27 January 2014, BPA filed a jurisdictional claim at the administrative section of the Court against the Decision ruled by the Government on the 8 January 2014 which dismissed the appeal.

We are now at the procedural stage of admitting the proposed proof.
This relevant fact was reported to the INAF by letter of 5 December 2014.

**9. Competitive process for the acquisition of a control stake holding of the Spanish bank institution Banco Inversis, S.A. through the subsidiary of Banca Privada d'Andorra, SA, the institution Banco Madrid, S.A.**

On the 12 August 2013, BPA notified the INAF about the differences that had arisen in the competitive process for the acquisition of a control stakeholding of the Spanish bank institution Banco Inversis, S.A., through the subsidiary of Banca d'Andorra, SA, the entity Banco Madrid, S.A., with the bank institution of the Principality of Andorra Banc Agricol Reig (Andbank).

Later, and by letter of 26 August 2013, this Institute was again informed about the procedural state of the conflict that had arisen between both entities.

Finally, on the 16 December 2013, the INAF was notified about the transactional agreement between Banco Inversis, S.A., Banca March, S.A., Andbank España, S.A.U., Sociedade Comercial Orey Antunes, S.A. and Banco Madrid, S.A.U.

The transactional agreement includes the facts which have occurred in the course of the competitive process of auction of the shares of the Spanish bank institution Banco Inversis, S.A., the different actions and the civil proceedings initiated by Banco Inversis, S.A. against Banco Madrid, S.A.U., by Banco Madrid, S.A.U. against Banca March, S.A. and by Banco Inversis, S.A. against three employees of Banco Madrid, S.A.U.

It also contains the commitment which has been acquired by Banco Madrid, S.A.U. to not contact or contract professionals of Banco Inversis, S.A. in view of the differences which the parties maintain concerning the confidentiality agreement that governed the acquisition process. Consequently the parties have agreed that for a term of two years, starting from the date when the transactional agreement is signed, Banco Madrid, S.A.U. undertakes not to either directly or indirectly require the services, or carry out any work collaboration offer, with any person entailed with Banco Inversis, S.A. in the category of executives and key employees or other professionals linked with that institution, all of them identified in a list.

Likewise, the said transactional agreement contains the commitment assumed by Banco Madrid, S.A.U. not to contact or attract clients that were assigned to the employees contracted by Banco Madrid, S.A.U. on and after the 12 July 2013, and whose positions (balances) were more than EURO 100.00.

On the other hand, Banco Inversis, S.A. has deposited a list at the notary containing the minimum information needed to clearly identify all the clients, whose management has been assigned to the employees contracted by Banco Madrid, S.A.U.: the following are excluded from this commitment (i) the present employees of Banco Madrid, S.A.U., (ii) the present members of the family of Banco Madrid, S.A.U. and (iii) the clients of Banco Madrid, S.A.U. at the date of completing the transactional agreement.

Regarding the indemnities and expenses which have been incurred by the parties as consequence of the divergences and legal actions which have been lodged, it has been

agreed that Banco Madrid, S.A.U. will pay Banco Inversis, S.A. the sum of EURO 2 million.

Regarding the confidential information which is in the possession of Banco Madrid, S.A.U. for the fact of having competed in the auction process, it has been agreed that Banco Madrid, S.A.U. will provide Banco Inversis, S.A. with a list, in a term of 10 days from completing the agreement, and once this has been catalogued, the documentation on physical support will be returned and the documentation that is on electronic support will be destroyed. An independent expert shall evidence that Banco Madrid, S.A.U. has effectively destroyed the electronic information.

Finally, the parties have also agreed that the three employees who have been contracted by Banco Madrid, S.A.U. will be penalised with suspension of work and salary from 60 to 120 days.

**Present situation**
The case is at present closed.

### 10. Legal action filed by Mr. Michel Simon and Ms. Viviana Baudet, against BPA in claim for money and damages for the acquisition of holdings of the fund BPA Fons Leveraged and Lehman Brothers

**Background**
On the 13 October 2014, the procedural representation of Mr. Michel Simon and Ms. Viviana Baudet filed legal action against BPA in a claim for money and damages for the acquisition of holdings of the fund Fons Leveraged and Lehman Brothers, for the amounts which are set out below:

a) Viviana Baudet
The sum of EURO 203,449. 21 corresponding to Lehman Brothers.
The sum of EURO 666,740.95 and an ancillary amount of EURO 233,205 and USD 132,600 for the BPA Fons Leveraged fund.
b) Michel Simon
The sum of EURO 591,884.68 and an ancillary amount of EURO 225,150 and USD 81,700 for the BPA Fons Leveraged fund.

BPA replied to the claim objecting to the arguments formulated by the other party.

**Present situation**
The process is at the procedural stage of conclusions.

B) SUBSIDIARIES LOCATED IN THE REPUBLIC OF PANAMA

### 1. Banca Privada d'Andorra (Panamá), S.A.

**Background**

From the 16 to 21 August 2011, the Superintendence of Bancos de Panamá notified the commencement of a corporate governance inspection from the 29 August to the 9 September 2011 on technological matters and another inspection on the 24 November 2011 on money laundering. Both the commencement of the inspections and their result were notified to the INAF in a communiqué dated the 25 November 2011, without any penalty having been produced for the bank.

