# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

RAMON CIERCO, HIGINI CIERCO, SUCCESSORS D'HIGINI CIERCO GARCIA, S.A., and CIERCO MARTINEZ 2 2003, S.L. in each Plaintiff's Personal Capacity and Derivatively on Behalf of Themselves and All Others Similarly Situated,

        Plaintiffs,

v.

JACOB LEW, in his Official Capacity as Secretary of the Treasury, *et al.*,

        Defendants.

Civil No. 15-cv-1641(JEB)

<u>Oral Argument Requested</u>

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND REQUEST FOR EXPEDITED CONSIDERATION</u>

Eric L. Lewis (DC Bar #394643)
*eric.lewis@lewisbaach.com*
A. Katherine Toomey (DC Bar #426658)
*katherine.toomey@lewisbaach.com*
LEWIS BAACH PLLC
1899 Pennsylvania Avenue, NW, Suite 600
Washington, DC 20006
(202) 833-8900

Aaron T. Wolfson *(pro hac vice)*
*aaron.wolfson@lewisbaach.com*
LEWIS BAACH PLLC
405 Lexington Avenue, 62nd Floor
New York, NY 10174
(212) 826-7001

Dated:  November 12, 2015

*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND ......................................................................................2

STATUTORY BACKGROUND .................................................................................5

STATEMENT OF FACTS ..........................................................................................6

ARGUMENT .............................................................................................................13

I.       Standard of Review .......................................................................................13

II.      The NOF and NPRM Must Be Vacated Because of FinCEN's Admitted Failure to Consider the Statutorily Mandated Factors ......................................................15

     A.       The NOF and NPRM Must be Vacated because FinCEN Failed to Consider BPA's Legitimate Business ...................................................15

     B.       FinCEN Has Repeatedly Ignored Its Obligation to Consider a Target Bank's Legitimate Business ...................................................................19

III.     FinCEN Improperly Imposes Section 311 Sanctions Through Procedures Calculated to Preclude Meaningful and Timely Challenge ...............................21

     A.       FinCEN Eschewed Application of an Objective Standard in Reaching its Finding that BPA is of "Primary Money Laundering Concern." ...........21

     B.       FinCEN Intended for its "Proposed" Sanction to be Immediately Implemented ........................................................................................25

     C.       FinCEN Frustrates any Meaningful "Notice and Comment" Process by Withholding Disclosure of the Administrative Record on which its Finding and Proposed Sanction are Purportedly Based ........................27

IV.      The Court Should Grant Urgent Relief to Avoid Ongoing Damage Due to the Continuing Injurious Effects of FinCEN's Improper Agency Action ...............30

CONCLUSION ..........................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................................ 31

*AFL-CIO v. Chao,*
    496 F. Supp. 2d 76 (D.D.C. 2007) ................................................................................ 13

*Air Transp. Ass'n v. FAA,*
    169 F.3d 1 (D.C. Cir. 1999) .......................................................................................... 28

*Am. Medical Ass'n v. Reno,*
    57 F.3d 1129 (D.C. Cir. 1995) ...................................................................................... 27

*Am. Wildlands v. Norton,*
    193 F. Supp. 2d 244 (D.D.C. 2002) .............................................................................. 18

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................................................................... 13

*Appalachian Voices v. McCarthy,*
    989 F. Supp. 2d 30 (D.D.C. 2013) ................................................................................ 16

*Brown v. Plata,*
    563 U.S. 493 (2011) ...................................................................................................... 23

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009) .......................................................................................... 18

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988) ........................................................................................ 3

*FBME Bank Ltd. v. Lew,*
    No. 15-CV-01270(CRC), 2015 WL 5081209 (D.D.C. Aug. 27, 2015) .......................... 27

*Home Box Office, Inc. v. FCC,*
    567 F.2d 9 (D.C. Cir. 1977) .......................................................................................... 27

*Massachusetts v. E.P.A.,*
    549 U.S. 497 (2007) ...................................................................................................... 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................................. 14, 18

*Picur v. Kerry,*
    No. 14-CV-1492(KBJ), 2015 WL 5325709 (D.D.C. Sept. 11, 2015) .................. 13, 14, 18

*Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.,*
    740 F.2d 21 (D.C. Cir. 1984) .................................................................................. 31, 32

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
    374 F.3d 1209 (D.C. Cir. 2004) .................................................................................... 16

*Quantum Entm't v. U.S. Dept. of Interior,*
    597 F. Supp. 2d 146 (D.D.C. 2009) ................................................................ 18

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.,*
    758 F.3d 296 (D.C. Cir. 2014) ..................................................................... 29

*Role Models Am. Inc. v. White,*
    317 F.3d 327 (D.C. Cir. 2003) ..................................................................... 33

*U.S. Postal Serv. v. Postal Regulatory Comm'n,*
    785 F.3d 740 (D.C. Cir. 2015) ..................................................................... 23

## STATUTORY AUTHORITIES

5 U.S.C. § 551 *et seq* ......................................................................... 3, 13

5 U.S.C. § 553 ............................................................................... 10, 27

5 U.S.C. § 704 .................................................................................. 31

5 U.S.C. § 706 ............................................................................... 14, 22

31 U.S.C. § 5318A ......................................................................... *passim*

Pub. L. No. 107-56, 115 Stat. 272 (2001) ........................................................ 5

## RULES AND REGULATIONS

69 Fed. Reg. 28,098 ............................................................................ 21

69 Fed. Reg. 51,973 ............................................................................ 21

69 Fed. Reg. 51,979 ............................................................................ 21

70 Fed. Reg. 21,362 ............................................................................ 21

70 Fed. Reg. 21,369 ............................................................................ 21

70 Fed. Reg. 55,214 ............................................................................ 20

76 Fed. Reg. 9,403 ............................................................................. 20

77 Fed. Reg. 31,434 ............................................................................ 20

77 Fed. Reg. 59,747 ............................................................................ 25

80 Fed. Reg. 60,575 ............................................................................ 25

Fed. R. Civ. P. 56(a) .......................................................................... 13

## LEGISLATIVE MATERIALS

H.R. Rep. No. 107-250 (2001) ................................................................... 24

## PRELIMINARY STATEMENT

Plaintiffs' motion for partial summary judgment should be granted, and should be granted expeditiously, for two principal reasons:

*First*, the illegality of defendants' conduct in this case is clear and can be determined on undisputed facts. Defendants are responsible for administering provisions in the USA PATRIOT Act aimed at protecting the United States from foreign money laundering and terror finance.[1] This authority has been delegated to a unit within the Treasury Department known as The Financial Crimes Enforcement Network ("FinCEN").  In this case, FinCEN made a finding, based on undisclosed internal criteria, that Banca Privada d'Andorra S.A. ("BPA"), a small bank located in the tiny European principality of Andorra, is an institution of "primary money laundering concern," and that it should be shut down.  Despite an unequivocal statutory mandate to do so, FinCEN has conceded that it failed to consider the impact of its actions on BPA's legitimate business.  Although FinCEN acknowledged that BPA provided ordinary banking services, it claimed that the extent of that business was "difficult to assess," which, it turns out, is the usual explanation it offers when it declines to consider this statutory requirement.  But "it's too hard" is not a legally cognizable excuse for an agency's failure to perform a statutory duty.

*Second*, summary judgment is necessary now.  Immediately upon the issuance of FinCEN's unilateral and untested finding, BPA was denied access to the U.S. banking system and, as encouraged by FinCEN in its notice, seized by its regulators.  In the absence of urgent intervention by this Court, BPA will be utterly lost to plaintiffs.  Accordingly, plaintiffs respectfully request expedited consideration of this motion.  Should the Court grant plaintiffs'

---

[1] Section 311 of the USA PATRIOT Act amended the Bank Secrecy Act to add these anti-money laundering provisions, codified at 31 U.S.C. § 5318A.

request to hold a hearing, plaintiffs further request that the hearing be scheduled at the first available date.

## FACTUAL BACKGROUND

There is an unmistakable *Alice in Wonderland* quality to the instant administrative action. In *Alice*, during the trial of the Knave for theft of the Queen's tarts, the Queen proclaimed the order of business: "Sentence first – verdict afterwards."  That sums up FinCEN's actions here.

