**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RAMON CIERCO, <u>et al.</u>, | |
| Plaintiffs, | |
| v. | Civil Action No. 15-1641 (JEB) |
| JACOB LEW, in his official capacity as Secretary of the Treasury, <u>et al.</u>, | |
| Defendants, | |
| and | |
| BANCA PRIVADA D'ANDORRA S.A., in receivership, | |
| Nominal Defendant. | |

<u>**MEMORNADUM IN SUPPORT OF THE MOTION TO DISMISS
BY DEFENDANTS JACOB LEW, U.S. DEPARTMENT OF THE TREASURY,
JENNIFER SHASKY CALVERY, AND
THE FINANCIAL CRIMES ENFORCEMENT NETWORK**</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................2

    I.    Section 311 of the PATRIOT Act.................................................................2

    II.   FinCEN's Proposed Rule ............................................................................2

    III.  Actions by the Andorran Government .........................................................5

    IV.  This Action...................................................................................................6

DISCUSSION .....................................................................................................................7

    I.    Legal Standard ............................................................................................7

    II.   Plaintiffs Lack Standing..............................................................................9

          A.  The alleged downstream injuries of FinCEN's proposed rule cannot be redressed

              through this case .................................................................................9

          B.  Alleged future injuries are insufficient for Article III standing................................12

          C.  Plaintiffs do not have standing to challenge FinCEN's proposed rule on behalf of

              BPA.........................................................................................................14

    III.  Plaintiffs' Claims Are Not Ripe for Review..............................................18

    IV.  Plaintiffs Challenge to a Non-Final Rule is Not Actionable Under the APA......................20

    V.   Plaintiffs Fail to State a Claim for a Due Process Violation....................................26

          A.  There has been no deprivation by the government ...................................26

          B.  Plaintiffs lack a sufficiently pled constitutional presence...........................................28

          C.  Even if plaintiffs are entitled to due process, the rulemaking process affords

              plaintiffs more than adequate notice and an opportunity to be heard .......................31

          D.  Plaintiffs received notice in the Notice to Finding .....................................32

CONCLUSION.....................................................................................................................34

# TABLE OF AUTHORITIES

Federal Cases

*32 Cnty. Sovereignty Comm. v. Dep't of State*,
    292 F.3d 797 (D.C. Cir. 2002) ........................................................... 28

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ........................................................................ 19

*Action All. of Senior Citizens v. Leavitt*,
    483 F.3d 852 (D.C. Cir. 2007) ........................................................... 25

*Al Haramain Islamic Found. v. U.S. Dep't of the Treasury*,
    686 F.3d 965 (9th Cir. 2012) ............................................................ 32

*Al-Aqeel v. Paulson*,
    568 F. Supp. 2d 64 (D.D.C. 2008) ...................................................... 32

*Allen v. Wright*,
    468 U.S. 737 (1984) ........................................................................ 10

*Alternative Research & Dev. Found. v. Veneman*,
    262 F.3d 406 (D.C. Cir. 2001) ........................................................... 12

*Am. Airways Charters, Inc. v. Regan*,
    746 F.2d 865 (D.C. Cir. 1984) ........................................................... 17

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ......................................................................... 27

*Arbelaez v. Newcomb*,
    1 Fed. App'x 1, Civil No. 00-5217 (D.C. Cir. Jan. 18, 2001) ..................... 29

*Ariz. Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011) ......................................................................... 7

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ........................................................ 8, 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................. 8, 29

*Ass'n of Nat'l Advertisers, Inc. v. FTC*,
    627 F.2d 1151 (D.C. Cir. 1979) ......................................................... 34

*Banco Nacional De Cuba v. Sabbatino*,
    376 U.S. 398 (1964) ........................................................................ 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................... 8

*Belmont Abbey Coll. v. Sebelius*,
  878 F. Supp. 2d 25 (D.D.C. 2012) ........................................................ 13

*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................ 21, 22

*Better Gov't Ass'n v. Dep't of State*,
  780 F.2d 86 (D.C. Cir. 1986) ........................................................ 19

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ........................................................ 30

*Bristol-Myers Co. v. Fed. Trade Com.*,
  424 F.2d 935 (D.C. Cir. 1970) ........................................................ 22

*Califano v. Sanders*,
  430 U.S. 99 (1977) ........................................................ 19

*Californians v. U.S. DOE*,
  860 F. Supp. 2d 44 (D.D.C. 2012) ........................................................ 13

*Chamber of Commerce of the U.S. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011) ........................................................ 12

*Chrebet v. County of Nassau*,
  24 F. Supp. 3d 236 (E.D.N.Y. 2014) ........................................................ 31

*City of Harper Woods Emples. Ret. Sys. v. Olver*,
  589 F.3d 1292 (D.C. Cir. 2009) ........................................................ 14

*Clapper v. Amnesty Int'l USA*,
  133 S. Ct. 1138 (2013) ........................................................ 11, 12

*Cowin v. Bresler*,
  741 F.2d 410 (D.C. Cir. 1984) ........................................................ 14

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989) ........................................................ 27

*Defenders of Wildlife & Sierra Club v. Perciasepe*,
  714 F.3d 1317 (D.C. Cir. 2013) ........................................................ 12

*Doe v. Va. Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ........................................................ 28

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003) ........................................................ 14

*FBME Bank Ltd. v. Lew*,
  No. 15-1270, 2015 WL 5081209 (D.D.C. Aug. 27, 2015) ........................................................ 6, 24, 25, 26

*FTC v. Std. Oil Co.,*
  449 U.S. 232 (1980) ...................................................................................................... 25

*Food & Water Watch, Inc. v. Vilsack,*
  No. 15-5037, 2015 WL 9286978 (D.C. Cir. Dec. 22, 2015) ..................................... 8

*Franchise Tax Bd. v. Alcan Aluminium,*
  493 U.S. 331 (1990) ...................................................................................................... 17

*Grand Lodge of the FOP v. Ashcroft,*
  185 F. Supp. 2d 9 (D.D.C. 2001) ................................................................................. 7

*Greenya v. George Washington Univ.,*
  512 F.2d 556 (D.C. Cir. 1975) .....................................................................................27

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003) ..................................................................................... 33

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
  219 F. Supp. 2d 57 (D.D.C. 2002) .............................................................................. 34

*Humane Soc'y of the U.S. v. Vilsack,*
  797 F.3d 4 (D.C. Cir. 2015) ........................................................................................ 8

*In re BP Public Ltd. Co. Derivative Litig.,*
  507 F. Supp. 2d 302 (S.D.N.Y. 2007) ........................................................................ 15

*In re Fed. Nat. Mortgage Ass'n Sec., Derivative, "ERISA" Litig.,*
  503 F. Supp. 2d 9 (D.D.C. 2007) *aff'd sub nom. Pirelli Armstrong Tire Corp. Retiree Med.*
  *Benefits Trust ex rel. Fed. Nat'l Mortgage Ass'n v. Raines*, 534 F.3d 779
  (D.C. Cir. 2008)............................................................................................................18

*Int'l Bhd. of Teamsters v. Transp. Sec. Admin.,*
  429 F.3d 1130 (D.C. Cir. 2005) ................................................................................... 13

*Islamic Am. Relief Agency v. Unidentified FBI Agents,*
  394 F. Supp. 2d 34 (D.D.C. 2005) .............................................................................. 32

*Johnson v. Eisentrager,*
  339 U.S. 763 (1950) ...................................................................................................... 29

*Kadi v. Geithner,*
  42 F. Supp. 3d 1 (D.D.C. 2012) .................................................................................. 33

*Kamen v. Kemper Fin. Servs.,*
  500 U.S. 90 (1991) ........................................................................................................ 14

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) ...................................................................................................... 7

*Labovitz v. Wash. Times Corp.,*
 172 F.3d 897 (D.C. Cir. 1999) ............................................................. 14, 15, 16

*Lake Pilots Ass'n v. U.S. Coast Guard,*
 257 F. Supp. 2d 148 (D.D.C. 2003) ............................................................. 20

*Lightfoot v. D.C.,*
 273 F.R.D. 314 (D.D.C. 2011).............................................................26

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ............................................................. 9

*Lujan v. Nat'l Wildlife Fed'n,*
 497 U.S. 871 (1990) ............................................................. 21

*Motor Vehicle Mfrs. Ass'n of the U.S. v. N.Y. State Dep't of Envtl. Conserv.,*
 79 F.3d 1298 (2d Cir. 1996) ............................................................. 20

*Mt. Emmons Mining Co. v. Babbitt,*
 117 F.3d 1167 (10th Cir. 1997) ............................................................. 25

*Nat'l Ass'n of Home Builders v. EPA,*
 667 F.3d 6 (D.C. Cir. 2011) ............................................................. 13

*Nat'l Coal. against Misuse of Pesticides v. Thomas,*
 809 F.2d 875 (D.C. Cir. 1987) ............................................................. 33-34

*Nat'l Council of Resistance of Iran v. Dep't of State,*
 251 F.3d 192 (D.C. Cir. 2001) ............................................................. 30, 32

*Nat'l Park Hosp. v. DOI,*
 538 U.S. 803 (2003) ............................................................. 18

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
 366 F.3d 930 (D.C. Cir. 2004) ............................................................. 10

*Ohio Forestry Ass'n v. Sierra Club,*
 523 U.S. 726 (1998) ............................................................. 19

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
 182 F.3d 17 (D.C. Cir. 1999) ............................................................. 28