**Present situation**

On the 14 February 2014 the INAF was notified that the Superintendence of Bacons de Panama would perform an inspection at the facilities of Banca Privada d'Andorra (Panama) S.A. This is an overall inspection for the purpose of assessing the operational aspects, on corporate governance and on money laundering and financing of terrorism, *inter alia.*

The inspection will commence on the 12 February 2014.

**2. BPA Valores, S.A.**

**Background**

From the 29 August to the 1 September 2012, the Superintendence of Stock Markets of Panama performed an integral inspection of the company, about which that institute was informed, and which resulted in no penalties.

**Present situation**

At present there are no incidents in the company.

**3. BPA International Trust S.A.**

**Background**

On the 2 August 2002 the Superintendence of Bancos de Panamá notified the commencement of a special pre-operational inspection which commenced on the 6 August. The result was notified to that Institute on the 20 August 2014, with a positive result, namely, in the sense that BPA International Trust, SA could commence its fiduciary transactions as from 15 August 2013.

On the 7 February 2014 the Superintendence of Bancos de Panamá notified the commencement of an inspection at the company's facilities. The inspection will start on the 10 February 2014 and its purpose is to assess the operational and risk aspects concerning the fiduciary transactions.

**Present situation**

On the 28 February 2014 this Institute was notified about the result of the inspection and with regard to which it should be said that there has been no penalty in this respect.

**C) SUBSIDIARY LOCATED IN SWITZERLAND**

### BPA-IPWM (SUISSE) S.A.

There are no comments to be highlighted with regard to this subsidiary.

## D) SUBSIDIARY LOCATED IN IRELAND

### BPA Finance Public Limited Company S.A.

There are no comments to be highlighted with regard to this subsidiary.

## E) SUBSIDIARIES LOCATED IN THE REPUBLIC OF URUGUAY

### 1. Noswey, S.A.

There are no comments to be highlighted with regard to this subsidiary.

### 2. Banca Privada d'Andorra (Uruguay), S.A. I.F.E. (in liquidation)

**Background**

In the month of March 2010 the Banco Central del Uruguay initiated a penalising process on the institution for weaknesses in the money laundering system of assets and imposed a penalty on it for an economic sum of EURO 1700. This fact was reported to the INAF by letter of 18 March 2010.

On the 27 February 2013, the Banco Central del Uruguay, and as a result of the company being in the process of liquidation and dissolution, resolved to withdraw the qualification granted to the institution and consequently it has only been qualified to continue with the liquidation process of the institution.

**Present situation**

At present there are no incidents.

## F) SUBSIDIARIES LOCATED IN THE SPANISH STATE

### 1. Preliminary proceedings in the abbreviated process 2218/2013 prosecuted at the Examining Court number 53 of Madrid

Criminal claim filed on 1 July 2013 by Bernardo Luis Abelló García, Beraga Solar, S.L, Feraga, S.L. and Progar S.L. against Alfonso Bermúdez de la Fuente and Sánchez-Aguilera (ex agent of Banco Madrid S.A.U.) and against Capital Market S.A. and Banco Madrid. S.A.U. as subsidiary civil responsible parties.

On the 11 September 2013, Banco Madrid S.A.U. requested the court to adopt precautionary measures for the purpose of prohibiting the defendant from disposing of certain properties and the preventive annotation of attachment on these properties.

On the 19 September 2013 the court dismissed the request to adopt precautionary measures.

On the 28 February 2014, the court ruled a writ ruling the provisional dismissal of the actions and the filing of the case

On the 7 March 2014 the plaintiff filed an appeal for modification against the writ.

In another order of considerations, it should be highlighted that neither BPA nor the institutions that form the BPA Group are being object of any investigation, reporting, complaint or writ of indiction in the framework of a criminal procedure lodged against any member of the Senior Executive, namely the Board of Directors and/or the General Management, with regard to offences against the security of legal transactions, infidelity in the safekeeping of documents and violation of secrecy, embezzlement of public funds, of discovery and disclosure of secrets, against the patrimony and other criminal offences (or their equivalent in other jurisdictions regarding the applicable penalty), with the exception of the facts described with regard to two members of the General Management as consequence of the International Letters Rogatory CRI-022-3/13.

Nor is there any administrative penalising procedure with regard to the subsidiaries located in other states.

In view of the foregoing, BPA requests the INAF that it consider the requirement as completed for information requested in the framework of the communiqué number EB 02/2014 -Requirement for information with regard to the relevant facts which may have an impact on the reputational risk of the Andorra financial system.

Please do not hesitate to contact us if you require any additional details.

Yours truly,

> (Illegible signature)
> Santiago de Rosselló
> Assistant General Manager

Received on     March 2014

---

Don Juan Amor Fernández, Traductor/Intérprete Jurado de Catalán e Inglés, nombrado por el Ministerio de Asuntos Exteriores y de Cooperación, certifica que la que antecede es traducción fiel y completa al inglés de un documento redactado en catalán/español.

I the undersigned Juan Amor Fernández, sworn translator for the Catalan and English Languages, duly appointed by the Ministry for Foreign Affairs and Cooperation, do hereby certify that the foregoing is a true and faithful version of the original Catalan/Spanish document hereunto attached.

Águilas (Murcia) Spain, 30th June 2015