On March 10th of this year, FinCEN issued a Notice of Finding ("NOF") that BPA was of "primary money laundering concern" and a Notice of Proposed Rulemaking ("NPRM") that it intended to impose the fifth "special measure" available under Section 311 of the USA PATRIOT Act, the statute's harshest sanction, which would ban all U.S. banks from acting as BPA's correspondent banks or handling its U.S. dollar transactions.[2]  Although the NOF was an untested, *ex parte* finding by FinCEN, and the NPRM based upon it purported to be only a "proposed" action, U.S. banks immediately treated it as a final adjudication, closing BPA's accounts as soon as the Notices were issued.  The NPRM also expressly "encourage[d] other countries to take similar action" – that is, to prohibit their own domestic banks from doing business, directly or indirectly, with BPA.

Thus, within days, FinCEN's "proposed" sentence was well on its way to being fully executed.  U.S. banks refused to process BPA's dollar transactions, regulators in Andorra seized BPA and shut its doors, and regulators in Spain and Panama did the same to subsidiaries in those countries.  BPA was afforded no opportunity whatsoever to defend itself against FinCEN's finding before its "proposed" sentence was carried out.  As FinCEN expected and intended, its

---

[2] BPA's U.S. correspondent banks previously maintained accounts that permitted BPA to receive deposits and make payments and to handle other financial transactions denominated in U.S. dollars.

"proposal" to preclude BPA from accessing the U.S. financial system left BPA all but dead, unable to operate and quickly dismantled.  "Sentence first," indeed.

FinCEN imposed its sanction against BPA in manifest disregard of Section 311's procedural protections.  In fact, the U.S. government's own statements reveal that BPA was not even the real object of FinCEN's concern but was simply a pawn to be sacrificed by FinCEN in order to send a message to the Andorran government expressing U.S. displeasure with certain aspects of that country's banking regulations.  FinCEN's unexplained choice to impose the fifth "special measure" – the harshest weapon in its arsenal – did not represent a reasoned exercise of discretion based on the specific facts of this case but instead followed FinCEN's uniform practice.  According to FinCEN's Director, FinCEN *always* imposes the fifth "special measure," whenever it acts pursuant to Section 311.  SOF Ex. 15 ¶ 27. [3]

Plaintiffs, who are majority shareholders and non-executive directors of BPA, move for partial summary judgment on four counts of their Complaint: Counts 1 and 2 seek relief under the Administrative Procedure Act, 5 U.S.C. § 551 et seq., and Counts 4 and 5 seek relief under common law principles because FinCEN's actions exceeded its delegated authority and facially violated the statute that FinCEN purports to implement.[4]  *See Dart v. United States*, 848 F.2d 217, 222 (D.C. Cir. 1988).  As set forth below, this Court should enter summary judgment in this case because the undisputed facts show that FinCEN's actions were arbitrary and capricious and in violation of Section 311.  Specifically, FinCEN:

---

[3] References to exhibits attached to the Statement of Undisputed Material Facts ("SOF") are described as "SOF Ex."  References to other facts that provide important context but are not strictly material to the grounds for relief are cited in the text of this memorandum and its footnotes.

[4] Count 3 of the complaint seeks relief under the Constitution's Due Process Clause, but resolution of that claim is unnecessary if relief is granted on the counts at issue here.

(i) Violated the express statutory requirements of Section 311, first, by failing to consider the extent of BPA's legitimate business in connection with its determination of whether BPA is an institution of "primary money laundering concern" and, second, by ignoring the adverse impact on the bank's legitimate business in determining which, if any, special measure to impose.

(ii) Improperly declared BPA to be an institution of "primary money laundering concern," thereby causing its closure, despite the fact that FinCEN has no implementing regulation defining "primary money laundering concern" and has acknowledged that it internally applies a definition of that term that is entirely subjective and, indeed, does not even require evidence of actual money laundering, just a "concern" about money laundering;

(iii) Issued the NOF and NPRM expecting and intending that U.S. banks would immediately close BPA's correspondent bank accounts and expressly encouraging foreign regulators to take similar action, notwithstanding that the NPRM was supposed to be a proposal and not a final agency action;

(iv) Violated its obligation to disclose the non-classified information on which its *ex parte* NOF and NPRM were based, and thereby deprived plaintiffs of any meaningful opportunity to challenge this agency action; and

(v) Violated its obligation to explain the basis for its selection of the fifth special measure rather than one of the statute's four lesser measures, thereby depriving BPA of any meaningful opportunity to argue that a lesser measure should have been imposed.

FinCEN's conduct here was an illegal exercise of power, and it was not an aberration. It is FinCEN's standard operating procedure in cases in which it seeks to send a message to a recalcitrant foreign country to force it to adopt anti-money laundering controls that FinCEN has recommended. In such cases, FinCEN makes an example of a relatively unimportant bank in order to bring the foreign country to heel. FinCEN issued its NOF and NPRM here knowing and intending that they would result in BPA's immediate closure and would cow the Andorran government. Mission accomplished. A closed bank has no resources with which to challenge FinCEN, and an intimidated foreign government has no incentive to do so. And so, FinCEN repeatedly acts with impunity, confident that it can impose draconian sanctions without regard to

the requirements of Section 311 or fear of reversal.   The Court should put a stop to this arrogant and illegal *modus operandi*.

## STATUTORY BACKGROUND

Following the September 11, 2001 terrorist attacks, Congress enacted a broad set of provisions aimed at combatting global terrorism.  USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001).  As part of this effort, Section 311 of the Act authorizes the Secretary of the Treasury to take certain actions to protect the U.S. financial institutions and the financial system as a whole from systemic money laundering with focus on international organized crime, terrorism and weapons trafficking.  31 U.S.C. § 5318A(a)(1).   The statute directs that the Secretary "shall consider" the following in determining whether an institution is of "primary money laundering concern":

> (i) the extent to which such financial institutions . . . are used to facilitate or promote money laundering in or through [a particular] jurisdiction, including any money laundering activity by organized criminal groups, international terrorists, or entities involved in the proliferation of weapons of mass destruction or missiles;

> (ii) the extent to which such institutions . . . are used for legitimate business purposes in the jurisdiction; and

> (iii) the extent to which [the proposed special measure] is sufficient to ensure, with respect to . . . institutions operating in the jurisdiction, that the purposes of this subchapter continue to be fulfilled, and to guard against international money laundering and other financial crimes.

31 U.S.C. § 5318A(c)(4)(B).

Upon a finding that an institution poses a "primary" threat of money laundering, the Secretary is authorized to select any of five "special measures" imposing obligations on U.S. financial institutions in their dealings with the foreign bank.  The first four measures require more extensive record keeping by the U.S. banks tracking the foreign bank's transactions.  The fifth special measure is reserved for the most severe cases.  It imposes conditions upon or

completely prohibits U.S. banks from opening or maintaining a correspondent bank account in favor of the foreign bank, thereby eliminating the foreign bank's access to the U.S. financial system and preventing it from engaging in U.S. dollar-based transactions.

In selecting which, if any, of the five special measures to apply to a foreign financial institution, the statute further directs that the Secretary "shall consider" the following factors:

(i) whether similar action has been or is being taken by other nations or multilateral groups;

(ii) whether the imposition of any particular special measure would create a significant competitive disadvantage, including any undue cost or burden associated with compliance, for financial institutions organized or licensed in the United States;

(iii) the extent to which the action or the timing of the action would have a significant adverse systemic impact on the international payment, clearance, and settlement system, or on legitimate business activities involving the particular jurisdiction, institution, class of transactions, or type of account; and

(iv) the effect of the action on United States national security and foreign policy.

31 U.S.C. § 5318A(a)(4)(B).

The Secretary has delegated his authority under Section 311 to the Director of FinCEN. It is FinCEN's exercise of this authority against BPA that is the subject of this action.

## STATEMENT OF FACTS

BPA is an international commercial bank organized under the laws of Andorra, with its principal place of business in Andorra. SOF ¶ 1; SOF Ex. 1 ¶ 3-5; Ex. 2 at 13464. In 2011, BPA acquired Banco Madrid with the consent of the Spanish regulatory authorities. SOF ¶ 23; SOF Ex. 13. Until March 10, 2015, BPA engaged in regular banking business in Andorra and, through subsidiaries, in Spain and Panama. SOF Ex. 1 ¶ 8; Ex. 2 at 13464. BPA offered a variety of typical financial products and services, including corporate and personal banking, loans, funds management, and custody services. SOF Ex. 1 ¶ 9; Ex. 2 at 13466.