*People's Mojahedin Org. of Iran v. U.S. Dep't of State,*
 613 F.3d 220 (D.C. Cir. 2010) ............................................................. 32, 33

*Perez v. Mortg. Bankers Ass'n,*
 135 S. Ct. 1199 (2015) ............................................................. 23

*Perry Capital L.L.C. v. Lew,*
 70 F. Supp. 3d 208 (D.D.C. 2014) ............................................................. 17

*Pickus v. U.S. Bd. of Parole*,
   543 F.2d 240 (D.C. Cir. 1976) ........................................................................ 34

*Propert v. District of Columbia*,
   948 F.2d 1327 (D.C. Cir. 1991) ....................................................................... 27

*Pub. Citizen Health Research Group v. Comm'r, Food & Drug Admin.*,
   740 F.2d 21 (D.C. Cir. 1984) .......................................................................... 25

*Pub. Serv. Comm'n v. Wycoff Co.*,
   344 U.S. 237 (1952) ...................................................................................... 18

*Ralls Corp. v. Comm. on Foreign Inv.*,
   758 F.3d 296 (D.C. Cir. 2014) ........................................................................ 33

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
   324 F.3d 726 (D.C. Cir. 2003) ................................................................... 8, 21

*Renal Physicians Ass'n v. U.S. HHS*,
   489 F.3d 1267 (D.C. Cir. 2007) ................................................................. 10, 11

*Rifkin v. Bear Stearns & Co.*,
   248 F.3d 628 (7th Cir. 2001) .......................................................................... 14

*Sec. Indus. & Fin. Mkts. Ass'n v. U.S. CFTC*,
   67 F. Supp. 3d 373 (D.D.C. 2014) ................................................................... 17

*Shibeshi v. United States*,
   920 F. Supp. 2d 105 (D.D.C. 2013) ................................................................... 7

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981) ........................................................................ 34

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ....................................................................................... 10

Sparrow v. United Air Lines, Inc.,
   216 F.3d 1111 (D.C. Cir. 2000) ......................................................................... 7

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ...................................................................................... 13

*Tenn. Gas Pipeline Co., Div. of Tenneco, Inc. v. Fed. Energy Regulatory Com.*,
   736 F.2d 747 (D.C. Cir. 1984) ........................................................................ 20

*Tex. v. United States*,
   523 U.S. 296 (1998) ...................................................................................... 19

*Tex. Indep. Producers & Royalty Owners Ass'n v. U.S. EPA*,
   413 F.3d 479 (5th Cir. 2005) .......................................................................... 19

*Trudeau v. FTC,*
   456 F.3d 178 (D.C. Cir. 2006) ........................................................................... 7

*US Ecology, Inc. v. DOI,*
   231 F.3d 20 (D.C. Cir. 2000) ........................................................................... 12

*United States v. All Assets Held In Account No. 80020796,*
   No. 13-cv-1832, 2015 WL 1285791 (D.D.C. Mar. 19, 2015) ......................... 28, 30

*United States v. Sum of $70, 990, 605,*
   2015 WL 533192 (D.D.C. Sept. 14, 2015) ...........................................................30

*United States v. Verdugo-Urquidez,*
   494 U.S. 259 (1990) ....................................................................................... 28

*United Transp. Union v. ICC,*
   891 F.2d 908 (D.C. Cir. 1989) ........................................................................... 8

*Valona v. U.S. Parole Comm'n,*
   165 F.3d 508 (7th Cir. 1998) ........................................................................... 25

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
   435 U.S. 519 (1978) ....................................................................................... 23

*Warth v. Seldin,*
   422 U.S. 490 (1975) ....................................................................................... 10

*West Virginia v. EPA (In re Murray Energy Corp.),*
   788 F.3d 330 (D.C. Cir. 2015) ...................................................................... 21, 23

*Wyo. Outdoor Council v. U.S. Forest Serv.,*
   165 F.3d 43 (D.C. Cir. 1999) ........................................................................... 19

State Cases

*Feldman v. Cutaia,*
   951 A.2d 727 (Del. 2008) ............................................................................... 16

*J.P. Morgan Chase & Co. S'holder Litig. v. Harrison,*
   906 A.2d 766 (Del. 2006) ............................................................................... 15

*Rales v. Blasband,*
   634 A.2d 927 (Del. 1993) ............................................................................... 18

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,*
   845 A.2d 1031 (Del. 2004) ............................................................................. 15

Federal Statutes

5 U.S.C. § 704 ........................................................................................................8, 21

5 U.S.C. § 553 ............................................................................................................ 23

5 U.S.C. § 706(1) ....................................................................................................... 25

31 U.S.C. § 5311 ................................................................................................. *passim*

31 U.S.C. § 5318A .............................................................................................. *passim*

Other Authorities

80 Fed. Reg. 13,304 ........................................................................................... *passim*

80 Fed. Reg. 13,464 .................................................................................................. 3, 4

## INTRODUCTION

Plaintiffs are suing the Financial Crimes Enforcement Network ("FinCEN"), the Department of the Treasury, Secretary Jacob Lew, in his official capacity, and FinCEN director Jennifer Shasky Calvery, in her official capacity, over agency action that is proposed and not final, and as a result of third-party actions that FinCEN neither directed nor authorized. Plaintiffs' complaint thus reflects classic jurisdictional infirmities, and it should be dismissed. Plaintiffs cannot demonstrate that they have Article III standing, or prudential standing. Plaintiffs seek to assert the rights of a bank in which they own shares, requesting relief for injuries they did not suffer.  In addition, plaintiffs complain of alleged injuries imposed by third parties not before the Court, including foreign governments and non-party U.S. financial institutions.  In addition, the only agency action at issue is proposed, not final, and is thus not subject to review under the Administrative Procedure Act ("APA").  There is no basis for this Court to exercise jurisdiction over the complaint.

In addition, even if this Court did have jurisdiction over plaintiffs' claims, they fail to state a claim upon which relief can be granted.  In plaintiffs' telling, FinCEN violated the purported "constitutional" rights of the plaintiffs (two foreign nationals who own a substantial part of a foreign bank) simply by following the Congressional mandate in 31 U.S.C. § 5318A ("section 5318A") that it propose and impose penalties using the well-established informal rulemaking process.  Rulemaking procedures are the subject of extensive and lengthy case law in this District and Circuit, and FinCEN did precisely what it is supposed to do.  It published a Notice of Finding ("NOF") and a proposed rule reflecting its view that the fifth special measure under section 5318A should be imposed on BPA; with that notice, and the proposed rule, the agency provided plaintiffs and other interested commenters significant notice and opportunity to

be heard.  FinCEN did not violate federal law, let alone the Constitution, by following the path that Congress has directed it to follow.  And for nearly seven months after the proposed rule was published, plaintiffs did not appear to disagree.  Instead, after a preliminary injunction was entered in another lawsuit brought directly by the affected financial institution after publication of a final rule, these plaintiffs rushed to file suit.  That case provides little or no support for plaintiffs' complaint, and its holding does not stave off dismissal of this premature lawsuit.  The Court should dismiss this case in its entirety.

## BACKGROUND

### I.      Section 311 of the PATRIOT Act

Shortly after September 11, 2001, Congress strengthened federal laws against money laundering to stanch the flow of "the financial fuel that permits transnational criminal enterprises to conduct and expand their operations."  31 U.S.C. § 5311 (note).  Accordingly, in Section 311 of the USA PATRIOT Act, Congress authorized the Secretary of the Treasury to take certain "special measures" against foreign jurisdictions or foreign institutions of "primary money laundering concern."  Id. § 5318A(a)(1).  The fifth of these special measures—if imposed by a final rule—would prohibit, or impose conditions on, U.S. banks and financial institutions' opening or maintaining of correspondent accounts on behalf of a primary money laundering concern—effectively limiting or cutting off access, and thereby preventing harm, to the U.S. financial system.  Id. § 5318A(b)(5).  By statute, the fifth special measure may be imposed only by regulation.  Id. § 5318A(a)(2)(C).

### II.     FinCEN's Proposed Rule

On March 13, 2015, FinCEN, the component of the Department of the Treasury responsible for administering Section 311, issued a notice of proposed rulemaking ("NPRM")

and notice of finding that reasonable grounds exist to conclude that BPA is of primary money laundering concern.  80 Fed. Reg. 13,304 (Mar. 13, 2015); 80 Fed. Reg. 13,464 (Mar. 13, 2015). Based on classified, protected, and privileged information, as well as public information, FinCEN found that several high-level BPA managers knowingly facilitated transactions by "third-party money launderers" acting on behalf of transnational criminal organizations. Because such organizations often have difficulty accessing financial networks directly, they frequently use third-party intermediaries—including professional gatekeepers, such as accountants and attorneys—to transact with banks, seeking an aura of legitimacy for their laundering of illicit profits.  Here, FinCEN found that high-level BPA managers assisted third-party money launderers in, among others, the following schemes:

- One BPA manager created front companies and opened accounts that were used for false invoicing for Andrey Petrov and another Russian third-party launderer, both of whom are connected to Russian criminal organizations.  Petrov was arrested by Spanish authorities in 2013 for laundering 56 million euros.  80 Fed. Reg. at 13,465.

- Another BPA manager accepted bribes to process 20 million euros in bulk wire transfers to suspected shell companies for Gao Ping, a third-party launderer connected to Chinese human-trafficking organizations.  Ping was arrested by Spanish authorities in 2012 for money laundering.  Id.