On March 10, 2015, FinCEN issued the two "notices" relevant here:  the NOF reflecting its "finding" that BPA is "a Financial Institution of Primary Money Laundering Concern" and the NPRM announcing FinCEN's intent to impose the most severe version of the fifth special measure on BPA, effectively banning BPA from the U.S. financial market.  SOF ¶¶ 10-11; SOF Exs. 2 and 5.  The NOF and NPRM were issued without notice to BPA, and BPA had no opportunity to participate in or otherwise offer input into the investigative process leading to them.  SOF ¶ 12; SOF Ex. 1 ¶ 7.  Moreover, the NOF and NPRM both reflect that, in reaching its decision in this case, FinCEN did not consider the extent of BPA's legitimate business because it deemed that factor to be too "difficult to assess."  SOF ¶¶ 10-11; SOF Ex. 2 at 13466; Ex. 5 at 13305.

Plaintiffs Ramon Cierco and Higini Cierco (the "Ciercos") are citizens and residents of Andorra.  SOF ¶ 2; SOF Ex. 1 ¶¶ 1-2.  Together with another family member, the Ciercos own, directly or indirectly, through plaintiffs Successor d'Higini Cierco Garcia S.A. and Cierco Martinez 2 2003, S.L., approximately 75% of the shares in BPA.[5]  SOF ¶¶ 2-4; SOF Ex. 1 ¶¶ 3-5.  Prior to the events giving rise to this action, the Ciercos served as non-executive Directors of BPA and, on a rotating basis, as the Chairman of the Board of Directors of BPA.  SOF ¶ 5; SOF Ex. 1 ¶ 6.  Before the issuance of the NOF and NPRM, the Ciercos were the majority shareholders in a small but prosperous bank.  After the NOF and NPRM were issued, BPA was taken from the Ciercos by the Andorran regulators, and it is now being stripped of its assets and sold.  SOF ¶ 34; SOF Ex. 21.

---

[5] Both Successors D'Higini Cierco Garcia, S.A. and Cierco Martinez 2 2003, S.L, of which the Ciercos are the sole shareholders, are organized under Andorran law.  SOF ¶¶ 2-4.

### U.S. and Andorran Discussions Leading Up to the Seizure of BPA

In the months prior to the seizure of BPA, the governments of the United States and Andorra were in discussions concerning anti-money laundering ("AML") controls that the U.S. thought Andorra should put in place.  On or about August 26, 2014, the U.S. Embassy in Spain sent a "Verbal Note" to the Andorran government citing certain AML recommendations that the U.S. government wanted the Andorran government to implement.  SOF ¶ 8; SOF Ex. 3.

On September 22, 2014, the Andorran government responded to the Verbal Note, informing the U.S. Embassy in Spain that, although in general terms Andorra was committed to the fight against money laundering and countering terrorist financing, it declined to adopt the specific cash transaction reporting measures that the U.S. had proposed. SOF ¶ 9; SOF Ex. 4. The United States was dissatisfied with the Andorran response to its requests, and its dissatisfaction led directly to the issuance of the NOF and NPRM in this case.  In April 2015, at a conference in Spain, Anton Smith, Counselor for Economic Affairs at the U.S. Embassy in Madrid said, "With respect to Andorra, last year we signaled our discomfort with an official report directing the authorities to some failures . . . in the system there.  I will not say that they did not realize it, but they did not react with the appropriate vigor that we were expecting, and we had to use the hammer."  The U.S. government denied that the statement had been made, but it was captured on videotape and posted on YouTube. [6]

### The Issuance of the NOF and NPRM and the Resulting Seizure of BPA

The issuance of the NOF and NPRM had an immediate impact on BPA.  As FinCEN knew they would, BPA's correspondent banks in the U.S. and abroad immediately closed BPA's accounts.  SOF ¶ 28, SOF Ex. 1 ¶ 12; Ex. 16.  In the NPRM, FinCEN expressly "encourage[d]

---

[6] *See* Els Americans Van Actuar l'any Passat Per La Falta de Fluidesa de les Autoritats Andorranes, YouTube (uploaded May 27, 2015), https://youtu.be/jXli0F9UgqQ.

other countries to take similar action" – that is to prohibit their own domestic banks from doing business with BPA, directly or indirectly.  SOF Ex. 5 at 13305.  As a result, on March 11, 2015, the Andorran regulator, the Institut Nacional Andorra de Finances ("INAF"), initiated a "preventive intervention of the bank," seizing it, removing its Board of Directors, and replacing them with government appointees.  SOF Ex. 18.  INAF made clear that its action was "not motivated by a . . . lack of liquidity nor solvency of BPA or its Group" but was caused by "the action of the FinCEN."  SOF ¶ 31; SOF Ex. 18.[7]

As a result of FinCEN's action and the financial turmoil it caused, regulators in Spain seized BPA's subsidiary, Banco Madrid.  SOF ¶ 35.  Administrators of that bank have filed for bankruptcy.  SOF ¶ 35; SOF Ex. 23.  On March 10, 2015, regulators in Panama seized BPA's subsidiary BPA Panama, where it remains under government control.  SOF ¶ 36; SOF Ex. 24.

On April 2, 2015, Andorra passed new legislation authorizing the expropriation of BPA as a result of FinCEN's actions.  SOF ¶ 32; SOF Ex. 16.  On April 27, 2015, the Andorran government removed BPA's Board of Directors and placed the bank under the control of the newly created Agency for the Restructuring of Financial Entities ("AREB").  SOF ¶ 32; SOF Ex. 19.  AREB is charged with administering a "resolution process" designed to dismantle BPA, transfer its good assets to another institution, and sell that institution to new shareholders. SOF ¶ 34; SOF Ex. 21.  That process is well underway.

Vall Banc, the bank to which BPA's assets are to be transferred, has been incorporated by AREB, which is also its sole shareholder.  SOF Ex. 20.  As of October 29, 2015, AREB announced the start of the application process for potential buyers to bid on Vall Banc.  SOF Ex.

---

[7] *See also,* Press Release, INAF, Intervention of Banca Privada d'Andorra (Mar. 16, 2015), available at https://www.inaf.ad/files/Press_Release_INAF_2015-03-16.pdf.

22.   The transfer of BPA's remaining assets to Vall Banc and Vall Banc's sale are to be completed by AREB expeditiously.  SOF ¶ 34; SOF Exs. 20, 21 and 22.

### Process Followed Under the NOF and NPRM

FinCEN reached its finding that BPA is a foreign bank of "primary money laundering concern," as announced in the NOF, based on an internal investigation in which BPA did not participate.  SOF ¶ 12; SOF Ex. 1 ¶ 7.  When, as here, the imposition of the fifth special measure, the statute's harshest sanction, is proposed, Section 311 requires FinCEN to conduct a rulemaking process.  31 U.S.C. § 5318A(a)(2)(C); 5 U.S.C. § 553.  Rulemaking, of course, requires the publication of factual findings and a proposed rule so that the target bank and other interested parties can challenge the agency's proposed action before it becomes effective.  5 U.S.C. § 553(c).

BPA's administrator, AREB, filed no comment in response to the NOF or the NPRM and has not objected to FinCEN's actions.  SOF ¶ 38; SOF Ex. 1 ¶ 13.  By letter of May 6, 2015, counsel for plaintiffs, the Ciercos and their family corporations, as BPA's controlling shareholders, filed a comment objecting to the NOF and the NPRM's proposed sanction.  SOF ¶ 13; SOF Ex. 6.  The May 6 letter reported that, since 2003, KPMG and Deloitte, two of the largest and most respected accounting firms in the world, were given unfettered access to BPA's files and personnel, annually audited BPA's AML compliance program and found the bank in compliance.  SOF Ex. 6 at 7.  Plaintiffs included with their comment reports from KPMG and Deloitte.  SOF Ex. 6 at 8 nn.9, 12.

At a meeting with FinCEN personnel on July 15, 2015, plaintiffs' counsel offered to provide FinCEN with a letter dated March 24, 2014 – written more than a year before FinCEN issued the NOF – addressed to BPA's Andorran regulator.  SOF ¶ 14; SOF Ex. 7 ¶ 3.  In that

letter, BPA identified and self-reported *each of the specific instances of money laundering FinCEN later relied on in its NOF* and described the actions it had taken to correct them. *Id.*; SOF Ex. 9.[8]  On July 22, at FinCEN's request, plaintiffs' counsel reiterated the offer in writing and, in addition, asked FinCEN a number of questions concerning FinCEN's dealings with the Andorran government and other matters bearing on the NOF.[9]  SOF ¶ 15; SOF Ex. 7 ¶ 3; Ex. 8.