FinCEN also found that BPA's weak anti–money laundering ("AML") controls— including inadequate monitoring of suspicious activity—serve to attract third-party money launderers.  Id. at 13,465.  Moreover, many money laundering transactions conducted through BPA would be identified as high risk by a bank with adequate AML controls, such as transactions conducted on behalf of shell companies, unlicensed money transmitters, and

customers without accurate address information, and transactions for large, round dollar amounts without a specified purpose.  Id. at 13,466.  Such transactions suggest a failure to conduct sufficient due diligence on customers, inadequate monitoring of transactions, or complicity in money laundering.  Id.  At the time the NPRM was published, BPA held direct correspondent accounts with four U.S. banks, and between 2009 and 2014, "BPA processed hundreds of millions of dollars through its U.S. correspondents."  Id.  One U.S. correspondent closed an account held by BPA after BPA processed "tens of millions of dollars on behalf of unlicensed money transmitters" through that account.  Id.  Moreover, "62 percent of BPA's outgoing transactions through one U.S. correspondent bank involved only four high-risk customers.  These customers, deemed high-risk by the U.S. correspondent bank, included a shell company, an Internet business, and two non-bank financial institutions."  Id.

In view of these findings, FinCEN proposed imposing the fifth special measure against BPA, and invited public comment.  Id. at 13,304.  If adopted, "the fifth special measure would prohibit covered financial institutions from establishing, maintaining, administering, or managing in the United States any correspondent account for or on behalf of BPA."  Id. at 13,306.  The proposed rule would also "require a covered financial institution to apply special due diligence to all of its foreign correspondent accounts that is reasonably designed to guard against processing transactions involving BPA."  Id.  Among other things, "covered financial institutions must notify those foreign correspondent account holders that the covered financial institutions know or have reason to know provide services to BPA that such correspondents may not provide BPA with access to the correspondent account maintained at the covered financial institution."  Id.  The comment period for the NPRM closed on May 12, 2015.  Id. at 13,304.

III.      Actions by the Andorran Government

On March 11, 2015, the Institut Nacional Andorrà de Finances—which supervises the Andorran financial system—chose to place BPA in administration.[1]  See Compl. ¶ 3.  The next month, in April 2015, the Andorran parliament enacted a law regarding the restructuring and resolution of banks, which created a new government agency for that purpose.  See id.  On March 13, 2015, the Andorran government also arrested the CEO of BPA, Juan Pau Miguel Prats, as part of a money laundering investigation.  See Charles Penty, Andorran Police Arrest BPA CEO Miquel in Money Laundering Probe, Bloomberg, March 14, 2015 (http://www.bloomberg.com/news/articles/2015-03-14/andorran-police-arrest-bpa-ceo-miquel-in-money-laundering-probe).  In June 2015, the new agency—the Agència Estatal de Resolució d'Entitats Bancàries, or AREB—approved a resolution plan for BPA, under which the bank's "good" and "bad" assets would be separated, the "good" assets transferred to a bridge bank, and the bridge bank sold.[2]  Under this resolution plan, plaintiffs allege, "the shareholders . . . have no involvement and no residuary interest" in the bank, Compl. ¶ 27, and "there is no prospect of the bank being returned to the shareholders," id. ¶ 24.  In July 2015, AREB announced the creation of the bridge bank, named Vall Banc, and in October 2015, announced that the sale process for Vall Banc had begun, with 31 interested bidders participating in the sale process.[3]

---

[1] Press Release, Agència Estatal de Resolució d'Entitats Bancàries ("AREB"), AREB Assumes the Tutelage of BPA (Apr. 27, 2015) (all AREB press releases available at http://areb.ad/comunicats-de-premsa).

[2] Press Release, AREB, AREB Will Create a 'Good Bank' with Legitimate Assets and Liabilities Segregated from BPA (June 15, 2015).

[3] Press Release, AREB, Board of the AREB Creates the New Bank Named Vall Banc (July 22, 2015); Press Release, AREB, AREB Wishes to Announce that the Sale Process of Vall Banc Has Started (Oct. 29, 2015).

IV.    **This Action**

Although plaintiffs claim that the March 2015 proposed rule caused "immediate" harm to their interests as shareholders, id. ¶ 43, and that, by June 2015, it was clear that they "would have no . . . residuary interest" in BPA under the Andorran government's resolution plan, id. ¶ 27, they did not file their complaint until October 2015.[4]  Plaintiffs Ramon and Higini Cierco are Andorran citizens who allege that they (through their holding companies) are the majority shareholders of BPA.  Compl. ¶¶ 15-17, 24-25.  They claim that FinCEN's action, though merely proposed, initiated a chain of events by which the Principality of Andorra—an independent sovereign—elected to place BPA in administration, approve a resolution plan, and offer its "good" assets for sale, thereby reducing the value of plaintiffs' holdings.

Plaintiffs' complaint raises six claims.  In Count I, they allege that the Notice of Finding and proposed rule are arbitrary and capricious.  Id. ¶¶ 97-112.  In Counts II and V, they claim that they lacked adequate notice of, and opportunity to comment on, the notice of finding and proposed rule, largely because FinCEN allegedly "refused to provide the information or evidence underlying the accusations."  Id. ¶ 110.  In Count III, they allege that FinCEN violated the due process rights of themselves and BPA.  Id. ¶¶ 113-20.  In Count IV, they allege that the notice of finding and proposed rule failed to account for the scope of BPA's legitimate business.  Id. ¶¶

---

[4] The timing of plaintiffs' complaint might be explained by recent developments in a different case involving Section 311.  In July 2015, FinCEN issued a final rule imposing the fifth special measure with respect to a Tanzanian bank operating mainly in Cyprus, FBME Bank.  In August 2015, Judge Cooper entered a preliminary injunction barring the final rule from taking effect, in part concerned that the bank had received insufficient notice of unclassified, non-protected evidence considered during the rulemaking.  FBME Bank Ltd. v. Lew, No. 15-1270, 2015 WL 5081209 (D.D.C. Aug. 27, 2015).  Judge Cooper has since granted the agency's motion for a voluntary remand to reopen the rulemaking to address these procedural concerns.  FBME Bank Ltd. v. Lew, No. 15-1270, 2015 U.S. Dist. LEXIS 150760 (D.D.C. Nov. 6, 2015).  Notably, in the FBME case, the bank challenged a final rule, not a proposed one.  Although plaintiffs filed this suit as related to FBME, Judge Cooper rejected the notice of a related case sua sponte.

121-26.  Count VI asks the Court to order the agency to finalize the proposed rule "within 30

days . . . so that its conduct can be subject to full judicial review," id. ¶ 133.

**DISCUSSION**

## I.      Legal Standard

Defendants move to dismiss this case for lack of jurisdiction under Federal Rule of Civil

Procedure 12(b)(1) and failure to state a claim upon which relief can be granted under Federal

Rule of Civil Procedure 12(b)(6).  In evaluating a motion to dismiss, "the Court must 'treat the

complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences

that can be derived from the facts alleged.'"  Shibeshi v. United States, 920 F. Supp. 2d 105, 106

(D.D.C. 2013) (quoting Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir.

2000)).  "The Court need not accept as true, however, 'a legal conclusion couched as a factual

allegation,' nor an inference unsupported by the facts set forth in the Complaint."  Id. (quoting

Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006)).

A federal court is presumed to lack subject matter jurisdiction until the plaintiff

establishes otherwise.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  A

plaintiff's claims of jurisdiction should be closely scrutinized because a court has "an affirmative

obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand

Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).

"Continued adherence to the case-or-controversy requirement of Article III maintains the

public's confidence in an unelected but restrained Federal Judiciary."  Arizona Christian Sch.

Tuition Org. v. Winn, 563 U.S. 125, 133 (2011).

"To establish standing, Plaintiffs 'must state a plausible claim that [they have] suffered an

injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a

favorable decision on the merits.'" Food & Water Watch, Inc. v. Vilsack, No. 15-5037, 2015 WL 9286978, at *4 (D.C. Cir. Dec. 22, 2015) (quoting Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015)). When evaluating standing at the motion to dismiss stage, the Court "accept[s] the well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations in the plaintiff[s'] favor," but "do[es] not assume the truth of legal conclusions, nor . . . accept[s] inferences that are unsupported by the facts set out in the complaint." Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015) (citations and internal quotation marks omitted). Furthermore, " '[w]hen considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties).'" Id. at 21 (quoting United Transp. Union v. ICC, 891 F.2d 908, 913 (D.C. Cir. 1989)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007)) (alterations in original).

Finally, plaintiffs seek review under the APA of FinCEN's publication of a proposed rule imposing a special measure with respect to BPA. 5 U.S.C. § 704 limits this Court's review under the APA to cases challenging "final agency action." See Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n, 324 F.3d 726, 731 (D.C. Cir. 2003) ("The District Court's authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'").

II.        **Plaintiffs Lack Standing**

To satisfy "the irreducible constitutional minimum of standing," plaintiffs must establish

three elements.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  "First, the plaintiff

must have suffered an 'injury in fact'—an invasion of a legally protected interest which is

(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.

Second, there must be a causal connection between the injury and the conduct complained of—

the injury has to be fairly traceable to the challenged action of the defendant, and not the result of

the independent action of some third party not before the court.  Third, it must be likely, as

opposed to merely speculative, that the injury will be redressed by a favorable decision."  Id. at

560-61 (quotations, alterations, and citations omitted).