On September 4, 2015, plaintiffs' counsel again wrote to FinCEN.  SOF ¶ 15; SOF Ex. 7 ¶ 3; Ex. 9.  Having received no response to his previous letters, plaintiffs' counsel provided FinCEN with a copy of the March 24, 2014 letter and also set forth further information challenging the bases for the NOF and NPRM.  SOF Ex. 7 ¶ 3; Ex. 9.  The September 4 letter asked FinCEN to intercede with the Andorran authorities to prevent a rush to judgment with its expropriation of BPA and to include all stakeholders in the process.  SOF Ex. 9.  The letter also asked FinCEN (i) to disclose all non-classified information that it had considered in issuing the NOF so plaintiffs could provide further comment, and (ii) to advise why the fifth special measure was imposed and why lesser sanctions were not selected.  *Id.*

FinCEN has responded to none of plaintiffs' letters or requests.  SOF Ex. 7 ¶ 3.  Its only response was a September 16, 2015 email stating that "[i]f a specific response to your letters is appropriate, you will receive it by a separate communication."  SOF Ex. 10.  Other than a letter

---

[8] The NOF identifies three instances of alleged money laundering at BPA:  (i) a matter in the period 2011 to 2013 said to involve a third-party intermediary assisting Russian criminal organizations engaged in corruption; (ii) a matter in the same period said to involve a Venezuelan third-party in another corruption scheme; and (iii) a matter in the period 2011 to 2012 said to involve a Chinese third-party intermediary in a transnational scheme involving human trafficking.  SOF Ex. 2 at 13465.  BPA's March 24, 2014 letter addressed each of these matters.  SOF Ex. 9.

[9] Plaintiffs also made a request for relevant information under the Freedom of Information Act ("FOIA") on August 7, 2015.  SOF Ex. 11.  FinCEN responded that FOIA requests are handled on a "first come, first served" basis and, due to backlog, plaintiffs' request would be addressed no earlier than December.  SOF Ex. 12.

stating that FinCEN would not address plaintiffs' FOIA request until December 15, SOF Ex. 12, no other response has been received.  SOF Ex. 7 ¶ 3.

### BPA's Legitimate Business

Section 311 directs FinCEN in two separate sections, in assessing whether a foreign bank is of "primary money laundering concern," to consider not only the extent of the bank's money laundering activity but also the extent of the bank's legitimate business.  FinCEN failed to do so, because, it asserted, the legitimate business of BPA was "difficult to assess."  SOF ¶¶ 10-11; SOF Ex. 2 at 13466; Ex. 5 at 13305.  There is little question that BPA had extensive legitimate business.  BPA had branches in Andorra, and subsidiaries in Spain and Panama.  SOF Ex. 1 ¶ 8. The NOF itself acknowledges that BPA provided a wide variety of typical banking services to its clients.  SOF Ex. 2 at 13466.  When BPA acquired Banco Madrid in 2011 and made it a BPA subsidiary, the Bank of Spain, a major central bank within the European Union and one that operates under stringent AML standards, investigated and agreed not to oppose the purchase. SOF ¶ 23; SOF Ex. 13.  As recently as 2014, the British publication Global Banking & Finance Review named BPA's Spanish subsidiary, Banco Madrid, the "Best Wealth Manager" and "Best Asset Manager" in Spain.[10]

On March 10, 2015, the date of the NOF and NPRM, BPA's financial statements for 2011, 2012, and 2013 were available on its website, along with extensive information concerning BPA's corporate structure, data concerning its business, and a description of its policy of corporate responsibility.  SOF ¶ 25; SOF Ex. 1 ¶ 11.  Banco Madrid had a website with similar information.[11]  In addition, information concerning BPA's legitimate business was available

---

[10] Global Banking Finance Review Awards - 2014, http://www.globalbankingandfinance.com/ global-banking-finance-review-awards-2014/ (last visited Nov. 10, 2015).

[11] Banco Madrid, http://www.bancomadrid.com/ (last visited Nov. 10, 2015).

from:   (i) BPA's regulators in Andorra, Spain, and Panama; (ii) its banking and financial counter-parties and correspondents, including those in the United States; (iii) its AML auditors – Deloitte and KPMG; (iv) its directors, shareholders, senior management, and employees; and (v) its customers.   SOF ¶ 24; SOF Ex. 1 ¶ 10.   Yet, notwithstanding this wealth of information available to FinCEN, the agency found it too "difficult" to consider BPA's legitimate business. SOF Ex. 2 at 13466; Ex. 5 at 13305.

## ARGUMENT

## I.      Standard of Review

This motion seeks summary judgment in respect of four counts of the complaint. Counts 1 and 2 arise under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.; Counts 4 and 5 arise under federal decisional law.  With respect to all claims, under Federal Rule of Civil Procedure 56(a), summary judgment is appropriately granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law*." See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

Plaintiffs' motion as to Counts 4 and 5 of the complaint are governed by this straightforward and familiar standard.  Summary judgment is also "the appropriate procedural mechanism for resolving challenges to final agency actions under the Administrative Procedure Act." *Picur v. Kerry,* No. 14-CV-1492(KBJ), 2015 WL 5325709, *4 (D.D.C. Sept. 11, 2015). The application of Rule 56 to an APA claim, however, is more constrained, since the facts bearing on the agency's decision are limited to the administrative record.  *See AFL-CIO v. Chao,*

496 F. Supp. 2d 76, 81 (D.D.C. 2007).  Here, the administrative record – indeed, the NOF on its face – requires summary judgment in plaintiffs' favor.[12]

The APA empowers a court to hold unlawful and set aside an agency action that is: (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or (d) without observance of the procedure required by law.  5 U.S.C. § 706(2).  While the reviewing court may not "substitute its judgment for that of the agency," it must "ensure that the agency 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *Picur,* 2015 WL 5325709, at \*5 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983)).  As part of this assessment, the court must determine "whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.*  An agency's action will be deemed arbitrary and capricious under the APA if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  FinCEN's action is invalid and should be set aside under each of the § 706(2) standards set forth above.

---

[12] FinCEN has not provided plaintiffs with access to the full administrative record, has failed to respond to plaintiffs' request for an opportunity to review the materials on which the NOF and NPRM are based and has deferred plaintiffs' FOIA request for this information.  But summary judgment is nonetheless appropriate in this case because the NOF and the NPRM make clear that, whatever that record may be, FinCEN concedes that it failed to evaluate the extent of BPA's legitimate business or the impact on that business of any of the potential special measures that could be imposed.

## II.  The NOF and NPRM Must Be Vacated Because of FinCEN's Admitted Failure to Consider the Statutorily Mandated Factors.

The Court need look no further than FinCEN's own admitted failure to consider the statute's mandatory factors for determining whether BPA can properly be labeled as of "primary money laundering concern" and, if so, which special measure should be imposed.  Summary judgment is warranted on this basis alone.  As the Supreme Court noted recently in *Massachusetts v. E.P.A.*, the fact that an agency is permitted to exercise "judgment" does not give it "a roving license to ignore the statutory text."  549 U.S. 497, 532 (2007).  Yet, that is precisely what FinCEN has done here.

### A.  The NOF and NPRM Must be Vacated because FinCEN Failed to Consider BPA's Legitimate Business.

The statute requires FinCEN to consider BPA's legitimate business at two separate points in its decision-making.

*First*, in deciding whether a bank is of "primary money laundering concern," the statute requires FinCEN to consider (i) "the extent to which [such bank is] used to facilitate or promote money laundering" and (ii) "the extent to which [such bank is] used for legitimate business purposes."  31 U.S.C. § 5318A(c)(2)(B)(i) and (ii).[13]  This plain language requires that these two factors be quantified and evaluated in some tangible manner– the question is "the extent to which" and not merely "whether."

*Second*, in deciding which, if any, of the special measures to impose, FinCEN is required to consider "the extent to which . . . the action or the timing of the action would have a significant adverse systemic impact on [the bank's] legitimate business activities."  31 U.S.C. § 5318A (a)(4)(B)(iii).  Consideration of this factor plainly required FinCEN to consider actual

---

[13] A third factor listed but not pertinent here is whether the sanction being considered "is sufficient to ensure" that the statutory purposes will be fulfilled.  31 U.S.C. § 5318A(c)(2)(B)(iii).

evidence of BPA's legitimate banking business, the extent of its involvement in the Andorran financial sector, and the effect of the proposed special measure on its depositors, employees, and owners.