Plaintiffs lack standing for three reasons: First, the present injuries cited in their

complaint cannot be redressed by the relief they seek from FinCEN.  Plaintiffs complain about

the downstream actions of independent market actors and a foreign government.  Second,

plaintiffs' alleged procedural injuries – stemming from their supposed inability to effectively

comment on FinCEN's proposed rule – do not create Article III standing.  Finally, plaintiffs

cannot assert standing for themselves based on alleged harms to BPA, as this violates

longstanding legal prohibitions against shareholders asserting the rights of a corporation.

A.  **The alleged downstream injuries of FinCEN's proposed rule cannot be redressed**
    **through this case**

Plaintiffs lack standing because their alleged direct injuries cannot be redressed even if

they prevailed on the merits of their lawsuit.  Plaintiffs cannot establish a likelihood that the

injuries to BPA and their shareholdings alleged in their complaint will be redressed by a

favorable decision from this Court.  Their complaint alleges that FinCEN's publication of a

proposed rule imposing the fifth special measure on BPA has caused financial institutions in the U.S. to avoid conducting business with the bank, which has threatened BPA's continued existence.  Compl. ¶ 2 ("publication of the Notices effectively and intentionally expelled [BPA] from the U.S. financial system, including U.S. dollar transactions and U.S. correspondent bank accounts."); Id. ¶ 43 ("BPA's U.S. correspondent banks immediately froze BPA's accounts and refused further banking services, thus cutting BPA off from the U.S. dollar market.").  It is substantially more difficult for plaintiffs to establish redressability for an injury such as this, which at root is predicated on the actions of third parties other than FinCEN or the Department of the Treasury.  "In several cases, the Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries."  Nat'l Wrestling Coaches Ass'n v. Dep't of Educ., 366 F.3d 930, 938 (D.C. Cir. 2004) (citing Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976); Allen v. Wright, 468 U.S. 737 (1984); Warth v. Seldin, 422 U.S. 490 (1975)); see also Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs., 489 F.3d 1267, 1274 (D.C. Cir. 2007) ("standing to challenge a government policy cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling").

Plaintiffs' complaint provides no grounds for believing that vacating the NPRM will prompt financial institutions in the United States to re-establish business relationships with BPA.  If financial institutions in the United States can be prompted to withdraw from their relationships with BPA based on a proposed rule, plaintiffs can only speculate that an order from this Court requiring further explanation from FinCEN or the publication of additional information would prompt them to re-establish correspondent accounts or other financial relationships, especially

when FinCEN indisputably retains the ability to impose the fifth special measure on BPA.  See

Renal Physicians Ass'n, 489 F.3d 1267, 1277-78 (D.C. Cir. 2007) (holding that plaintiff could

not demonstrate likelihood of increased compensation if agency's regulation were set aside,

where agency remained free to adopt the same course of action under other rationales).

There is an even larger hurdle to plaintiffs' establishing redressability: BPA is in

receivership in Andorra, where authorities have undertaken their own criminal investigation into

BPA.  Andorran authorities are also in the process of liquidating the bank.  Compl. ¶ 3.

Plaintiffs' complaint does allege that if the NPRM were rescinded, "BPA could be returned to its

shareholders who could resurrect the portions of its business that are still viable."  The Court is

under no obligation to accept this allegation as true, even at the motion to dismiss stage, given

that it rests entirely on hypothetical future events that lie beyond plaintiffs' control.  See Arpaio,

797 F.3d at 19 ("we may reject as overly speculative those links which are predictions of future

events (especially future actions to be taken by third parties)").  The plaintiffs' allegation ignores

important events: Andorran authorities placed BPA into liquidation proceedings pursuant to their

own laws, established a "bridge bank" structure for the assets of BPA, and commenced the sales

process for the bridge bank.  See AREB Press Release, October 29, 2015,

http://areb.ad/images/areb/comunicats/11112015_AREB_ENG.pdf.  But this allegation is also

manifestly insufficient to establish redressability, as the plaintiffs are merely guessing about the

course of action that Andorran authorities might undertake, given that none of the relief

requested in this action could or would be directed at the Andorran Administrator.  Courts should

be reluctant to "endorse standing theories that rest on speculation about the decisions of

independent actors."  Clapper v. Amnesty Int'l U.S.A., 133 S.Ct. 1138, 1150 (2013); see also

Renal Physicians Ass'n, 489 F.3d at 1278 ("[T]he undoing of the governmental action will not

undo the harm, because the new status quo is held in place by other forces."); U.S. Ecology, Inc. v. Dep't of the Interior, 231 F.3d 20, 21 (D.C. Cir. 2000) (finding no redressability where the plaintiff's "alleged injury would not be redressable unless and until California accepted transfer of the disputed land and elected to proceed with the . . . project.").

**B.   Alleged future injuries are insufficient for Article III standing**

A plaintiff that asserts standing based on the expectation of future injury "confronts a significantly more rigorous burden to establish standing." Chamber of Commerce of U.S. v. EPA, 642 F.3d 192, 200 (D.C. Cir. 2011) (internal quotation omitted); accord Clapper, 133 S. Ct. at 1147 ("allegations of possible future injury are not sufficient") (internal quotation omitted).

Plaintiffs cannot meet this burden, because the action they challenge is the publication of a "proposed" rule. The D.C. Circuit has long has held that an administrative agency's "initiation of a rulemaking" through a notice and comment process does not impair the rights of interested parties so as to give rise to Article III standing, even if such parties would be directly regulated by a final rule. Alternative Research & Dev. Found. v. Veneman, 262 F.3d 406, 411 (D.C. Cir. 2001) (emphasis added). In Alternative Research, the Court held that an association of biomedical researchers lacked standing to challenge a settlement establishing a schedule for rulemaking to consider whether to regulate the treatment of birds, mice, and rats used in such research. Id. As the D.C. Circuit observed, parties potentially affected by such a rulemaking have the opportunity, first, to participate in the rulemaking and attempt to persuade the agency not to finalize the proposal, as the plaintiffs did in this case, and, second, to seek judicial review if the proposed rule is finalized in a manner that genuinely harms their interests. See id.

The D.C. Circuit recently reaffirmed this conclusion in Defenders of Wildlife v. Perciasepe, 714 F.3d 1317 (D.C. Cir. 2013), where it held that an association of energy

companies lacked standing to intervene for the purpose of challenging a consent decree that set a rulemaking schedule to revise regulations governing wastewater discharges from power plants. See id. at 1323-26.  Although in that case the EPA had also commenced a notice-and-comment rulemaking that could result in a "new, stricter rule" being applied to the petitioners, that fact did not create standing, because Article III "requires more than the possibility of potentially adverse regulation."  Perciasepe, 714 F.3d at 1325 (emphasis added); see also Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 13 (D.C. Cir. 2011) (same); Belmont Abbey Coll. v. Sebelius, 878 F. Supp. 2d 25, 37 (D.D.C. 2012) (Boasberg, J.) (dismissing APA case for lack of standing where agency had ongoing rulemaking proceeding).

Plaintiffs cannot premise Article III standing on a theory of procedural injury because of their alleged inability to effectively comment on the final rule.  See Compl. ¶¶ 66-73.  This claim fails for independent reasons under the APA.  See infra Section III.  Setting aside its legal deficiencies, it also does not represent an Article III injury.  "[A] denial of the opportunity to comment on a proposed rule does not, on its own, constitute an injury for standing purposes." Californians for Renewable Energy v. U.S. Dep't of Energy, 860 F. Supp. 2d 44, 49 (D.D.C. 2012) (Boasberg, J.); see also Int'l Bhd. of Teamsters v. TSA, 429 F.3d 1130, 1135 (D.C. Cir. 2005) ("[T]he mere inability to comment effectively or fully, in and of itself, does not establish an actual injury.").  As the Supreme Court recognized in Summers v. Earth Island Institute, 555 U.S. 488 (2009), "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing."  Id. at 496.  Plaintiffs attempt to link the alleged procedural injury to a more concrete injury by alleging that, in reaction to the NPRM, various market participants stopped doing business with BPA and foreign authorities placed BPA into liquidation proceedings.  See Compl.

¶¶ 2, 3, 26-27, 43.  But, as explained in section II.A, supra, these downstream effects are the result of the independent decisions of market participants and a sovereign foreign government and cannot be redressed through any relief in this action.  Plaintiffs cannot bootstrap a defective alleged procedural injury together with a defective alleged substantive injury in order to manufacture Article III standing.

### C.  Plaintiffs do not have standing to challenge FinCEN's proposed rule on behalf of BPA

"A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."  Dole Food Co. v. Patrickson, 538 U.S. 468, 474 (2003).  Thus, legal harms committed against a corporation give rise to claims belonging to the corporation itself and shareholder suits seeking to enforce those claims are derivative.  Cowin v. Bresler, 741 F.2d 410, 414 (D.C. Cir. 1984).  In a derivative suit, any recovery flows to the corporate treasury; in a direct suit, it flows only to the individual plaintiff-shareholders.  See, e.g., Labovitz v. Wash. Times Corp., 172 F.3d 897, 904 (D.C. Cir. 1999).