There can be no question that these provisions are mandatory. *See Appalachian Voices v. McCarthy,* 989 F. Supp. 2d 30, 54 (D.D.C. 2013) ("Use of the word 'shall' in a statute generally creates a mandatory duty"). FinCEN's failure to consider a mandatory factor is an arbitrary and capricious agency action. *Pub. Citizen v. Fed. Motor Carrier Safety Admin*., 374 F.3d 1209 (D.C. Cir. 2004). And this failure is undisputed. As it admitted in its NOF and NPRM, FinCEN did not evaluate the "extent" of BPA's legitimate business activity, weigh it against any evidence of BPA's complicity in money laundering, or consider the adverse impact of the chosen special measure on BPA's legitimate business.[14] FinCEN's NOF vaguely describes BPA's legitimate business in three sentences:

> It is difficult to assess on the information available the extent to which BPA is used for legitimate business purposes. BPA provides services in private banking, personal banking, and corporate banking. These services include typical bank products such as savings accounts, corporate accounts, credit cards, and financing.

SOF Ex. 2 at 13466. The same sentences are repeated in the NPRM. SOF Ex. 5 at 13305.[15]

Notwithstanding that FinCEN found it too "difficult to assess" BPA's legitimate business, FinCEN simply pronounced by fiat that "any impact on the legitimate business activities of BPA is outweighed by the need to protect the US financial system." SOF Ex. 5 at 13305. In essence,

---

[14] FinCEN also made no genuine effort to quantify BPA's purported money laundering activities, and for this reason, too, it could not weigh them against BPA's legitimate business operations and thereby determine on any objective basis whether BPA could reasonably be deemed to be a "primary" money laundering concern. *Infra* at pp. 21-25.

[15] In the NOF and NPRM FinCEN concluded that BPA is at risk of abuse by money launderers, but FinCEN made no effort to quantify or to evaluate in any objective way the amount of BPA's legitimate business, the amount of money laundering, or the nature and extent of the perceived risk.

FinCEN placed the purported money laundering incidents on one side of its scales, and *nothing* on the other (because the legitimate business was too "difficult to assess"), and then concluded that "something" outweighs "nothing."  This is the very definition of an "arbitrary and capricious" decision, and, moreover, it fails to provide the "reasonable grounds" required by the statute.  Nor can it rationally justify the imposition of Section 311's harshest sanction, as opposed to a lesser sanction.

In any event, FinCEN's stated position, that it is incapable of assessing the legitimate business of BPA on the available information, is untenable.  FinCEN is the Financial Investigation Unit of the U.S. government.  According to its website, it is a highly skilled and resourced agency that pursues its investigative mission by "receiving and maintaining financial transactions data, analyzing and disseminating that data for law enforcement purposes, and building global cooperation with counterpart organizations in other countries and with international bodies."[16]  Given its expertise in the investigation of complex financial transactions, FinCEN apparently had little difficulty unearthing information concerning purported money laundering at BPA (perhaps because BPA had itself identified and reported the information), but it disclaims having the investigative tools that would permit it to consider far more accessible and public information concerning BPA's legitimate business.  Such information was available on BPA's website, which permitted anyone, including FinCEN, to access substantial data about BPA's operations, including, *inter alia*, BPA's financial statements for 2011-2013; its growth, liquidity ratio, and risk-weighted capital ratio; its governance and structure; descriptions of its subsidiaries and branch offices; and details concerning the banking services it provided.  In addition to this publicly available information, FinCEN could certainly have requested more

---

[16] *See* What We Do, FinCEN, https://www.fincen.gov/about_fincen/wwd/ (last visited Nov. 10, 2015).

detailed, quantitative data on BPA's legitimate business from BPA itself, including its Board of Directors, its principal shareholders or its AML auditors. FinCEN, moreover, had access to foreign regulators who collect and evaluate massive quantities of information about BPA and its operating subsidiaries in Andorra, Spain, and Panama.  FinCEN appears to have ignored these sources and, in any event, failed to engage in the honest balancing exercise that the statute requires or to explain how the various factors weigh in that analysis.

But even if information concerning BPA's legitimate business were difficult to obtain, which it was not, there is nothing in the statute that allows FinCEN to decide unilaterally not to consider this factor.  *See Comcast Corp. v. FCC*, 579 F.3d 1 (D.C. Cir. 2009).  As the Court of Appeals observed in that case, the fact that an assessment "is difficult," does not excuse an agency's failure to undertake it, particularly where it is "clearly relevant" to the issue being decided and required by law.  *Id.* at 7.

Under the APA, an agency action will be set aside as arbitrary and capricious when, in reaching its decision, the agency fails to consider a relevant factor.  *See, e.g., Picur*, 2015 WL 5325709, at *5 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *Quantum Entm't v. U.S. Dept. of Interior,* 597 F. Supp. 2d 146, 153-54 (D.D.C. 2009) (agency's decision was "incomplete" in violation of the "prohibition against arbitrary or capricious agency decisions"); *Am. Wildlands v. Norton,* 193 F. Supp. 2d 244, 257-58 (D.D.C. 2002) (agency's decision remanded where decision did not "reflect a reasoned assessment of the statutory listing factors").  By FinCEN's own admission, as evident on the face of the NOF itself, it declined to weigh this required factor. Accordingly, this Court should vacate the NOF and NPRM because they are the result of arbitrary and capricious agency action.

**B.     FinCEN Has Repeatedly Ignored Its Obligation to Consider a Target
        Bank's Legitimate Business.**

FinCEN's willful disregard of the statute's mandate is not unique to this case.  FinCEN

has ignored its obligation to consider a bank's legitimate business on numerous occasions when

it imposed the fifth special measure.  In each case, it has tried to excuse its deliberate disregard

of the statutory requirements using virtually identical language, stating that such business is

"difficult" to assess, evaluate, or determine.  Indeed, it appears to be a strategic policy gambit to

close banks without meeting the statutory requirements.

For example, in 2005, FinCEN issued a Notice of Finding against Banco Delta Asia

SARL ("BDA"), which found that BDA had participated in money laundering in Macau.  That

NOF bears remarkable similarities to the NOF in the instant case.[17]  Like the instant case, that

NOF strongly suggests that FinCEN's real target was not BDA itself but the jurisdiction in which

BDA operated – in that case Macau – which had failed to impose controls on money laundering.

In the BDA NOF, FinCEN pointed to Macau's "lack of adequate controls and regulatory

oversight of the banking and gaming industries (many of which are associated with organized

criminal activity) that has led to an environment that can be exploited by money launderers."  In

the BDA case, as here, FinCEN ultimately aimed its most powerful weapon, the fifth special

measure, at one of the smallest banks in that country.  Notwithstanding the bank's small size, in

the BDA case, as in the instant case, FinCEN complained that "[i]t is difficult to determine the

extent to which [BDA] is used for legitimate purposes." And notwithstanding this purported

incapacity, like in the instant case, FinCEN then concluded, without further analysis or

---

[17] Banco Delta Asia's litigation is ongoing.  *See Banco Delta Asia, S.A.R.L. v. Fin. Crimes
Enforcement Network,* No. 1:13-CV-333(BAH) (D.D.C. filed Mar. 14, 2013).

evidentiary support, that "any legitimate use of Banco Delta Asia is significantly outweighed by its use to promote or facilitate money laundering and other financial crimes."[18]

In 2011, this pattern repeated itself in the NOF issued against Lebanese Canadian Bank SAL ("LCB").  Again, FinCEN complained about a lack of controls in the bank's primary jurisdiction – Lebanon.  And, again, FinCEN acknowledged that the bank conducted legitimate business, indeed, acknowledging that "it is likely that a high volume of [LCB's transactions through U.S. correspondent banks] is legitimate."  Nevertheless, and without making any effort to otherwise quantify or weigh LCB's legitimate business, FinCEN summarily concluded that "any legitimate use of LCB is significantly outweighed by the apparent use of LCB to promote or facilitate money laundering."[19]

In 2012, FinCEN took aim at the nation of Belarus, which was the subject of EU and US sanctions.  It identified a small and relatively insignificant bank in that country to send a message to Belarus.  This time it targeted JSC CredexBank ("Credex"), which was the 22nd largest of 33 banks in Belarus.  FinCEN again recited its mantra that it was "difficult to assess the extent to which Credex is engaged in legitimate business"  and, without any further data or analysis, concluded, "thus, any legitimate use of Credex is significantly outweighed by the apparent use of Credex to facilitate or promote money laundering and other financial crimes." [20]

---

[18] Finding that Banco Delta Asia SARL is a Financial Institution of Primary Money Laundering Concern, 70 Fed. Reg. 55,214, 55,216 (Sept. 20, 2005).