The determination whether a federal-law claim is direct or derivative is governed by federal law.  See Wright & Miller, Federal Practice & Procedure § 1821; cf. Rifkin v. Bear Stearns & Co., 248 F.3d 628, 631 (7th Cir. 2001) ("[S]tanding to bring a federal claim in federal court is exclusively a question of federal law.").  Where standing turns on the "allocation of governing power within [a] corporation," however, federal law often looks to state-law principles.  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991).  BPA was organized under the laws of Andorra and accordingly plaintiffs' standing to assert claims on behalf of BPA will depend upon Andorran law.  See City of Harper Woods Emples. Ret. Sys. v. Olver, 589 F.3d 1292, 1299 (D.C. Cir. 2009) (noting that "plaintiffs bear the burden of establishing standing to

bring a derivative suit under English law, which applies to this case"); In re BP p.l.c. Derivative Litig., 507 F. Supp. 2d 302, 307 (S.D.N.Y. 2007) ("[T]he rights of a shareholder in a foreign company (including the right to sue derivatively) are determined by the law of the place where the company is incorporated.").  Nothing in plaintiffs' complaint establishes that Andorran law even recognizes shareholder derivative actions, let alone that plaintiffs have met the prerequisites for filing a derivative action in this case.

Plaintiffs' complaint asserts that they have been injured by the loss of corporate assets – due to BPA's alleged inability to maintain correspondent accounts in the United States after FinCEN published the notice of proposed rulemaking, and by the decision of authorities in Andorra and Spain to place BPA and one of its subsidiaries into liquidation proceedings – and a corresponding diminution in the value of their shares of stock in BPA.  See Compl. ¶¶ 2, 24 ("Under the current circumstances there is no prospect of the bank being returned to the shareholders."); id. ¶ 25 ("In addition, FinCEN's actions directly damaged BPA by improperly interfering with its contractual relationships with U.S. banks, depriving it of access to the U.S. financial market and U.S. banking services . . . .").  As explained above, it is not at all clear that these alleged injuries would allow plaintiffs to sue on behalf of BPA under Andorran law. Indeed, even if this matter were resolved under the law of the United States, injuries to share value and depletion of corporate assets are classically derivative, not direct.  In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 766, 771 (Del. 2006).[5]  "Where all of a corporation's

---

[5] The principles for distinguishing direct from derivative claims are well-established and consistent across federal and state law.  The analysis is governed by two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004); see also Labovitz, 172 F.3d at 901 ("Claims based on injury to the corporation, however, are derivative in nature and any damages suffered are owed to the corporation.").  A claim is "direct"

stockholders are harmed and would recover pro rata in proportion with their ownership of the

corporation's stock solely because they are stockholders, then the claim is derivative in nature."

Feldman v. Cutaia, 951 A.2d 727, 733 (Del. 2008); see also, e.g., Rossette, 906 A.2d at 99 ("In

the eyes of the law, such equal 'injury' to the shares . . . is not viewed as, or equated with, harm

to specific shareholders individually.").  Decisions in the D.C. Circuit have adhered to that

principle.  See Labovitz, 172 F.3d at 904; Cowin, 741 F.2d at 414**.**

      Five counts of plaintiffs' complaint seek relief for FinCEN's publication of the "Notice

of Finding" and proposed rule with respect to BPA, and a sixth seeks mandamus for publication

of that final rule.  Compl. ¶¶ 131-33.  Count I alleges that FinCEN violated the APA in the

NPRM by failing to adequately consider the factors set forth in section 5318A, and failed to

consider whether alternative special measures would have resolved the money laundering

concern presented by BPA.  Id. ¶¶ 97-107.  Count II alleges that FinCEN did not provide a

sufficiently detailed factual basis in its notice of finding or notify BPA prior to publishing the

NPRM.  Id. ¶¶ 108-112.  Count III alleges a due process violation based on the same alleged

failures to notify BPA or provide it a hearing prior to the publication of the NPRM.  Id. ¶¶ 113-

120.  Counts IV and V, while not styled as APA claims, are based on alleged legal deficiencies

in considering the balance of money laundering versus legitimate activities in BPA's operations,

and providing allegedly insufficient factual detail in the NPRM.  Id. ¶¶ 121-130.  Count VI seeks

to compel FinCEN to publish a final rule with respect to BPA.  Id. ¶¶ 131-33.

      Neither Andorran nor U.S. law authorizes plaintiff to assert these claims.  The Supreme

Court has long recognized the "so-called shareholder standing rule. . . . [T]he rule is a

---

when "the duty breached was owed to the stockholder" and the shareholder "can prevail without
showing an injury to the corporation."  Tooley, 845 A.2d at 1039.  A claim is "derivative" if the
harm to the shareholder is the byproduct of some injury to the corporate body as a whole.  Id.

longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." Franchise Tax Bd. of California v. Alcan Aluminum Ltd., 493 U.S. 331, 336 (1990); see also Am. Airways Charters Inc. v. Regan, 746 F.2d 865, 873 n.14 (D.C. Cir. 1984) ("no shareholder—not even a sole shareholder—has standing in the usual case to bring suit in an individual capacity on a claim that belongs to the corporation."). The shareholder standing rule precludes shareholders of a corporation – or corporate parents or subsidiaries – from raising APA claims with respect to regulatory actions affecting the corporation. See Sec. Indus. & Fin. Markets Ass'n v. United States Commodity Futures Trading Comm'n, 67 F. Supp. 3d 373, 408 (D.D.C. 2014) (dismissing, based on the shareholder standing rule, APA claims brought by corporate parents on behalf of subsidiaries).

Plaintiffs cannot evade the limitations on derivative actions through a conclusory allegation that a "demand on the Administrator to represent the interests of BPA against Defendants would be futile." Compl. ¶ 27. First, nothing that plaintiffs cite in their complaint establishes that the futility exception to the derivative suit rule exists under Andorran law, which controls the legal relationship between shareholders and BPA. Second, even if the matter were resolved under U.S. law, the conflict of interest exception does not exist between the shareholders of an institution in receivership and the receiver. See Perry Capital v. Lew, 70 F. Supp. 3d 208, 231-32 (D.D.C. 2014) (holding that there is no "conflict of interest" exception to the bar on derivative suits by shareholders of an entity in conservatorship). Finally, establishing demand futility requires more than alleging that it is unlikely that the Administrator would file suit if asked to do so. Rather, the applicable law requires the shareholder to establish the

existence of a personal financial benefit for the director, or a material detriment that will be experienced by the director but not other shareholders.  See In re Fed. Nat. Mortgage Ass'n Sec., Derivative, "ERISA" Litig., 503 F. Supp. 2d 9, 17 (D.D.C. 2007) aff'd sub nom. Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat. Mortgage Ass'n v. Raines, 534 F.3d 779 (D.C. Cir. 2008) (citing Rales v. Blasband, 634 A.2d 927, 936 (Del. 1993). Plaintiffs make no effort to establish that the Andorran Administrator suffers from such a conflict of interest.  Thus, even if a demand futility exception existed, it would be inapplicable here.[6]

### III.    Plaintiffs' Claims Are Not Ripe for Review

"The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803, 808 (2003) (quotation omitted).  It "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies."  Id. at 807. It also "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  Id. at 807-08.

A case ripe for judicial review cannot be "nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 244 (1952).  In assessing ripeness, courts evaluate both "the fitness of the issues for judicial decision and the hardship to the parties of

---

[6] Further, satisfying the procedural requirement of a demand under Rule 23.1 does not create a substantive right to pursue a derivative action if such a right does not exist under Andorran law. See, e.g., 5-23.1 Moore's Federal Practice - Civil § 23.1.04.

withholding court consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), overruled

on other grounds in Califano v. Sanders, 430 U.S. 99, 105 (1977).

      Neither of the factors set forth in Abbott Labs supports judicial review in this case.

Plaintiffs seek review of an NPRM that has not yet formed the basis of a final rule, and a notice

of finding that imposes no legal consequences on plaintiffs, BPA, or anyone else.[7]  There is,

therefore, a significant chance that the ongoing rulemaking process will alleviate the need for

judicial review, or at least narrow and refine the scope of any actual controversy to more

manageable proportions.  See Texas v. United States, 523 U.S. 296, 300 (1998) ("A claim is not

ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or

indeed may not occur at all." (quotations omitted)).  Nor can plaintiffs claim that there is a

hardship in waiting for final agency action.  As in any other APA case, if FinCEN's resolution of

the rulemaking process does not alleviate their concerns, plaintiffs "will have ample opportunity

[] to bring [their] legal challenge at a time when harm is more imminent and more certain."  Ohio

Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 734 (1998); see also Texas Indep. Producers

and Royalty Owners Assoc. v. EPA, 413 F.3d 479, 483-84 (5th Cir. 2005) (dismissing challenge

to rule as unripe where agency deferred effective date of rule and announced its intent to

consider issues raised by plaintiff in new rulemaking during the deferral period); Wyoming

Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 50 (D.C. Cir. 1999) ("Prudence . . . restrains

courts from hastily intervening into matters that may best be reviewed at another time or another

setting, especially when the uncertain nature of an issue might affect a court's ability to decide

intelligently." (quotation omitted)); Better Gov't Ass'n v. Dep't of State, 780 F.2d 86, 88 (D.C.

---

[7] Unlike in Abbott Labs, where the FDA rule being challenged imposed immediate prospects of
civil or criminal penalties, see Abbott Labs, 387 U.S. at 153 & n.19, the NPRM imposes no
penalties on any U.S. financial institution conducting business with BPA.