[19] Finding that Lebanese Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern, 76 Fed. Reg. 9,403, 9,406 (Feb. 17, 2011).

[20] Finding that JSC CredexBank Is a Financial Institution of Primary Money Laundering Concern, 77 Fed. Reg. 31,434, 33,147 (May 25, 2012).

This pattern[21] strongly indicates that FinCEN's failure to consider the legitimate business of BPA reflects a calculated decision by FinCEN simply to ignore an inconvenient factor that might weigh against the imposition of a sanction that FinCEN wanted to impose. Such conduct is not just arbitrary and capricious; it constitutes a deliberate violation of statutory authority – a substitution by the agency of its own standards, priorities, and judgment for those of Congress.

## III.   FinCEN Improperly Imposes Section 311 Sanctions Through Procedures Calculated to Preclude Meaningful and Timely Challenge.

FinCEN's admitted, and apparently deliberate, failure to evaluate the factors Section 311 requires appears part of a larger strategy by FinCEN to act by fiat and evade meaningful and timely challenge to its actions.

### A.   FinCEN Eschewed Application of an Objective Standard in Reaching its Finding that BPA is of "Primary Money Laundering Concern."

FinCEN treats the statutory language "primary money laundering concern" as an unlimited mandate to impose sanctions based solely on its subjective appraisal of the money laundering risk that a potential target may represent, unconstrained by objective, measurable criteria. Notwithstanding that the term is the centerpiece of Section 311, Congress included no

---

[21] These are not the only examples. FinCEN reported that it found it difficult to evaluate the legitimate business of virtually every other bank on which it imposed the fifth special measure during the past 11 years, including: Commercial Bank of Syria, 69 Fed. Reg. 28,098, 28,100 (May 18, 2004) ("the extent of the Bank's legitimate activities is ultimately difficult to quantify"), First Merchant Bank OSH Ltd, 69 Fed. Reg. 51,979, 51,982 (Aug. 24, 2004) (legitimate activities "ultimately difficult to quantify"), First Merchant Finance Ltd, *id.*, (legitimate activities "ultimately difficult to quantify"), First Merchant International Inc., *id.*, (legitimate activities "ultimately difficult to quantify"), First Merchant Trust Ltd., *id.*, (legitimate activities "ultimately difficult to quantify"), FMB Finance Ltd., *id.*, (legitimate activities "ultimately difficult to quantify"), Infobank (renamed PJSC Trustbank), 69 Fed. Reg. 51,973, 51,975 (Aug. 24, 2004), ("difficult to determine the extent" of bank's legitimate business), Multibanka, 70 Fed. Reg. 21,362, 21,365 (Apr. 26, 2005), ("it is difficult to determine the extent to which Multibanka is used for legitimate purposes"), VEF Bank, 70 Fed. Reg. 21,369, 21,372 (Apr. 26, 2005), ("it is difficult to determine the extent to which VEF is used for legitimate purposes").

explicit definition of "primary money laundering concern."[22]  It did, however, lay out objective

factors that FinCEN must consider, and it required that "reasonable grounds exist" in support of

such a determination.  Congress, moreover, specified that FinCEN could promulgate regulations

further defining the statutory terms.  To date, FinCEN has not done so.

In the *FBME Bank* litigation, however, the Director of FinCEN provided a declaration

setting out how FinCEN has construed the term.  Focusing on the word "concern," the Director

declared:

> FinCEN applies a plain language approach to the phrase "money laundering
> concern."  FinCEN understands this phrase in its colloquial sense to refer to *a
> perceived risk or threat that justifies action by the agency.*

SOF Ex. 15 ¶ 17 (emphasis added).  This definition is circular and, hence, meaningless.  It

conveys no content as to the nature of the "perceived risk or threat" – that is, after all, precisely

what "concern" means in this context – that will justify agency action.  In short, the Director's

view is that FinCEN's actions justify themselves.  In addition, while paying lip service to the

factors Congress directs be considered, the Director makes clear that she can ignore them.  Thus,

for example, as to the statutory requirement that FinCEN consider "the extent" to which a

sanctions target "is used to facilitate or promote money laundering," the Director has announced

her view that the statute does not even require the target to actually be engaged in money

laundering at all.  She made this clear in her declaration, stating,  "Nor does the statute require

any determination that the designated financial institution be engaged in money laundering, only

that it be of primary money laundering concern."  SOF Ex. 15 ¶ 16.

By any measure, this circular, subjective construction of the central statutory term is

facially arbitrary and capricious under the APA.  5 U.S.C. § 706(2)(A).  It amounts to nothing

---

[22] Whether this failure renders the statute unconstitutionally vague is reserved for consideration, should it prove necessary, under Count 3 of the Verified Complaint.

more than an "I know it when I see it" or, to be more accurate, "I know it when I am concerned" standard, which is no standard at all.  As the D.C. Circuit has recently reaffirmed, the standard under which an agency exercises statutory authority must be "'reasonable and reasonably explained.'"  *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 753 (D.C. Cir. 2015) (citation omitted).  This requirement is not met if an agency "fails to articulate a comprehensible standard."  *Id.*  No deference is owed to an agency determination that is "'largely incomprehensible.'"  *Id.* (citation omitted).  The Director's sworn statements in *FBME Bank* are a frank admission that FinCEN has not articulated or applied a comprehensible, objective standard with respect to the central term in the statute and instead has adopted an impenetrable, subjective standard.

In her declaration in *FBME Bank*, the Director also essentially dismisses the word "primary" as a pertinent consideration under the statutory language, advancing her view that the statute does not require "any one factor to be given more weight than any other information the Director might chose to consider" and asserting that she is entitled to assess information on "a case-by-case basis," thereby stripping the concept of "primary" of all meaning.  SOF Ex. 15 ¶¶ 16, 17.  Yet evaluating a target bank in isolation on an individual "case-by-case" basis is not what the statute requires.  As noted by the Supreme Court, "primary" is defined as "[f]irst or highest in rank, quality, or importance; principal."  *Brown v. Plata*, 563 U.S. 493, 131 S. Ct. 1910, 1936 (2011).  Use of the word "primary" therefore necessarily requires a comparison, which cannot be made without the identification and designation of the most serious violators.

Unfortunately, money laundering is commonplace; virtually every bank has experienced it.  The Bank Secrecy Act does not expect or require banks to prevent all instances of money laundering, only that they take reasonable steps to prevent the practice through appropriate

detection and compliance systems. [23]  By using the word "primary," Congress signaled that it did not intend to sanction every bank that has had discrete instances of money laundering but rather to reserve sanctions for banks that are the foremost, chief, or principal financial institutions of money laundering concern to the U.S. financial system and, further, to apply the harshest sanction to only the very worst offenders.

Nothing in FinCEN's approach suggests that it gives any consideration to this statutory requirement.  To the contrary, it appears that it chooses small banks in small countries on which to "use the hammer," while ignoring banks in places that are well known to be centers of illegal financial activity such as weapons trafficking and terror financing that threatens national security. Certainly with respect to its NOF and NPRM against BPA, there is no indication whatsoever that FinCEN engaged in any comparative assessment that would justify labeling this small Andorran bank as of "primary" concern.  There is no suggestion in the NOF that BPA was in any way involved in weapons trafficking, terror financing, or anything that would meaningfully implicate national security.  Indeed, there is every reason to believe that BPA, as such, was of no real concern to FinCEN, but that the actual object of FinCEN's concern was the Andorran government, whose anti-money laundering controls FinCEN felt to be inadequate.

This might be dismissed as speculation but for a rare moment of diplomatic candor when Anton Smith, an Economic Counselor at the U.S. Embassy in Madrid said, "With respect to Andorra, last year we signaled our discomfort with an official report directing the authorities to some failures . . . in the system there.  I will not say that they did not realize it, but they did not

---

[23] As the legislative history of Section 311 makes clear, the statute was not directed at every bank or country that has experienced instances of money laundering but only at those posing a significant, ongoing risk of illegal conduct.  *See, e.g.,* H.R. Rep. No. 107-250 at 63 (2001).

react with the appropriate vigor that we were expecting, and we had to use the hammer."[24]  As discussed above, it was not the first time that FinCEN attacked a recalcitrant jurisdiction by using the "hammer" on a minor bank.