Cir. 1986) (one of the "crucial prerequisites to ripeness" is "final agency action"); Lake Pilots

Assoc., Inc. v. U.S. Coast Guard, 257 F. Supp. 2d 148, 160-162 (D.D.C. 2003) (holding

challenge to rule was not ripe where agency undertook a new rulemaking to address issue raised

by plaintiff in the lawsuit).

      None of plaintiffs' various legal claims changes this analysis.  Their APA claims are not

fit for resolution because they allege that FinCEN relied on "inaccurate, incomplete, and

outdated" information, and made "unsupported accusations" in its Notice of Finding and NPRM.

Compl. ¶¶ 101, 111.  But the adequacy of the record in supporting FinCEN's regulatory

decisions is something that the Court can evaluate only after FinCEN has finalized its regulation.

See Motor Vehicle Mfrs. Assoc. v. New York State Dep't of Envtl. Conservation, 79 F.3d 1298,

1306 (2d Cir. 1996) (concluding claims were not ripe where "plaintiffs' arguments depend upon

the effects of regulatory choices to be made by [state] in the future"); Lake Pilots Assoc., 257 F.

Supp. 2d at 162.  Moreover, their due process and statutory authority claims similarly challenge

an ongoing proceeding in which FinCEN has not yet imposed any legal sanction.  Review of an

agency action based on an NPRM – and conjecture that the final rule will not differ in any

material respect from the NPRM – "would venture away from the domain of judicial review into

a realm more accurately described as judicial preview," a realm into which the D.C. Circuit has

cautioned courts not to tread.  Tennessee Gas Pipeline Co. v. FERC, 736 F.2d 747, 751 (D.C.

Cir. 1984).

### IV.    Plaintiffs Challenge to a Non-Final Rule is Not Actionable Under the APA

      For similar reasons, plaintiffs' APA claims must be dismissed under Rule 12(b)(6)

because the APA affords a cause of action for final agency action only, and not for the proposed

rule that plaintiffs challenge in their complaint.  The APA's requirement of "final agency action"

is not a technicality; it reflects the separation of powers between the Judicial Branch charged

with interpreting the law and the Executive Branch responsible for administering the law.  Courts

may "intervene in the administration of the laws only when, and to the extent that, a specific

'final agency action' has an actual or immediately threatened effect."  Lujan, 497 U.S. at 894.

This limitation derives from section 704 of the APA, which provides that "[a]gency action made

reviewable by statute and final agency action for which there is no other adequate remedy in a

court are subject to judicial review."  5 U.S.C. § 704 (emphasis added).  Under Supreme Court

precedent, "final agency action" has two hallmarks: first, it must "mark the consummation of the

agency's decisionmaking process," and second, the action must "be one by which rights or

obligations have been determined, or from which legal consequences will flow."  Bennett v.

Spear, 520 U.S. 154, 177–78 (1997).

Here, the plaintiffs are challenging the publication of a proposed rule imposing the fifth

special measure on U.S. banks with correspondent accounts with BPA.  But it is well-established

that proposed rules are not final agency action subject to review under the APA.  "Proposed rules

meet neither of the two requirements for final agency action: (i) They are not the 'consummation

of the agency's decisionmaking process,' and (ii) they do not determine 'rights or obligations,' or

impose 'legal consequences.'"  In re Murray Energy Corp., 788 F.3d 330, 334 (D.C. Cir. 2015)

(quoting Bennett, 520 U.S. at 177–78); see also Reliable Automatic Sprinkler Co., 324 F.3d at

732 ("Here, the agency has not yet taken the steps required under the statutory and regulatory

scheme for its actions to have any legal consequences.").

In their complaint, plaintiffs attempt to transform proposed agency action into final

agency action by alleging that FinCEN's publication of the Notice of Finding with respect to

BPA constitutes a final action, and that the NPRM is a "de facto final rule."  Compl. ¶ 65.  The

published Notice of Finding does not qualify as final agency action, however, because it neither "mark[s] the consummation of the agency's decisionmaking process" nor is a decision from which "legal consequences will flow." Bennett, 520 U.S. at 177-78.  Under section 5318A, a finding that a foreign financial institution is of primary money laundering concern has no legal consequence apart from the fact that, based upon such finding, the Secretary of the Treasury "may require domestic financial institutions and domestic financial agencies to take 1 or more of the special measures." 31 U.S.C. § 5318A(a)(1) (emphasis added).  But before the Secretary can do so, FinCEN must follow further procedures set out in the statute. Id. § 5318A(a)(2).  The finding is thus a part of, but not the consummation of, an agency decisionmaking process that may, or may not, culminate in regulatory action requiring participants in the U.S. financial system to take one of the special measures set forth in section 5318A.  It should also be obvious from the foregoing that the NPRM is likewise not the consummation of the agency's decisionmaking process, nor an action from which legal consequences flow.  Under section 5318A, legal consequences flow from a final rule requiring one or more of the special measures. FinCEN "has merely proposed a rule, which may never be adopted or enforced." Bristol-Myers Co. v. F.T.C., 424 F.2d 935, 940 (D.C. Cir. 1970).

Nor can plaintiffs obtain judicial review of non-final agency action by repetitively alleging that the NPRM is "effectively" a final rule because it has resulted in action by third parties with respect to BPA.  Compl. ¶¶ 2, 4, 62, 105.  As the D.C. Circuit held just last year, "courts have never reviewed proposed rules, notwithstanding the costs that parties may routinely incur in preparing for anticipated final rules.  We recognize that prudent organizations and individuals may alter their behavior (and thereby incur costs) based on what they think is likely to come in the form of new regulations.  But that reality has never been a justification for

allowing courts to review proposed agency rules.  We see no persuasive reason to blaze a new

trail here."  In re Murray Energy Corp., 788 F.3d 330, 335 (D.C. Cir. 2015) (emphasis in

original).

Further, plaintiffs cannot manufacture a claim of procedural deficiency by claiming that

the NPRM is a "de facto" final rule and then fault FinCEN for not "providing adequate notice

and meaningful opportunity for BPA and/or plaintiffs to respond to the charges against BPA,

both before and after the issuance of the NOF and NPRM."  Compl. ¶ 110 (emphasis added).

Such "pre-notice notice" is not required.  Section 5318A imposes no procedural requirements for

imposing a special measure, other than the requirement that the fifth special measure "may be

imposed only by regulation."[8]  31 U.S.C. § 5318A(a)(2)(C).  The APA's rulemaking provision

requires that an agency publish a "[g]eneral notice of proposed rule making" in "the Federal

Register."  5 U.S.C. § 553(b).  There is no requirement that any person be given pre-publication

notice of an NPRM.  It is only "[a]fter notice required by this section," that "the agency shall

give interested persons an opportunity to participate in the rule making through submission of

written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C.

§ 553(c) (emphasis added).  FinCEN need not follow any procedures aside from those set forth

in section 5318A and the APA.  "Beyond the APA's minimum requirements, courts lack

authority 'to impose upon [an] agency its own notion of which procedures are 'best' or most

likely to further some vague, undefined public good.'"  Perez v. Mortgage Bankers Ass'n, 135 S.

Ct. 1199, 1207 (2015) (quoting Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council,

Inc., 435 U.S. 519, 549 (1978)).

---

[8] The other special measures "may be imposed by regulation, order, or otherwise as permitted by law."  31 U.S.C. § 5318A(a)(2)(B).

The preliminary injunction decision in <u>FBME</u> does not assist the plaintiffs.  In <u>FBME</u>, another court in this district held that plaintiffs were likely to prevail on their claim that FinCEN failed to provide adequate notice under the APA because it had not disclosed the unclassified materials supporting its decision and plaintiffs had therefore had no opportunity to respond to them.[9]  That ruling, however, has no applicability here.  <u>FBME</u>, unlike this case, involved a final rule.  2015 WL 5081209 at *4.  Because the rulemaking process in <u>FBME</u> was complete, the court had before it FinCEN's full and final stated reasons for imposing the fifth special measure and a much more complete picture of the process leading to FinCEN's final decision.  That is emphatically not the case here, where the process is still ongoing and no final decision has been rendered.[10]

Nor is the decision in <u>FBME</u> adequate grounds for ignoring the APA's requirement of final agency action.  Even assuming <u>arguendo</u> that FinCEN cannot finalize a regulation imposing the fifth special measure without first providing interested parties access to the unclassified and publicly releasable documents supporting the NPRM, FinCEN has not finalized any regulation with respect to BPA.  "The requirement of finality permits 'the agency an opportunity to correct its own mistakes and to apply its expertise' and prevents 'piecemeal review which at the least is

[9]  Of note, the court in FBME agreed with the government that FinCEN was not procedurally obligated to disclose the classified and Bank Secrecy Act-protected information it relied upon in its rulemaking.  <u>Id.</u> at *7.

[10] Further, in holding that FinCEN's failure to make the unclassified materials available for comment "<u>appears</u> to constitute a procedural error under the APA," <u>id.</u> at *8 (emphasis added), the court in <u>FBME</u> relied primarily on a line of inapposite cases that dealt with due process (not APA) challenges to the procedure for designating foreign terrorist organizations (FTOs).  <u>Id.</u> at *9.  As the court itself acknowledged, FTO designations are made through a purely adjudicative process that affords significantly less notice and opportunity to respond than the rulemaking process required for the fifth special measure of § 311.  <u>Id.</u>  To the extent it nonetheless concluded that the unclassified evidence should be made available in both types of proceedings, the government notes that the D.C. Circuit has never so ruled—nor has it ever imposed such a requirement upon other types of terrorism-related designations.  <u>See</u> <u>infra</u> Section V.C.

inefficient and upon completion of the agency process might prove to have been unnecessary.'"

Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin., 740 F.2d 21, 30 (D.C. Cir.

1984) (quoting FTC v. Standard Oil Co. of California, 449 U.S. 232, 242 (1980)).  Judicial

review of an ongoing rulemaking through serial proceedings – stepping in during the rulemaking

to correct an alleged procedural error and then later, if a final rule is adopted, reviewing the

merits of FinCEN's final rule – would clearly frustrate the D.C. Circuit's policy of avoiding

"piecemeal review" in APA cases.  Id.; see also Am. Petroleum Inst. v. EPA, 663 F.3d 382 (D.C.

Cir. 2012) ("Even if the challenger fails to persuade the agency, permitting the administrative

process to reach its end can at least solidify or simplify the factual context and narrow the legal

issues at play, allowing for more intelligent resolution of any remaining claims and avoiding

inefficient and unnecessary 'piecemeal review.'").  This is particularly true because the district

court's decision in FBME was issued in late August of 2015, several months after FinCEN

published its NPRM with respect to BPA, and FinCEN is in the process of evaluating the

ruling's effect upon ongoing rulemaking proceedings.  See Defendants' Motion to Stay

Summary Judgment Briefing Pending Resolution of Defendants' Motion to Dismiss at 11 & n.5,

ECF No. 17.[11]

---

[11] Plaintiffs' mandamus claim in Count VI should be dismissed because it is well-established that "the existence of an alternative remedy precludes mandamus."  Action All. of Senior Citizens v. Leavitt, 483 F.3d 852, 858 (D.C. Cir. 2007); see also Mt. Emmons Mining Co. v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997) ("The availability of a remedy under the APA technically precludes Mt. Emmons' alternative request for a writ of mandamus . . . ")  These alternative remedies include "the APA, which authorizes district courts to 'compel agency action unlawfully withheld or unreasonably delayed' without the need of a separate action seeking mandamus. Valona v. U.S. Parole Comm'n, 165 F.3d 508, 510 (7th Cir. 1998) (quoting 5 U.S.C. § 706(1)). Plaintiffs have not sought relief under section 706(1), however.

## V.       Plaintiffs Fail to State a Claim for a Due Process Violation

In Count III, plaintiffs contend that they have been deprived of a right to due process.  As an initial matter, there has been no deprivation of property by FinCEN or any other agency of the United States government.  Moreover, the complaint does not establish that plaintiffs, foreign nationals suing based on their substantial ownership of a foreign bank, are entitled to constitutional due process protection.  Finally, even if plaintiffs are entitled to any constitutional protections, FinCEN is engaged in a statutorily mandated <u>rulemaking</u> that has provided substantial notice and opportunity to be heard.  FinCEN gave notice of its proposed action through its NOF and NPRM; the agency has accepted any and all comments that plaintiffs or others wished to submit, and is in the process of considering such comments.  Indeed, this process has been ongoing since March 2015, when the NPRM was promulgated.  Plaintiffs' purported due process claim is in fact an argument that FinCEN should never have been able to do one of the things for which section 5318A was enacted: safeguard the U.S. financial system by identifying foreign financial institutions that present money laundering concerns.  Plaintiffs contend that they should have been provided with "advance notice" of the NOF (a pre-notice), before it was issued, and they also suggest that they should somehow have been informed that FinCEN was planning to issue an NPRM (a pre-proposal).  Compl. ¶ 118.  Plaintiffs thus seek a never-ending process by which FinCEN is administratively hamstrung from fulfilling its obligation to protect and defend the U.S. financial system.  Their due process claim fails to state a claim for relief, and it should be dismissed.

### A.       There has been no deprivation by the government.

"There are three basic elements to a procedural due process claim: there must be (1) a deprivation; (2) of life, liberty, or property; (3) without due process of law."  <u>Lightfoot v. D.C.</u>,

273 F.R.D. 314, 319 (D.D.C. 2011) (citing Propert v. District of Columbia, 948 F.2d 1327, 1331

(D.C. Cir. 1991).  Further, the deprivation must be the result of action by the government.  See

Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999); DeShaney v. Winnebago Cty. Dep't

of Soc. Servs., 489 U.S. 189, 195 (1989) ("The Clause is phrased as a limitation on the State's

power to act . . . ."); Greenya v. George Washington Univ., 512 F.2d 556, 559 (D.C. Cir. 1975)

("Although government has broad power to prohibit actions undertaken by private individuals,

the Constitution proprio vigore only places limitations on actions undertaken by governmental

entities.").

　　The present "deprivations" cited in plaintiffs' complaint are (1) the inability of BPA to

maintain correspondent accounts in the United States, and (2) the decision made by authorities in

Andorra to place BPA into liquidation proceedings.  See, e.g., Compl. ¶¶ 2, 3, 43; see also id. ¶

24 (alleging that BPA was placed in receivership as a "direct, foreseeable, and intended result"

of FinCEN's proposed action).  Neither action can be attributed to FinCEN or any other

government agency.  First, while the actions of regulated parties can in some instances be

attributed to the government, attribution "depends on whether the State 'has exercised coercive

power or has provided such significant encouragement, either overt or covert, that the choice

must in law be deemed to be that of the State.'"  Am. Mfrs. Mut. Ins. Co., 526 U.S. at 52.  The

NPRM has no legal effect, and thus is not an exercise of the government's coercive power.  80

Fed. Reg. 13,304 ("the Director of FinCEN proposes to impose the special measure authorized

by section 5318A(b)(5)") (emphasis added).  The NPRM reflects FinCEN's proposed special

measure and the notice of finding reflects the information supporting the NPRM; the proposed

rule does not prohibit BPA from having correspondent accounts, nor does it require U.S. banks

to take any action with respect to those correspondent accounts.  Second, the decision to place

BPA into liquidation proceedings was made by a foreign sovereign, Andorra, pursuant to its own domestic laws, and cannot be imputed to the government of this country.  See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964) (act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory").  In short, plaintiffs cannot premise a due process claim on the independent actions of third party market participants and a foreign sovereign.[12]

**B.      Plaintiffs lack a sufficiently pled constitutional presence.**

Foreign entities or nationals without minimum contacts with the United States lack due process or other constitutional rights.  People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise."); 32 County Sovereignty Comm. v. Dep't of State, 292 F.3d 797, 799 (D.C. Cir. 2002); United States v. All Assets Held In Account Number 80020796, No. 13-cv-1832, 2015 WL 1285791 at *7 (D.D.C. Mar. 19, 2015); see also United States v. Verdugo–Urquidez, 494 U.S. 259, 271 (1990) (in the context of the Fourth Amendment, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country");

---

[12] FinCEN did "encourage[] other countries to take similar action based on the information contained in this NPRM and the Notice of Finding."  80 Fed. Reg. 13,305; Compl. ¶ 44.  Such encouragement is entirely appropriate; FinCEN is charged by Congress with assessing threats to the U.S. financial system, and as part of that role, the agency works to establish and strengthen mechanisms for the exchange of information globally, and to engage, encourage, and support international partners in taking necessary steps to construct regimes to combat money laundering, terrorist financing, and other financial crimes. But in any event, any such actions would be the result of decisions by these other parties and cannot form the basis for the plaintiffs to seek relief in this action.  See Doe v. Virginia Dep't of State Police, 713 F.3d 745, 757 (4th Cir. 2013) ("The traceability and redressability prongs become problematic when third persons not party to the litigation must act in order for an injury to arise or be cured.").

Johnson v. Eisentrager, 339 U.S. 763, 770–71 (1950) (non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment habeas protections).

Plaintiffs lack sufficient contacts with the United States to claim the protection of the Due Process Clause.  They are Andorran citizens, resident in Andorra; while plaintiffs allege that they own real property in the United States, the Complaint is devoid of any specific allegations of what this property is and where it is located.  Compl. ¶ 41.  The absence of this specific information is notable in a complaint, which is verified by plaintiffs, consists of over 46 pages, and contains over 130 paragraphs. Such a vague and conclusory allegation of owning "significant real property assets" is not entitled to a presumption of truth on a motion to dismiss, see Iqbal, 556 U.S. at 678, and regardless, does not show that plaintiffs are entitled to due process protection.[13]  Such tenuous assertions do not create any meaningful current contacts with the United States or property here.  See Arbelaez v. Newcomb, Civ. No. 00-5217, 1 Fed. App'x 1, 1 (D.C. Cir. 2001) (appellants could not assert constitutional claims because they were "foreign nationals without a substantial connection to the United States" despite holding two U.S. bank accounts).