**B.    FinCEN Intended for its "Proposed" Sanction to be Immediately Implemented.**

The idea that the NPRM is a "proposed" rulemaking is in fact a sham.  FinCEN wastes no time in executing its sentence.  The moment the NPRM is issued, U.S. banks, as FinCEN expects and intends, immediately stop allowing the target bank access to correspondent banking accounts. FinCEN also urges foreign regulators to sanction the target bank without cautioning them to wait to see whether adoption of a final regulation will actually uphold FinCEN's finding and proposed sanction.   The consequences are inevitable, intentional, and devastating.   FinCEN is the gatekeeper for the dollar-based financial system, the preeminent system in the world necessary to the functioning of international finance.  No foreign regulator, and particularly not one from a relatively insignificant jurisdiction like Andorra, can afford to or will challenge FinCEN's role as the world's financial policeman and FinCEN knows this.  Barred by U.S. banks from using correspondent accounts to participate in the U.S. dollar market and beleaguered by foreign regulators shutting down its operations abroad, the target bank quickly unravels.[25]  Meanwhile, FinCEN delays completion of its rulemaking process until the bank is wiped out and, in most instances, issues no final regulation at all but withdraws its proceedings as moot because the

---

[24] *See* Els Americans Van Actuar l'any Passat Per La Falta de Fluidesa de les Autoritats Andorranes, YouTube (uploaded May 27, 2015), https://youtu.be/jXli0F9UgqQ.

[25] *See, e.g.,* Withdrawal of the Proposed Rulemaking Against Lebanese Canadian Bank SAL, 80 Fed. Reg. 60,575, 60,576 (Oct. 7, 2015) ("LCB no longer exists as a foreign financial institution."); Repeal of the Final Rule Imposing Special Measures and Withdrawal of the Findings of Primary Money Laundering Concern Against Myanmar Mayflower Bank and Asia Wealth Bank, 77 Fed. Reg. 59,747, 59,748 (Oct. 1, 2012) ("Subsequent to the issuance of the final rule related to the Banks, the Government of Burma revoked the licenses of the Banks in 2005 and neither financial institution currently exists.").

bank, at FinCEN's hand, is effectively dead.   FinCEN thereby can use delay effectively to insulate its conduct from scrutiny.

As long ago as 2008, the Government Accountability Office ("GAO") investigated FinCEN's implementation of Section 311 and, in particular, questioned why extended delays were commonplace between its issuance of an initial NOF and NPRM and any final rule.   As the GAO observed, although it often takes FinCEN years to finalize or withdraw a proposed Section 311 final rule, the "proposed rules had significant impact because U.S. financial institutions took immediate action on the basis of their being announced, effectively implementing them before they were finalized."  SOF Ex. 14 at 17.   The GAO went on to state:

> Despite taking years to finalize in some cases, the proposed rules under Section 311 had an immediate impact on targeted institutions and jurisdictions.   Treasury, State and Justice officials told us that once a proposed rule is issued, almost all U.S. financial institutions immediately implement it voluntarily, stopping transactions with designated financial institutions or jurisdictions.   Federal Reserve and Treasury's Offices of the Comptroller of the Currency officials also said that U.S. banks often treat proposed Section 311 rules as final and generally cut off all financial interactions with the targeted institution.   Federal Reserve officials noted that this response to a proposed rule is unusual and, within the context of BSA requirements, appears to be unique to proposed rules under Section 311.

*Id*. at 21.

Writing in response to the draft GAO Report and addressing GAO's concern about the delay between FinCEN's issuance of a proposed rule and the finalization or withdrawal of that rule, then-Under Secretary of the Treasury Stuart A. Levey did not challenge GAO's conclusions.  Instead, he argued that there is no requirement under the APA that rules be finalized in any given time period, admitting, indeed boasting, that FinCEN need issue no final rule precisely because the issuance of a proposed rule can provide the result it seeks.   As he put it: "[T]he rule making action is not an end in itself. *The most successful exercise of Section 311 would be where the*

*underlying threat is eliminated, making the final regulatory action itself unnecessary*."  SOF Ex. 14 at 38 (emphasis added).[26]  As the GAO recognized:

> Because a proposed rule applying Section 311 in practice has the same effect as a final rule, [FinCEN] may lack incentive to finalize or withdraw such rules.

*Id*. at 27.  Precisely.

### C.  FinCEN Frustrates any Meaningful "Notice and Comment" Process by Withholding Disclosure of the Administrative Record on which its Finding and Proposed Sanction are Purportedly Based.

Under the APA, FinCEN is required to provide adequate notice of any regulation it proposes in order to "give interested persons an opportunity to participate in the rule making."  5 U.S.C. § 553(b)-(c).  This is not merely a formality.  Such notice must provide "sufficient detail on [the regulation's] content and basis in law and evidence to allow for meaningful and informed comment."  *Am. Medical Ass'n v. Reno*, 57 F.3d 1129, 1132 (D.C. Cir. 1995).  Its purpose is to allow for "an exchange of views, information, and criticism between interested persons and the agency."  *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977).  This is only possible if the agency "disclose[s] in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based."  *Id.*  In the *FBME Bank* case, this Court recently issued an injunction against FinCEN, directing it to voluntarily disclose all non-classified evidence contained in the administrative record underlying its finding.[27]  *FBME Bank Ltd. v. Lew*, No. 15-CV-01270(CRC), 2015 WL 5081209, at *8 (D.D.C. Aug. 27, 2015).  The onus is not on an

---

[26] In her declaration in *FBME Bank*, FinCEN's Director acknowledged that FinCEN has imposed the fifth special measure in *every* Section 311 case it has undertaken.  Her declaration listed the fifteen matters involving financial institutions in which Section 311 sanctions have been proposed, all of them involving the harshest sanction.  In the vast majority, the NPRM was eventually withdrawn, still remains pending, or was only concluded long after its effects were complete.  SOF Ex. 15 ¶ 24.

[27] The statute further provides for submission of classified information to the reviewing court *ex parte* and *in camera* thereby allowing the full record underlying any finding and sanction to be subjected to review.  31 U.S.C. § 5318A(f).

interested party to request this evidence, but rather "[i]t is the agency's affirmative obligation to make this material publicly available and expose it to refutation during the rulemaking proceeding." *Id.* (citing *Air Transp. Ass'n v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999).

In utter disregard of this requirement, FinCEN has made no disclosure whatsoever in the BPA matter beyond the NOF and NPRM themselves. While the onus was not on plaintiffs to request this information, plaintiffs nevertheless repeatedly requested FinCEN to provide it. In a meeting on July 15, 2015, FinCEN agreed to listen to plaintiffs' counsel but declined to make any comment or provide any additional information. In a letter to FinCEN dated July 22, 2015, plaintiffs' counsel raised numerous questions, including whether there were "other cases or matters" involving BPA but not disclosed by FinCEN that FinCEN believed warranted the NOF, whether there were factors that distinguish BPA from other Andorran banks that led to the NOF, and whether there were communications with the Andorran government pertaining to BPA. SOF Ex. 8 at 6-7. In a subsequent letter dated September 4, 2015, having received no response to his specific questions, counsel for plaintiffs asked that FinCEN disclose "all non-classified material that was considered in issuing the Notice, with an opportunity to respond by BPA." SOF Ex. 9 at 5. And plaintiffs also requested the information via a FOIA request. SOF Ex. 11.

FinCEN has responded to none of these requests. In a September 16, 2015 email, FinCEN merely stated: "If a specific response to your letters is appropriate, you will receive it by a separate communication." SOF Ex. 10. In response to plaintiffs' request for documents under FOIA, FinCEN responded that it would not even address the request until December 15, 2015, at the earliest. SOF Ex. 12. More than seven months into its purported rulemaking proceeding, FinCEN still has yet to respond, or to provide anything beyond the NOF and NPRM.

In their counsel's letters, plaintiffs provided FinCEN with written comments on the NOF and NPRM, setting out to the extent possible, given their lack of access to the administrative record or to BPA's own files after its expropriation, plaintiffs' objections to FinCEN's actions. While their submissions significantly undercut statements contained in the NOF itself,[28] plaintiffs could not address any undisclosed evidence on which FinCEN purportedly based its finding. As the D.C. Circuit has held in the due process setting: The opportunity to present evidence and interact with the agency "is plainly not enough to satisfy due process" where the plaintiff "never had the opportunity to tailor its submission to the [agency's] concerns or rebut the factual premises underlying [its] action." *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014).