Moreover, even if plaintiffs did own real property of some kind in some location within the United States, it is not at all clear that such ownership would establish an entitlement to constitutional protections for this lawsuit.  Indeed, it would be odd for a foreign national's ownership of entirely unrelated, personally-owned property to translate to due process protections related to a special measure proposed by a U.S. agency for a wholly-foreign bank. Even when the minor property interests of an alien are wholly confiscated via civil forfeiture, it

---

[13] Plaintiffs would not, of course, be deprived of these alleged "real property" interests as a result of the imposition of the fifth special measure; a Final Rule imposing the special measure simply prohibits U.S. financial institutions from maintaining correspondent relationships; it does not take, vest or freeze any property belonging to plaintiffs.

is an open question whether the Due Process Clause applies to the civil forfeiture proceedings.
United States v. All Assets Held In Account Number 80020796, No. 13–1832, 2015 WL
1285791 at *7 (D.D.C. Mar. 19, 2015).  Thus, this case stands in stark contrast to United States
v. Sum of $70, 990, 605, __ F.Supp.3d __, 2015 WL 533192, at *10 (D.D.C. Sept. 14, 2015),
where the court concluded that a foreign bank was entitled to due process protections because the
"property at issue . . . was money located in U.S. bank accounts" and then proceeded to evaluate
the sufficiency of the process that was used to deprive the foreign bank of those funds.  Here,
plaintiffs aver no such connection to BPA or the bank's activities, even in their conclusory
allegation of personal property ownership.  Even assuming that plaintiffs have some property
interest in this country, no court has held that a property interest standing alone entitles an alien
living abroad to the full range of constitutional protections, including due process protections for
government action that is unrelated to the property interest.  Cf. Nat'l Council of Resistance of
Iran v. Dep't of State, 251 F.3d 192, 204 (D.C. Cir. 2001) (holding, after a review of the entire
record including classified information, that an organization with both presence and property in
the United States had "come within the territory of the United States and developed substantial
connections with this country" sufficient to give rise to due process protections).  The right of an
alien outside the United States to assert constitutional claims is based on "objective factors and
practical concerns" rather than "formalism."  Boumediene v. Bush, 553 U.S. 723, 764 (2008).  In
determining the constitutional rights of aliens outside the United States, the Court applies a
"functional approach" rather than a bright-line rule.  Id.  Plaintiffs' boilerplate recitations of an
unspecified property ownership fail to satisfy the standards for due process in this context.

**C.    Even if plaintiffs are entitled to due process, the rulemaking process affords plaintiffs more than adequate notice and an opportunity to be heard.**

Even if the Court finds that plaintiffs have constitutional presence, they have not stated a claim for a violation of their procedural due process rights.  As noted above, it is not clear that plaintiffs even have a protectable interest that has been deprived by FinCEN's proposed action. The action is not yet final, and there is a chance that FinCEN's Final Rule will not impose the fifth special measure.  The purported due process injury is neither ripe nor likely to be redressed by the request relief.  Even if the injury is ripe, the injury belongs to BPA, and not to plaintiffs. But assuming the Court bypasses these significant and extensive procedural hurdles, plaintiffs' due process clause still fails to state a claim for relief.  The proposed fifth special measure of section 5318A does not block or freeze any bank accounts belonging to a designated foreign financial institution; if adopted as a final rule, it simply would prohibit or restrict U.S. banks from opening or maintaining of correspondent accounts that involve that foreign financial institution.  It is doubtful whether any foreign national has a protectable property interest in having access to the U.S. financial system, even if, as they claim, they cannot do business without such access.  Cf. Chrebet v. County of Nassau, 24 F. Supp. 3d 236, 245 (E.D.N.Y. 2014) (loss of future business opportunity not a protectable property interest).

Further, the proposed fifth special measure of section 5318A should be viewed in the context of other kinds of Treasury targeted measures for activities affecting national security. Any such comparison confirms that plaintiffs have been and are being afforded more process than was provided in most, if not all, cases challenging Treasury designations, which are administrative actions that freeze all assets of a sanctions target subject to U.S. jurisdiction.  In fact, in cases involving challenges to Treasury's Office of Foreign Assets Control ("OFAC")

designations of Specially Designated Global Terrorists ("SDGTs") under the International

Emergency Economic Powers Act ("IEEPA"), there has typically been no pre-deprivation notice

at all—a practice that has consistently been found not to violate due process.  See, e.g., IARA,

394 F. Supp. 2d at 49-50; Holy Land Found., 219 F. Supp. 2d at 76-77; Al-Aqeel, 568 F. Supp.

2d at 67, 71; see also Al-Haramain Islamic Found. v. U.S. Dep't of Treasury, 686 F.3d 965, 985

(9th Cir. 2012) ("[A]s many courts have held, the potential for 'asset flight' almost certainly

justifies OFAC's decision not to provide notice before freezing the assets.").[14]

> **D.    Plaintiffs received notice in the Notice of Finding.**

Plaintiffs' due process claim fails because FinCEN provided more than enough

information in the notice of finding, which was published six months before plaintiffs filed this

lawsuit, to provide sufficient notice for due process purposes.  The level of factual detail

provided in the finding, as well as the amount of time given to plaintiffs and other commenters to

respond, surpasses the type of notice found to be appropriate in similar national security contexts

for designations under IEEPA.  See, e.g., Al-Aqeel, 568 F. Supp. 2d at 71; Holy Land Found.,

219 F. Supp. 2d at 64.  It is also more robust than the "truncated" administrative process for FTO

designations under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which, as

the D.C. Circuit noted, gives the target "no opportunity to either add to or comment on the

contents of [the] administrative record."  NCRI, 251 F.3d at 197.  And as with IEEPA and

AEDPA designations, FinCEN is expressly permitted by statute to rely on classified information,

and such reliance does not violate due process.  Id.; PMOI, 613 F.3d at 230-31; Holy Land

---

[14] On the other hand, in cases involving challenges to designations by the Department of State of foreign terrorist organizations ("FTOs") pursuant to AEDPA, some form of pre-deprivation process is required.  See NCRI, 251 F.3d at 205-09; PMOI, 613 F.3d at 230-31.  However, no FTO designation is subject to the notice and comment rulemaking procedure, with the extensive back-and-forth between target and designating agency, provided by section 5318A.

Found., 333 F.3d at 164.[15]  In any event, FinCEN has already provided plaintiffs with a detailed

unclassified summary in the form of the NOF as well as the NPRM.[16]  Were the case to proceed

to a final rule, and the plaintiffs appropriately challenged a final agency action, FinCEN would

submit the administrative record supporting that final rule.  As a result, even if the Court has

jurisdiction over plaintiffs' due process claim, the process followed by the agency is consistent

with the statute and provides plaintiffs with sufficient notice and opportunity to be heard.

Moreover, the challenged action is a rulemaking by regulation, as explicitly required by

the implementing statute.  See 31 U.S.C. § 5318A(a)(2)(C).  Plaintiffs nevertheless gloss over

this statutory provision, characterizing the rulemaking process as some kind of a de facto

adjudication that deprived them of advance notice the opportunity to present evidence in

response.  Plaintiffs are essentially asking the Court to rewrite the statute, which neither due

process nor Circuit case law requires.  "[D]ue process imposes no constraints on informal

rulemaking beyond those imposed by the statute."  Nat'l Coal. Against The Misuse of Pesticides

v. Thomas, 809 F.2d 875, 881 (D.C. Cir. 1987); see also Sierra Club v. Costle, 657 F.2d 298, 392

---

[15]  Plaintiffs also complaint that FinCEN did not disclose the information that formed the basis of its decision to propose the fifth special measure on BPA.  Compl., ¶ 120.  Such disclosure is not what the law requires, particularly where the specific information sought by plaintiffs is classified or prohibited from disclosure by the Bank Secrecy Act.  See Holy Land Found., 333 F.3d at 164 ("The due process clause requires only that process which is due under the circumstances of the case."); see also Kadi, 42 F. Supp. 3d at 23-24.  Section 1358A expressly provides for the reliance on classified information in findings of primary money laundering concern, and expressly permits the agency to submit such materials ex parte and in camera when necessary in judicial proceedings.

[16]  The NCRI/PMOI line of cases also suggest that, at least in the context of final actions imposing sanctions designations, due process requires the government to provide the target the unclassified portions of the record relied upon for the decision.  See PMOI, 613 F.3d at 227; cf. Ralls Corp. v. CFIUS, 758 F.3d 296, 319-320 (D.C. Cir. 2014).  Unlike the parties in these cases, however, plaintiffs are challenging a non-final agency action, so the agency is not obligated to prepare and submit an administrative record.

n. 462 (D.C. Cir. 1981); <u>Ass'n of Nat'l Advertisers, Inc. v. FTC</u>, 627 F.2d 1151, 1163-64 (D.C.

Cir. 1979); <u>Pickus v. Board of Parole</u>, 543 F.2d 240, 242-45 (D.C. Cir. 1976).  Their due process

claim should be dismissed. [17]

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint and deny the plaintiff's

motion for partial summary judgment as moot.

Dated:  January 25, 2016                         Respectfully submitted,

                                                 BENJAMIN C. MIZER
                                                 Principal Deputy Assistant Attorney General

                                                 CHANNING PHILLIPS
                                                 United States Attorney

                                                 DIANE KELLEHER
                                                 Assistant Director

                                                   /s/ *Thomas D. Zimpleman*
                                                 ERIC B. BECKENHAUER
                                                 THOMAS D. ZIMPLEMAN
                                                 LYNN Y. LEE
                                                 Trial Attorneys
                                                 U.S. Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 20 Massachusetts Ave. NW
                                                 Washington, DC  20530
                                                 Tel:  (202) 514-8095
                                                 Fax:  (202) 616-8470
                                                 E-mail:  Thomas.D.Zimpleman@usdoj.gov

                                                 *Counsel for Defendants*

---

[17] Even if plaintiffs were able to show FinCEN's rulemaking process were somehow procedurally deficient, that decisionmaking process is still open, and as a result, all the Court should require is further process, not a reversal of the proposed rule.