In short, FinCEN's unlawful actions with respect to BPA were deliberate. FinCEN fully intended to destroy BPA as a shot across the bow of the Andorran government. FinCEN issued its NOF and NPRM knowing and intending that they would immediately cut BPA off from international banking connections and almost certainly result in the closure of BPA by its regulators or creditors. Then by denying access to the administrative record, precluding timely and meaningful comment, and delaying the issuance of a final rule, FinCEN sought to insulate its conduct from any genuine adversarial examination and ultimately from judicial review.

FinCEN may find this conduct expedient and even commendatory. Former Under Secretary Levey certainly presented it as such in his letter to the GAO. But it is flatly contrary to the statutory scheme. The statute plainly contemplates that the stigma of labeling a bank as a "primary money laundering concern" and its accompanying sanctions will not be given force and

---

[28]  As noted, counsel provided FinCEN with a letter that BPA sent to its Andorran regulator over a year earlier identifying and self-reporting each of the three specific instance of money laundering that are included in the NOF and describing BPA's corrective actions. *See* pp. 10-11, *supra*.

effect until there is a genuine and meaningful opportunity to challenge them.  In respect of the imposition of the four lesser sanctions identified by the statute – including certain recordkeeping and reporting requirements or obtaining information as to beneficial ownership of accounts and other matters – the statute limits the duration of any such sanctions to a period of 120 days unless FinCEN engages in formal rulemaking and promulgates a final rule within that period.  31 U.S.C. § 5318A(a)(3)(B).  In respect of the imposition of the fifth and harshest sanction, the statute requires FinCEN to act solely through rulemaking proceedings.  31 U.S.C. § 5318A(a)(2)(C). The statute thus contemplates that Section 311's harshest sanction will become effective only *after* there has been a meaningful opportunity to test it.  Unlike the lesser sanctions, which can be made immediately effective but only for a limited period, denying a foreign bank access to the means to process U.S. dollar-based financial transactions would devastate its ability to function as an international bank.  SOF ¶ 30; SOF Ex. 17.  Unless a meaningful opportunity to challenge the evidentiary basis for imposing this sanction is provided *before* the sanction is made effective, the target bank will find itself in the same posture as the Knave of Hearts, doomed by "sentence first – verdict afterward."

**IV.    The Court Should Grant Urgent Relief to Avoid Ongoing Damage Due to the Continuing Injurious Effects of FinCEN's Improper Agency Action.**

This Court can and should act now.  FinCEN has clearly and deliberately exceeded its delegated authority causing serious injury to plaintiffs – both directly and derivatively. Accordingly, summary judgment is appropriate on Counts 4 and 5 of the complaint.

The same is true in respect of Counts 1 and 2.  It is well settled that review under the APA is available for "final agency action for which there is no other adequate remedy."  5 U.S.C.

§ 704.[29]  The Supreme Court has instructed courts to apply the finality requirement in a "flexible" and "pragmatic" way.  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967), *abrogated on other grounds by Califano v. Sanders*, 97 S. Ct. 980 (1977); *see also Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 30 (D.C. Cir. 1984) (quoting *Abbott Labs.*, 387 U.S. at 149-50).  Courts therefore consider whether the agency action is "sufficiently final that [the court] would have no interest in postponing review."  *Pub. Citizen Health Research Grp.*, 740 F.2d at 30.

In this case, postponing review would not only be disastrous for plaintiffs, it could deprive this Court of its ability to adjudicate plaintiffs' complaint at all.  As shown above, BPA has been expropriated, and the Andorran regulators are in the process of dismembering it and selling the pieces.  The process will soon be complete.  At present, there is still the potential that the plaintiffs can be restored to their ownership of BPA, albeit a substantially smaller BPA.  But once assets are transferred to the new government bank and that bank is sold, that possibility becomes considerably more remote.  Absent relief from this Court, there is little prospect that BPA will survive and plaintiffs' interest in it can be saved.

It is thus self-evident that, as a practical matter, the NPRM imposed immediate and permanent sanctions on BPA and is therefore effectively final.  As the GAO observed in its 2008 report, FinCEN's NPRMs are "unique" among proposed rulemaking because they have "significant" and "immediate impact on targeted institutions."  U.S. and foreign financial institutions respond to an NPRM by immediately closing the accounts of a targeted bank.  The NPRM therefore "has the same effect as a final rule."  SOF Ex. 14 at 17, 21, 27.  That the NPRM

---

[29] The NOF labeling BPA a "primary money laundering concern" constitutes final agency action as it is "effective as [sic] March 6, 2015," it contemplates no further action by FinCEN, and there is no administrative procedure for its appeal.

expressly "encourage[d] other countries to take similar action" by prohibiting their own domestic banks from doing business with BPA, reflects FinCEN's own understanding that its decision was already final.  SOF Ex. 5 at 13305.

Moreover, FinCEN's previous conduct and statements make clear that waiting for a final rule in this case may be futile.  FinCEN routinely postpones the issuance of a final rule until the final rule is no longer necessary.  The GAO recognized this potential abuse of the rulemaking process in its 2008 report, noting that because an NPRM has the same effect as a final rule, FinCEN "may lack incentive to finalize or withdraw such rules."  SOF Ex. 14 at 27.  The futility of awaiting a final rule is underscored by the recent action taken by FinCEN in relation to Lebanese Canadian Bank SAL ("LCB").  In February 2011, FinCEN issued a proposed rulemaking to impose the fifth special measure against LCB.  As a result of that proposed rulemaking, LCB's banking license was revoked and its assets were liquidated.  In October of this year, after more than four years, FinCEN revoked its NPRM against LCB and advised that it would not issue a final rule because "LCB no longer exists as a foreign financial institution."  80 Fed. Reg. 60575, 60576 (Oct. 7, 2015).

If the Court awaits further action from FinCEN, BPA will almost certainly suffer the same fate as LCB and FinCEN will be free to continue to violate its statutory obligations.  The D.C. Circuit has cautioned that "when disinclined to find finality, [the courts] must then weigh this consideration against the immediate impact of the actions on the challengers, and whether that impact is so harmful that present consideration is warranted."  *Pub. Citizen Health Research Grp.*, 740 F.2d at 30 (quotation omitted).[30]  The immediate and crushing impact of the NOF and

---

[30] The D.C. Circuit has held that "[t]o be final, an action need not be the last administrative [action] contemplated by the statutory scheme.  Rather, the question is whether the agency has

the NPRM on BPA and on plaintiffs outweighs the need to wait for a relatively insignificant administrative step that FinCEN may delay for months or even years, if it ever takes that step at all.  Immediate consideration of FinCEN's actions is more than justified in these circumstances.

Accordingly, plaintiffs respectfully request that the Court enter partial summary judgment in plaintiffs' favor and order as follows:

(i)     That FinCEN's NOF and NPRM be vacated;

(ii)    That FinCEN is directed forthwith to provide notice of the foregoing to all U.S. financial institutions through publication in the Federal Register;

(iii)   That FinCEN is directed forthwith to provide notice to BPA's prior U.S. correspondent banks, advising them that the NOF and NPRM against BPA have been vacated and that these banks are free to resume correspondent banking relationships with BPA without regulatory consequence;

(iv)    That FinCEN is directed forthwith to provide notice to BPA's regulator and administrator in Andorra that its NOF and NPRM against BPA have been vacated and that FinCEN withdraws its prior encouragement to take adverse action against BPA; and

(v)     That FinCEN is directed promptly to report to this Court, with copy to plaintiffs, the results of its compliance with the foregoing.

---

impose[d] an obligation, denie[d] a right, or fixe[d] some legal relationship."  *Role Models Am. Inc. v. White*, 317 F.3d 327, 331 (D.C. Cir. 2003) (citation and quotations omitted).

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court enter partial summary judgment in their favor as set out in the accompanying Proposed Order.

Respectfully submitted,

By:   /s/ Eric L. Lewis
    Eric L. Lewis (DC Bar #394643)
    *eric.lewis@lewisbaach.com*
    A. Katherine Toomey (DC Bar #426658)
    *katherine.toomey@lewisbaach.com*
    LEWIS BAACH PLLC
    1899 Pennsylvania Avenue, NW, Suite 600
    Washington, DC 20006
    (202) 833-8900

    Aaron T. Wolfson *(pro hac vice)*
    *aaron.wolfson@lewisbaach.com*
    LEWIS BAACH PLLC
    405 Lexington Avenue, 62nd Floor
    New York, NY 10174
    (212) 826-7001

Dated:    November 12, 2015          *Attorneys for  Plaintiffs*