**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RAMON CIERCO, HIGINI CIERCO, SUCCESSORS D'HIGINI CIERCO GARCIA, S.A., and CIERCO MARTINEZ 2 2003, S.L. in each Plaintiff's Personal Capacity and Derivatively on Behalf of Themselves and All Others Similarly Situated,

        Plaintiffs,

    v.

JACOB LEW, in his Official Capacity as Secretary of the Treasury, *et al.*,

        Defendants.

Civil No. 15-cv-1641(JEB)

<u>Oral Argument Requested</u>

## <u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

Eric L. Lewis (DC Bar #394643)
*eric.lewis@lewisbaach.com*
A. Katherine Toomey (DC Bar #426658)
*katherine.toomey@lewisbaach.com*
LEWIS BAACH PLLC
1899 Pennsylvania Avenue, NW, Suite 600
Washington, DC 20006
(202) 833-8900

Aaron T. Wolfson *(pro hac vice)*
*aaron.wolfson@lewisbaach.com*
LEWIS BAACH PLLC
405 Lexington Avenue, 62nd Floor
New York, NY 10174
(212) 826-7001

Dated:  February 8, 2016

*Attorneys for  Plaintiffs*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT .............................................................................. 1

SUMMARY OF FACTS ........................................................................................ 6

    U.S. and Andorran Discussions Leading Up to the Seizure of BPA ................... 9

    The Issuance of the NOF and NPRM and the Resulting Seizure of BPA .......... 10

    Process Followed Under the NOF and NPRM ................................................. 11

    BPA's Legitimate Business ............................................................................. 12

ARGUMENT ...................................................................................................... 13

I.     The NOF and NPRM Are Ripe for Judicial Review ...................................... 13

    A.    The Applicable Legal Standards ........................................................ 15

    B.    Applying These Standards, the NOF and NPRM Are Final ................. 17

II.    Plaintiffs Have Standing to Assert Their Claims ........................................... 22

    A.    Plaintiffs' Injuries Are Traceable to Defendants' Issuance of the NOF and NPRM and Are Redressable in This Proceeding ................................ 22

    B.    The Complaint Alleges Both Direct and Derivative Injury ................... 27

    C.    Direct Standing ................................................................................ 27

    D.    Derivative Standing .......................................................................... 29

III.   Defendants Violated Plaintiffs' Due Process Rights ...................................... 33

    A.    Plaintiffs Are Entitled to Due Process Given Their Substantial Presence and Property in the United States ....................................................... 33

    B.    The Complaint Sufficiently Pleads a Deprivation by the Government ...... 37

    C.    FinCEN's Actions Violated Due Process Requirements ....................... 39

CONCLUSION ................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*32 Cnty. Sovereignty Comm. v. Dep't of State,*
    292 F.3d 797 (D.C. Cir. 2002) ............................................................................. 34

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ............................................................................................. 16

*AFP Imaging Corp. v. Ross,*
    780 F.2d 202 (2d Cir. 1985) ................................................................................ 28

*Al-Aqeel v. Paulson,*
    568 F. Supp. 2d 64 (D.D.C. 2008) .............................................................. 34, 36, 37

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) ......................................................................................... 37, 38

*Am. Petroleum Inst. v. EPA,*
    683 F.3d 382 (D.C. Cir. 2012) ........................................................................ 15, 21

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,*
    724 F.3d 243 (D.C. Cir. 2013) ............................................................................. 23

*Ams. for Safe Access v. DEA,*
    706 F.3d 438 (D.C. Cir. 2013) .......................................................... 22, 23, 24, 25

*Arbelaez v. Newcomb,*
    1 F. App'x 1 (D.C. Cir. 2001) ............................................................................. 35

*Arbelaez v. Newcomb,*
    No. 98-cv-02813(LFO) (D.D.C. May 16, 2000) ................................................... 35

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................................... 6

*Autor v. Pritzker,*
    740 F.3d 176 (D.C. Cir. 2014) ............................................................................... 6

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................... 7

*Bennett v. Donovan,*
    703 F.3d 582 (D.C. Cir. 2013) ............................................................................. 23

*Bennett v. Spear,*
    520 U.S. 154 (1997) ......................................................................................... 17, 27

*Bingham v. Zolt,*
    66 F.3d 553 (2d Cir. 1995) .................................................................................. 28

*Block v. Meese,*
    793 F.2d 1303 (D.C. Cir. 1986) .................................................................. 23, 24, 25

*Boddie v. Connecticut,*
    401 U.S. 371 (1971) ........................................................................................... 39

*Branch v. FDIC,*
    825 F. Supp. 384 (D. Mass. 1993) ..................................................................... 33

*Calero-Toledo v. Pearson Yacht Leasing Co.,*
    416 U.S. 663 (1974) ..................................................................................... 40, 41

*Califano v. Sanders,*
    430 U.S. 99 (1977) ............................................................................................ 16

*Ciba-Geigy Corp. v. EPA,*
    801 F.2d 430 (D.C. Cir. 1986) .......................................................................... 17

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.,*
    No. 14-cv-953(GK), 2015 WL 5675813 (D.D.C. Sept. 25, 2015) ..................... 17

*Comm. of U.S. Citizens Living in Nicaragua v. Reagan,*
    859 F.2d 929 (D.C. Cir. 1988) .......................................................................... 38

*Ctr. for Law & Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) ........................................................................ 26

*Delta Constr. Co. v. EPA,*
    783 F.3d 1291 (D.C. Cir. 2015) ........................................................................ 27

*Detroit Int'l Bridge Co. v. Gov't of Can.,*
    No. 10-cv-476 (RMC), 2015 WL 5726601 (D.D.C. Sept. 30, 2015) .................... 6

*Dynalantic Corp. v. Dep't of Def.,*
    115 F.3d 1012 (D.C. Cir. 1997) ........................................................................ 22

*Eagle-Picher Indus. v. EPA,*
    759 F.2d 905 (D.C. Cir. 1985) ..................................................................... 15, 16

*Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of Treasury,*
    545 F.3d 4 (D.C. Cir. 2008) .............................................................................. 22

*FBME Bank Ltd. v. Lew,*
    No. 15-cv-01270(CRC), 2015 WL 5081209 (D.D.C. Aug. 27, 2015) ...... 21, 43, 44

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.,*
    493 U.S. 331 (1990) .......................................................................................... 22

*Green v. Stuyvesant,*
    505 F. Supp. 2d 176 (D.D.C. 2007) .................................................................... 6

*Hamilton v. Paulson,*
    542 F. Supp. 2d 37 (D.D.C. 2008) ...................................................................... 6

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2002) ............................................................... 41, 42

*Houghton v. Shafer,*
    392 U.S. 639 (1968) .......................................................................................... 32

*Hull v. Eaton Corp.*,
    825 F.2d 448 (D.C. Cir. 1987) ............................................................................ 30

*Int'l Union, United Auto., Aerospace & Agr. Implement*
    *Workers of Am. v. Brock*,
    783 F.2d 237 (D.C. Cir. 1986) ...................................................................... 15, 17

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) ............................................................................ 40

*Islamic Am. Relief Agency v. Unidentified FBI Agents*,
    394 F. Supp. 2d 34 (D.D.C. 2005) ...................................................................... 40

*Kadi v. Geithner*,
    42 F. Supp. 3d 1 (D.D.C. 2012) .................................................................... 33, 36

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991) ............................................................................................ 30

*Larson v. Valente*,
    456 U.S. 228 (1982) .......................................................................................... 27

*Martinez-Aguero v. Gonzalez*,
    459 F.3d 618 (5th Cir. 2006) ............................................................................ 36

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .......................................................................................... 39

*McCarthy v. Madigan*,
    503 U.S. 140 (1992) .......................................................................................... 32

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ........................................................................ 26

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) .......................................................................................... 39

*In re Murray Energy Corp.*,
    788 F.3d 330 (D.C. Cir. 2015) .......................................................................... 21

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*,
    737 F.2d 1095 (D.C. Cir. 1984) ........................................................................ 43

*Nat'l Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) .......................................................... 33, 34, 35, 42

*Nat'l Parks Conservation Ass'n v. Manson*,
    414 F.3d 1 (D.C. Cir. 2005) ........................................................................ 23, 25

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004) .......................................................................... 24

*Natural Res. Def. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ........................................................................ 23

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) .......................................................................................... 20

iv

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015) ............................................................................ 23

*PDK Labs Inc. v. Ashcroft*,
    338 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................... 39

*People's Mojahedin Org. of Iran v. Dep't of State*,
    613 F.3d 220 (D.C. Cir. 2010) .............................................................................. 44

*Perry Capital LLC v. Lew*,
    70 F. Supp. 3d 208 (D.D.C. 2014) ........................................................................ 32

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) .............................................................................. 43

*Reeve Aleutian Airways, Inc. v. United States*,
    982 F.2d 594 (D.C. Cir. 1993) .............................................................................. 38

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
    489 F.3d 1267 (D.C. Cir. 2007) ............................................................................ 24

*Robbins v. Kleindienst*,
    383 F. Supp. 239 (D.D.C. 1974) .......................................................................... 32

*Role Models Am., Inc. v. White*,
    317 F.3d 327 (D.C. Cir. 2003) .............................................................................. 16

*State Farm Mut. Auto. Ins. Co. v. Dole*,
    802 F.2d 474 (D.C. Cir. 1986) ........................................................................ 16, 21

*Suess v. United States*,
    33 Fed. Cl. 89 (1995) ............................................................................................ 33

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ................................................................................ 26

*Town of Barnstable v. Fed. Aviation Admin.*,
    659 F.3d 28 (D.C. Cir. 2011) .......................................................................... 25, 26

*Tozzi v. U.S. Dep't of Health & Human Servs.*,
    271 F.3d 301 (D.C. Cir. 2001) ................................................................... 23, 24, 25

*Trifax Corp. v. District of Columbia*,
    314 F.3d 641 (D.C. Cir. 2003) .............................................................................. 38

*United States v. All Assets Held in Account No. XXXXXXX*,
    83 F. Supp. 3d 360 (D.D.C. 2015) ........................................................................ 35

*United States v. Sum of $70,990,605*,
    No. 12-cv-1905(RDM), 2015 WL 5331923 (D.D.C. Sept. 14, 2015) .............. 34, 35

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ............................................................................................. 36

*United Transp. Union v. ICC*,
    891 F.2d 908 (D.C. Cir. 1989) .............................................................................. 23

## STATE CASES

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004)...................................................................................... 28

## STATUTORY AUTHORITIES

5 U.S.C. § 553 ............................................................................................................ 11

31 U.S.C. § 5318A...................................................................................................... 8, 11

## RULES AND REGULATIONS

D.C. Cir. R. 32.1 ........................................................................................................ 35

Exec. Order 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ........................................ 41

Fed. R. Civ. P. 12 ........................................................................................................ 6

Fed. R. Civ. P. 23.1 .................................................................................................... 29, 30

Fed. R. Civ. P. 44.1 .................................................................................................... 30

H.R. Conf. Rep. 108-381 ............................................................................................ 37

L. Civ. R. 7(n)(1) ........................................................................................................ 18

Repeal of the Final Rule and Withdrawal of the Finding of Primary Money Laundering
   Concern Against VEF Banka,
   76 Fed. Reg. 45,689 (Aug. 1, 2011)........................................................................ 19

Repeal of the Final Rule Imposing Special Measures and Withdrawal of the Findings of
   Primary Money Laundering Concern Against Myanmar Mayflower Bank and Asia
   Wealth Bank,
   77 Fed. Reg. 59,747 (Oct. 1, 2012)......................................................................... 19

Withdrawal of the Finding of Primary Money Laundering Concern and the Notice of
   Proposed Rulemaking Against First Merchant Bank,
   73 Fed. Reg. 19,452 (Apr. 10, 2008) ...................................................................... 19

Withdrawal of the Proposed Rulemaking Against Lebanese Canadian Bank,
   80 Fed. Reg. 60,575 (Oct. 7, 2015) ......................................................................... 19, 21

## ADDITIONAL AUTHORITIES

11 Fletcher Cyc. Corp. § 5096.................................................................................... 28

16 Fletcher Cyc. Corp. § 7783.50................................................................................ 32, 33

Gelter, Martin, *Why Do Shareholder Derivative Suits Remain Rare in Continental
   Europe?*, 37:3 Brook. J. Int'l L. 843 (2012) ........................................................... 30, 31

Government Accountability Office, *USA PATRIOT Act: Better Interagency
   Coordination and Implementing Guidance for Section 311 Could Improve U.S. Anti-
   Money Laundering Efforts*, GAO-08-1058 .............................................................. 4, 5, 6, 20

International Business Publications, USA, *Andorra Business Law Handbook* (6th ed,
   2008)........................................................................................................................ 30

Plaintiffs hereby respond to defendants' motion to dismiss.  As set forth below, there is no basis for the Court to dismiss the complaint.

## PRELIMINARY STATEMENT

The complaint addressed in defendants' motion to dismiss bears little relation to the complaint actually filed in this action.  Rather than addressing the allegations of the complaint, defendants' motion recasts it, essentially seeking the dismissal of the complaint they would wish to oppose rather than the one actually filed.  Defendants conveniently ignore or bury in footnotes the well-pleaded allegations regarding what defendants did, what they said, what they intended, and how third parties understandably and predictably responded to it.

Significantly, the motion to dismiss does not deny the heart of plaintiffs' claim – that the Financial Crimes Enforcement Network ("FinCEN") deliberately ignored in its action against Banca Privada d'Andorra S.A. ("BPA"), and routinely ignores, its statutory obligation to consider a target bank's legitimate business, both in assessing whether the bank should be labeled "of primary money laundering concern" and in determining what special measure (if any) is appropriate to impose.  Although defendants reiterate in their motion FinCEN's purported "findings" concerning money laundering, there is not a word about its "finding" concerning BPA's legitimate business.  In particular, defendants make no effort whatsoever to argue that FinCEN fulfilled its statutory obligations to consider BPA's legitimate business.

Defendants' motion urges this Court to validate what might be termed a "Goldilocks Strategy," in which it is never the right time to challenge a Notice of Finding ("NOF") or a Notice of Proposed Rulemaking ("NPRM") under Section 311.  Defendants assert simultaneously that the complaint was overly delayed (*e.g.*, Defs.' Mem. Supp. Mot. to Dismiss, ECF No. 29-1 ("Defs.' Mem.") at 2, 6) and that it was premature (*e.g.* Defs.' Mem. at 18-19).

There is apparently only one constant in FinCEN's litigation strategy: no bank can ever get meaningful judicial relief from a wrongly issued Section 311 Notice.  In this case, defendants argue that they can (i) ignore statutorily mandated factors that they are required to consider in taking action under Section 311; (ii) apply their own tautological criteria for the determination of what constitutes a bank "of primary money laundering concern" and the determination to apply the fifth special measure (which defendants *always* impose, rather than some lesser measure, which they have never imposed);[1] and (iii) issue a Notice of Finding and Proposed Rule, which they expect and intend will immediately shut the bank down, as happened here.  In defendants' view, there can be no challenge to their action until the NPRM is confirmed by the issuance of a final rule, which rarely happens because the target bank does not survive the issuance of the NOF and NPRM, thereby mooting the Notices.  In defendants' world, any challenge to their unlawful conduct is either premature or moot.  This is the FinCEN playbook, implemented time after time, to destroy banks it targets and prevent anyone from effectively challenging its actions.

The bottom line here is that plaintiffs' direct and derivative claims are well-pleaded and should be permitted to go forward.

In support of their direct claim, plaintiffs allege:

(i) Defendants issued the NOF and NPRM with the intent and expectation that it would cause the Government of Andorra to take action in relation to BPA.  The issuance of the NOF and NPRM was, in the words of one candid U.S. official, "a hammer" wielded by FinCEN to force the Andorran government to take action.  And, of course, even without the "hammer" statement, as the motion to dismiss acknowledges, the NPRM itself "encourages" foreign governments to take action in respect of BPA.  This

---

[1] Jennifer Shasky Calvery Decl. ¶ 27, *FBME Bank Ltd. v. Lew*, No. 15-cv-01270 (CRC) (D.D.C. Aug. 18, 2015), ECF No. 20.

was no mere modest suggestion; it was a directive that Andorra ignores at the peril of its entire financial sector.

(ii) As a result of defendants' action, plaintiffs were deprived of personal property – that is their ownership of shares in BPA and their positions as Chairmen of its Board – precisely because the Government of Andorra acted on the NOF and NPRM by placing BPA in a process of "resolution," as defendants effectively required.  That deprivation is a direct harm to plaintiffs, as is any theft, conversion, or taking of personal property.

(iii) That harm is redressable by the relief requested here.   The Andorran Government has stated publicly that it is unable to work with plaintiffs or to return their bank to them because Andorra's hands are tied by FinCEN's actions and preferences. The withdrawal of the NOF and NPRM meet the standard for redressability.

In support of their derivative claim, plaintiffs allege:

(i) They are majority shareholders of BPA, and were its Chairmen and members of its Board of Directors.

(ii) BPA was directly and severely injured by the NOF and NPRM in that it was deprived of its accounts and relationships with banks operating in the U.S., through which it was able to conduct dollar-based transactions.  This harm was directly traceable to FinCEN's NOF declaration that BPA was "of primary money laundering concern" and its issuance of the NPRM.   BPA was further injured when it was deprived of its subsidiaries by the actions of the Governments of Spain and Panama, who were also acting in accordance with defendants' "encouragement" that foreign countries take actions in respect of BPA;

3

(iii) These injuries are redressable at least in part by withdrawal of the NPRM and NOF by FinCEN, which would make it substantially more likely that BPA would be able to re-establish banking relationships with U.S. banks;

(iv) Plaintiffs have made multiple requests to AREB, the Andorran government agency that took over BPA, to obtain its cooperation in bringing this action and in otherwise securing and rescuing the assets of the bank.  All of these requests have been rejected or ignored.

(v) Given FinCEN's use of "the hammer" and the Government of Andorra's need to protect its banking system, it would be futile to expect AREB, a government agency, to bring an action against FinCEN.

The bulk of defendants' arguments – particularly those concerning "ripeness," "traceability," and "redressability" – are premised on the assertion that the NOF and NPRM are simply preliminary steps and that banks and foreign governments are free to ignore the NOF and NPRM.  This is willful blindness.  The reality is that Section 311 Notices are a unique and powerful "hammer" wielded by FinCEN and that ignoring them, even when the rulemaking is characterized as "proposed," is not an option reasonably open to either regulated banks or foreign governments.  FinCEN, the Federal Reserve, and other Treasury officials have readily acknowledged (and even touted) the power and effective finality of FinCEN's "proposed" rulemaking under Section 311.  As the U.S. Government Accountability Office ("GAO") observed in its 2008 Report concerning FinCEN's repeated failure to issue final rules after it had issued NOFs and NPRMs pursuant to Section 311:

> Despite taking years to finalize in some cases, proposed rules under Section 311 had an immediate impact on targeted institutions and jurisdictions. Treasury, State, and Justice officials told us that once a proposed rule is issued, almost all U.S. financial institutions immediately implement it voluntarily, stopping

4

financial transactions with designated financial institutions or jurisdictions. Federal Reserve and Treasury's Office of the Comptroller of the Currency officials also said that U.S. banks often treat proposed Section 311 rules as final and generally cut off all financial interactions with the targeted institution. Federal Reserve officials noted that this response to a proposed rule is unusual and, within the context of BSA requirements, appears to be unique to proposed rules under Section 311. Officials explained that U.S. banks may be taking this action because the proposed rule is associated with a finding of primary money laundering concern and, in many instances, Treasury issued a finding together with a notice of proposed rule-making. Because it makes good business sense to protect banks from risks to their reputation and possible government penalties, banks may discontinue business with other banks labeled a primary money laundering concern to reduce their reputational risk. Banks may be concerned that continuing business with a bank labeled as of "primary money laundering concern" would negatively impact their reputation. Moreover, U.S. financial institutions must take publicly available information into account when implementing their anti-money laundering programs and assessing risks. In addition, banks are generally given a short time frame to come into compliance with rules under Section 311 once they are finalized, so they may cut off all financial interaction with a targeted entity when the proposed rule is issued to ensure that they have minimized their risk of non-compliance.

Foreign government officials and representatives from targeted financial institutions in countries we visited also agreed that proposed rules have an immediate impact on these institutions and jurisdictions. Foreign government officials told us that, following the issuance of proposed rules, U.S. correspondent accounts of targeted banks were immediately closed. Bank representatives also told us that the proposed rules had a significant impact on their business. Bank managers from one targeted institution stated that the banks' deposits had decreased by one third of their original amount 3 days after the proposed rule was issued. In another case, a bank lost approximately 80 percent of its business as a result of a proposed rule, according to a bank representative. Attorneys for targeted financial institutions with whom we spoke emphasized that the amount of time between the proposed and final rule is important to targeted institutions since a long delay can weaken a bank financially. One legal representative noted that long delays between the proposed and final rule can put a bank in a financial position where it cannot afford to take legal action in U.S. court opposing special measures if a rule is finalized against it.

5

USA PATRIOT Act: Better Interagency Coordination and Implementing Guidance for Section 311 Could Improve U.S. Anti-Money Laundering Efforts, GAO-08-1058 ("GAO Report") at 21-22, *available at* http://www.gao.gov/products/GAO-08-1058.[2]

Finally, defendants also assert that the Ciercos have no due process rights and, in any event, that they have received the process that is due. But the complaint expressly alleges that both BPA and the Ciercos have substantial ties with the United States, including the Ciercos' ownership of millions of dollars in real property, which is all that is necessary for a plaintiff to have constitutional rights. A meaningless opportunity to provide comment on the NOF and NPRM after they have already done their damage to both the Ciercos and BPA cannot satisfy due process. Defendants' obligations to provide due process go beyond passively accepting comments based upon undisclosed criteria and incomplete information.

## SUMMARY OF FACTS

The standard for sustaining a complaint in the face of a motion to dismiss is well-settled. All well-pleaded factual allegations of the complaint are to be taken as true. *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009). In addition, all reasonable inferences are to be drawn in favor of sustaining the complaint. *Autor v. Pritzker,* 740 F.3d 176, 179 (D.C. Cir. 2014). Only if, taking

---

[2] The GAO Report is quoted extensively in plaintiffs' motion for partial summary judgment. Mem. Supp. Pls.' Mot. Partial Summ. J., ECF No. 15-1, at 26, 27, 31, 32; Statement of Undisputed Material Facts ("SOF"), ECF No. 15-2 ¶ 26. Although plaintiffs do not deem it necessary, given that the Court can take judicial notice of the determinations of the GAO Report, *Detroit Int'l Bridge Co. v. Gov't of Can.*, No. 10-cv-476 (RMC), 2015 WL 5726601, at *7 (D.D.C. Sept. 30, 2015) ("judicial notice may be taken of public records and government documents available from reliable sources") (citing *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008), *rev'd on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012) (taking judicial notice of document on government website and collecting cases regarding same)), and that the Court may look outside of the complaint in considering defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), *Green v. Stuyvesant*, 505 F. Supp. 2d 176, 178 (D.D.C. 2007), to the extent the Court would find it helpful, plaintiffs can amend the complaint to include these facts and any other facts from the summary judgment motion that are relied on herein.

all factual allegations as true and crediting all inferences in favor of plaintiff, the Court determines that the claim does not rise above the level of speculation, should a complaint be dismissed. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). As discussed below, the complaint in this case readily meets this standard.

In March 2015, FinCEN "used the hammer" of Section 311 on the Government of Andorra – and BPA was the nail that it hit. Without notice to the plaintiffs or BPA and based on a Notice of Finding in which FinCEN deliberately and intentionally failed to consider a mandatory factor required in Section 311, FinCEN declared BPA a bank "of primary money laundering concern" and announced to U.S. banks that they would continue to do business with BPA at their peril. Compl. ¶ 1. FinCEN also specifically urged foreign banks and governments to bar BPA from maintaining accounts and to guard against processing BPA's transactions. *Id.* Yet now before this Court, FinCEN disclaims responsibility for its actions, denying that it had anything to do with the responses of U.S. banks and foreign governments, which FinCEN itself expressly requested under threat of taking that hammer to the entire Andorran financial system, and insisting that this Court is powerless to review FinCEN's actions. FinCEN's modesty in this Court is strategic and false.

BPA is an international commercial bank organized under the laws of Andorra, with its principal place of business in Andorra. *Id.* ¶ 22. Until March 10, 2015, BPA engaged in regular banking business in that country and, through subsidiaries, in Spain and Panama. *Id.* BPA offered a variety of financial products and services, including corporate and personal banking, loans, funds management, credit cards, financing, and other retail services to its customers, who were located predominantly in Spain, France, and Andorra. *Id.* ¶¶ 34, 36. In 2011, BPA acquired Banco Madrid after review and approval by the Spanish regulatory authorities, and

approximately two-thirds of BPA assets were vested in this Spanish subsidiary.  *Id.* ¶¶ 23, 33.
BPA was recognized as highly skilled and successful.  *Id.* ¶ 23.

On March 10, 2015, FinCEN issued the two "Notices" relevant here: the NOF reflecting
its "finding" that BPA is "a Financial Institution of Primary Money Laundering Concern" and
the NPRM announcing FinCEN's proposal to impose its most severe sanction, the fifth special
measure, on BPA, effectively banning BPA from the U.S. financial market.  *Id.* ¶¶ 1, 44.[3]
FinCEN issued the NOF and NPRM without prior notice to BPA, and BPA had no opportunity
to participate in or otherwise offer input into the investigative process leading to them.  *Id.* ¶¶ 1,
6.  Moreover, the NOF and NPRM both acknowledge that, in reaching its decision, FinCEN did
not consider, despite express requirements in the statute that it do so, BPA's legitimate business
because it deemed that factor to be too "difficult to assess."  *Id.* ¶¶ 57-61.

Plaintiffs Ramon Cierco and Higini Cierco (the "Ciercos") are citizens and residents of
Andorra.  *Id.* ¶¶ 15-16.  Together with another family member, the Ciercos own, directly or
indirectly through plaintiffs Successor D'Higini Cierco Garcia S.A. and Cierco Martinez 2 2003,
S.L., approximately 75% of the shares in BPA.  *Id.* ¶ 17.  Prior to the events giving rise to this
action, the Ciercos served as non-executive Directors of BPA and, on a rotating basis, as the
Chairman of the Board of Directors of BPA.  *Id.*  Before the issuance of the NOF and NPRM, the
Ciercos were the majority shareholders in a small but prosperous bank.  As a result of the NOF
and NPRM, BPA has been taken from the Ciercos, and it is being systematically dismembered

---

[3] Under the "fifth special measure," FinCEN may prohibit or otherwise restrict domestic banks
from opening or maintaining correspondent accounts for a foreign bank that has been designated
as of "primary money laundering concern."  31 U.S.C. § 5318A(b)(5).  The other four "special
measures" impose various recordkeeping and reporting requirements in respect of the foreign
bank's dollar transactions but do not preclude the bank from accessing the U.S. financial system.

and is purportedly in the process of being sold through an opaque and non-commercial process. *Id.* ¶¶ 3, 24, 96.

### U.S. and Andorran Discussions Leading Up to the Seizure of BPA

In the months prior to the seizure of BPA, the governments of the United States and Andorra were in discussions concerning additional anti-money laundering ("AML") controls that the U.S. thought Andorra should put in place. On or about August 26, 2014, the U.S. Embassy in Spain sent a "Verbal Note" to the Andorran government citing certain AML recommendations that the U.S. government wanted the Andorran government to implement. Compl. ¶ 84.

On September 22, 2014, the Andorran government responded to the Verbal Note, informing the U.S. Embassy in Spain that, although in general terms Andorra was committed to the fight against money laundering and terrorist financing, it declined to adopt the specific cash transaction reporting measures that the U.S. government had proposed. *Id.* ¶ 85. The United States was dissatisfied with the Andorran response to its requests, and its dissatisfaction led directly to the issuance of the NOF and NPRM in this case. In April 2015, at a conference in Spain, Anton Smith, Counselor for Economic Affairs at the U.S. Embassy in Madrid said: "With respect to Andorra, last year we signaled our discomfort with an official report identifying problems in the system there. I will not say that they did not realize it, but they did not react with the appropriate vigor, and we had to use the hammer." *Id.* ¶¶ 6, 87-89. The U.S. government denied that Mr. Smith made this statement, but it was captured on videotape and posted on YouTube. [4] *Id.* ¶ 88.

---

[4] *See* Els Americans Van Actuar l'any Passat Per La Falta de Fluidesa de les Autoritats Andorranes, YouTube (uploaded May 27, 2015), https://youtu.be/jXli0F9UgqQ.

### The Issuance of the NOF and NPRM and the Resulting Seizure of BPA

The issuance of the NOF and NPRM had an immediate and devastating impact on BPA and the Ciercos. As FinCEN knew they would, BPA's correspondent banks in the U.S. and abroad immediately closed BPA's accounts. *Id.* ¶¶ 2-5, 24-25. In the NPRM, FinCEN expressly "encourage[d] other countries to take similar action" – that is, to prohibit their own domestic banks from doing business with BPA, directly or indirectly. *Id.* ¶ 1. As a direct, proximate, and intended result, on March 11, 2015, the Andorran regulator, the Institut Nacional Andorra de Finances ("INAF"), initiated a "preventive intervention of the bank," seizing it from its then owners, removing its Board of Directors, and replacing them with government appointees. *Id.* ¶¶ 3, 22, 95-96.[5]

On March 16, 2015, as a result of FinCEN's action and the financial turmoil it caused, regulators in Spain seized BPA's subsidiary, Banco Madrid. *Id.* ¶ 23. That bank has been liquidated. *Id.* On March 11, 2015, regulators in Panama seized BPA's subsidiary, BPA Panama, where it remains under government control. *Id.* ¶¶ 3, 45.

The Andorran government placed the assets and operations of the bank under the control of the Agency for the Restructuring of Financial Entities ("AREB"), which was created subsequent to the FinCEN action for that purpose. *Id.* ¶ 22. AREB is charged with administering a "resolution process" designed to dismantle BPA, transfer its good assets to another institution, and sell that institution to new shareholders. *Id.* ¶ 95. That process is underway.

---

[5] As set forth in plaintiffs' summary judgment motion, INAF had made clear in public statements that its action was directly caused by FinCEN's NOF and NPRM, stating that the seizure was "not motivated by a . . . lack of liquidity nor solvency of BPA or its Group" but was caused by "the action of the FinCEN." Pls.' Mem. at 9; Press Release, INAF, Intervention of Banca Privada d'Andorra (Mar. 16, 2015), *available at* https://www.inaf.ad/files/Press_Release_INAF_2015-03-16.pdf.

## **Process Followed Under the NOF and NPRM**

When, as here, the imposition of the fifth special measure, the statute's harshest sanction, is proposed, Section 311 requires FinCEN to conduct a rulemaking process.   31 U.S.C. § 5318A(a)(2)(C); 5 U.S.C. § 553.   Rulemaking, of course, requires the publication of factual findings and a proposed rule so that interested parties can challenge the agency's proposed action.  5 U.S.C. § 553(c).

By letter of May 6, 2015, counsel for plaintiffs, the Ciercos and their family corporations, as BPA's controlling shareholders, filed a comment objecting to the NOF and the NPRM's proposed sanction.  Compl. ¶ 66.  The May 6 letter reported that, since 2003, KPMG and Deloitte, two of the largest and most respected accounting firms in the world, were given unfettered access to BPA's files and personnel, had annually audited BPA's AML compliance program, and had found the bank in compliance.  *Id.*

At a meeting with FinCEN personnel on July 15, 2015, plaintiffs' counsel offered to provide FinCEN with a letter dated March 24, 2014 – written more than a year before FinCEN's NOF – addressed to BPA's Andorran regulator.  *Id.* ¶¶ 74, 77.  In that letter, BPA identified and self-reported *each of the specific instances of money laundering FinCEN later cited in its NOF,* described *sub judice* court proceedings against the individuals allegedly responsible, and described the actions it had taken to correct the issues.  *Id.* ¶ 77.  On July 22, at FinCEN's request, plaintiffs' counsel reiterated the offer in writing and, in addition, asked FinCEN a number of questions concerning FinCEN's dealings with the Andorran government and other matters bearing on the NOF.  *Id.* ¶ 80.

On September 4, 2015, plaintiffs' counsel again wrote to FinCEN.  Having received no response to his previous letters, plaintiffs' counsel provided FinCEN with a copy of the March

24, 2014 letter, referred to above, and also set forth further information challenging the basis for the NOF and NPRM.  *Id.* ¶ 81.  The September 4 letter asked FinCEN to intercede with the Andorran authorities to prevent a rush to judgment with Andorra's expropriation of BPA and to include all stakeholders in the process.  The letter also asked FinCEN to disclose all non-classified information that it had considered in issuing the NOF so plaintiffs could provide further comment and to advise why the fifth special measure was proposed and lesser sanctions were not selected.  *Id.*

FinCEN has responded to none of plaintiffs' requests.  Its only response was a September 16, 2015 email stating that "[i]f a specific response to your letters is appropriate, you will receive it by a separate communication."  *Id.* ¶ 82.  There has been no such communication.

### BPA's Legitimate Business

Section 311 directs FinCEN in assessing whether a foreign bank is of "primary money laundering concern" to consider not only the extent of the bank's money laundering activity but also the extent of the bank's legitimate business.  Inevitably, every bank is used from time to time for money laundering, despite the active implementation of AML controls.  Consideration of a bank's legitimate business requires FinCEN to assess whether instances of money laundering it identifies are disproportionate to the bank's regular activities.  Yet FinCEN explicitly declined to evaluate this factor because, it asserted, the legitimate business of BPA was "too difficult to assess."  Compl. ¶ 57.  There is little question that BPA had extensive legitimate business.  BPA had branches in Andorra, a subsidiary with extensive operations and approximately 25 branches in Spain, and another subsidiary in Panama.  *Id.* ¶¶ 2, 22, 33-36.  The NOF itself acknowledges that BPA provided a wide variety of typical banking services to its clients.  *Id.* ¶ 61.  As recently as 2014, the British publication Global Banking & Finance Review

named BPA's Spanish subsidiary, Banco Madrid, the "Best Wealth Manager" and "Best Asset Management Company" in Spain.  *Id.* ¶ 23.  It also had two of the five highest performing closed end funds in Spain.  *Id.*

BPA's financial statements for 2011, 2012, and 2013 are available on its website, along with extensive information concerning its corporate structure, data concerning its business, and a description of its policy of corporate responsibility.  *Id*. ¶ 61.  In addition, information concerning BPA's legitimate business was available from: (i) BPA's regulators in Andorra, Spain, and Panama; (ii) its banking and financial counter-parties and correspondents, including those in the United States; (iii) its AML auditors – Deloitte and KPMG; (iv) its directors, shareholders, senior management, and employees; and (v) its customers.  Yet, notwithstanding this wealth of information available to FinCEN, the agency found it "too difficult" to consider BPA's legitimate business.  *Id.* ¶¶ 57-61.  This was in keeping with a pattern and practice by FinCEN of ignoring consideration of this mandatory factor, and simply cutting and pasting language from one Section 311 notice to the next reciting the purported difficulty of assessing the legitimate businesses of the banks it closes down.  *Id.*  FinCEN has a strategy of weighing something – instances of money laundering – against nothing – its willful ignorance of legitimate business – and invariably finding that something outweighs nothing.

## **ARGUMENT**

### I.    **The NOF and NPRM Are Ripe for Judicial Review**.

Defendants' ripeness argument is based on their contention that the rulemaking proceeding to determine whether to impose the statute's harshest sanction is still in process.  The argument focuses almost exclusively on the NPRM.  Indeed, throughout their brief, and in their ripeness argument in particular, defendants all but ignore the Notice of Finding, probably

because their ripeness arguments tend to founder on the NOF's express finding that on its face is final.  In any event, defendants' ripeness arguments, both as to the NOF and the NPRM, are meritless.  Defendants ask this Court to impose an artificially high barrier to judicial review of clearly final actions with direct and devastating consequences, ignoring the longstanding recognition that "finality" and "ripeness" need to be evaluated in the real world and not in an abstract world of defendants' construction.

The NOF purports to be, and is, a final agency action.  It is expressly an administrative "finding" – not a "proposed finding" – that BPA is a foreign bank "of primary money laundering concern."  There is nothing preliminary or tentative about that finding.  The NPRM does not propose to revisit that finding; it is limited to consideration of whether the "fifth special measure" is an appropriate sanction.  The administrative record on which the NOF was reached, although still undisclosed by FinCEN, is complete and was so when that finding was published.  The NOF is thus a reviewable final agency action.

Since the NOF is final and reviewable, the NPRM, which is predicated on the NOF, is equally final and reviewable.  The NOF and the NPRM were fundamentally defective, contrary to law, and caused immediate and devastating consequences; the subsequent rulemaking proceeding to adopt a formal sanction is irrelevant to the ripeness analysis to redress the injury that has already occurred.  Here the violations were complete and their consequences suffered when the NOF and NPRM were issued.

The argument that plaintiffs' claims are unripe is part of defendants' "Goldilocks Strategy" that insists that this porridge is too hot because the rulemaking process is still cooking.  This argument ignores the fact that, as alleged in the complaint, the damage that has been done to

plaintiffs has already occurred.[6]  It is this immediacy of action and its resulting damage to the target banks and their owners that makes Section 311 Notices unique in federal rulemaking. Plaintiffs' claims need not wait for a final rule because plaintiffs' injuries will not be caused by the final rule.  Any marginal cost savings of waiting for FinCEN's preordained glacial process to complete (if it ever does) are more than outweighed by the ongoing damage caused by the critical predicate finding which is final – that BPA is "of primary money laundering concern." As alleged in the complaint, and as acknowledged in the GAO Report, banks and governments do not wait for the issuance of a final rule before taking action on a Section 311 Notice, nor do defendants intend them to wait.  Given these well-pleaded allegations, the Court should reject defendants' theoretical and disingenuous ripeness argument.

### A.     The Applicable Legal Standards

To assess whether a claim is ripe, courts consider two factors: (i) "the fitness of the issues for judicial decision;" and (ii) "the hardship to the parties" caused by delaying review.  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012).  The requirement that a claim be fit for judicial resolution "is primarily meant to protect 'the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'"  *Id.*  A claim satisfies the fitness requirement if it is "essentially legal" and "sufficiently final."  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 783 F.2d 237, 249 (D.C. Cir. 1986). While the fitness factor is important, a showing of "hardship to the parties" can "outweigh[] the

---

[6] It is not "future damage," which defendants set up as a straw man argument in their motion to dismiss, but present damage that has already occurred, is ongoing, and is redressable only through the withdrawal of the NOF and NPRM.

competing institutional interests in deferring review." *Eagle-Picher Indus. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985).

The ripeness inquiry is not meant to be "a matter of weaving complicated legal distinctions divorced from reality." *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 479 (D.C. Cir. 1986). Instead, "[i]t requires . . . the exercise of practical common sense." *Id.* "To be final, an action need not be the last administrative [step] contemplated by the statutory scheme. Rather, the question is whether the agency has impose[d] an obligation, denie[d] a right, or fixe[d] some legal relationship." *Role Models Am., Inc. v. White*, 317 F.3d 327, 331 (D.C. Cir. 2003) (internal citation and quotation marks omitted). In examining this question, the Supreme Court has instructed that the Administrative Procedures Act's ("APA") finality requirement should be applied in a "flexible" and "pragmatic way." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

In the instant case, flexibility and pragmatism require appreciation of the inarguable finality of FinCEN's finding that BPA is "of primary money laundering concern," as set forth in the NOF, and the unequivocal practical effect of the NOF and NPRM on BPA's continued operation and, indeed, its very existence. As acknowledged in its more candid comments in connection with the GAO Report, the fact that FinCEN has not completed its formal rulemaking proceeding is irrelevant to the finality of the effect of a Section 311 Notice. This is particularly so in the instant case where, nearly eleven months later, FinCEN has taken no action and appears to be applying its "slow march" policy in applying Section 311 and trying to make all possible challenges moot.

**B.      Applying These Standards, the NOF and NPRM Are Final.**

By definition, the NOF and NPRM are administrative decisions that are fit for judicial review.  As this Court recently ruled, among the factors indicative of finality are the agency's own characterization of its decision, whether it was published in the Federal Register, and whether it was expressly made effective against one or more private parties.  *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*, No. 14-cv-953(GK), 2015 WL 5675813, at *13 (D.D.C. Sept. 25, 2015) (citing *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 n.7 (D.C. Cir. 1986)).  Here, FinCEN published the NOF in the Federal Register to provide notice to the public, including all U.S. banks providing correspondent banking services to BPA, that BPA had been "found" by FinCEN to be a foreign bank "of primary money laundering concern."  The NOF reflects FinCEN's final decision on the subject, one that took effect immediately and with devastating consequences, based on a largely undisclosed record, but on a record that was complete to FinCEN's satisfaction and not one it proposed to develop further.  The NOF thus "mark[s] the consummation of [FinCEN's] decisionmaking process" on that issue.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  The NPRM announced FinCEN's decision to initiate a rulemaking proceeding to impose a formal sanction based on the NOF that BPA was "of primary money laundering concern," a finding which would not be revisited.  While the contemplated rulemaking proceeding to select a formal sanction involves what is ostensibly an ongoing process, the publication of the NOF and NPRM alone had immediate effect, and were expected and intended do so.

The issues before the Court, moreover, are "purely legal" and "would not become any more concrete from further factual development."  *Int'l Union, United Auto*, 783 F.2d at 250.  The factual record on which plaintiffs challenge the NOF and NPRM is complete.  That record

was closed on March 6, 2015, when FinCEN issued those notices.  Although defendants have yet to file a list of the contents of that record, as required by Local Civil Rule 7(n)(1), neither the further record FinCEN may develop in its rulemaking proceeding on the issue of sanction nor the passage of time will change the facts pertaining to the NOF and NPRM nor clarify the issues the Court is asked to decide.  The questions of whether FinCEN properly issued its NOF without any prior notice to BPA and without disclosing its underlying basis, and whether it selected the "death penalty" as its proposed sanction without considering BPA's legitimate business are "purely legal" issues; that is why plaintiffs were able to file their motion for partial summary judgment.

The hardship factor is also fully satisfied here.  While defendants insist that FinCEN's action in announcing the NOF "imposes no legal consequences on plaintiffs, BPA, or anyone else" (Defs.' Mem. at 19), this deliberately ignores reality.  As alleged in the complaint, FinCEN fully understands, expects, and encourages banks here and abroad to act immediately upon its issuance of an NOF labeling a bank of "primary money laundering concern."   Compl. ¶ 2. FinCEN went even further in the NPRM, announcing that it "encourages *other countries* to take similar action based on the information contained in this NPRM and the Notice of Finding."  *Id*. ¶¶ 44, 63 (emphasis supplied).

Although defendants argue to this Court that the NOF and NPRM were not intended to have immediate impact (Defs.' Mem. at 27-28, 31), the actual Notices themselves tell a different story.  FinCEN does not caution U.S. banks and foreign regulators to withhold adverse action against BPA until the rulemaking process reaches its conclusion.  To the contrary, it actively encourages immediate adverse action.  Indeed, in a moment of candor, a U.S. government official acknowledged that its NOF and NPRM against BPA were intended as a "hammer" – an

example showing the Andorran government the consequences to its banking industry of Andorra's failure to meet FinCEN's anti-money laundering standards.   Under this threat, Andorra regulators heeded FinCEN's "encouragement," took control of BPA, and began to dismantle it.  FinCEN's goal – to put BPA out of business – was met by the mere issuance of the NOF and NPRM, before the rulemaking process had even begun.

Because banks and foreign governments can be expected to act immediately to implement NOFs and NPRMs issued pursuant to Section 311, it is rare that FinCEN is ever required to actually issue a final rule.   Where FinCEN has issued an NOF that a financial institution is "of primary money laundering concern," it is generally the case that the target ceases operations long before the issuance of any purportedly "final" rule confirming the imposition of any special measures.[7]   The GAO Report explains the "reality" behind FinCEN's practice of intentional delay.   It does not result from a complex review process or extended

---

[7] Since passage of the USA PATRIOT ACT, FinCEN has issued Section 311 Notices in respect of 18 banks (other than BPA).   With respect to nine of them, FinCEN has subsequently withdrawn the NOF, NPRM or final rule on the basis that the relevant bank has ceased to exist or operate.   *See* Withdrawal of the Proposed Rulemaking Against Lebanese Canadian Bank, 80 Fed. Reg. 60,575, 60,576 (Oct. 7, 2015); Repeal of the Final Rule Imposing Special Measures and Withdrawal of the Findings of Primary Money Laundering Concern Against Myanmar Mayflower Bank and Asia Wealth Bank, 77 Fed. Reg. 59,747, 59,748 (Oct. 1, 2012); Repeal of the Final Rule and Withdrawal of the Finding of Primary Money Laundering Concern Against VEF Banka, 76 Fed. Reg. 45,689, 45,690 (Aug. 1, 2011); Withdrawal of the Finding of Primary Money Laundering Concern and the Notice of Proposed Rulemaking Against First Merchant Bank, 73 Fed. Reg. 19,452, 19,453 (Apr. 10, 2008).

As to the remaining nine banks targeted with NOFs, FinCEN has issued final rules against three of them, and they are fighting for their survival, with two of them filing suit against FinCEN in this Court (*Banco Delta Asia v. FinCEN*, No. 13-cv-00333; *FBME Bank Ltd. v. Lew*, No. 15-cv-01270).   Most of the remaining banks are still awaiting a final rule, despite the NOF and NPRM having been issued years earlier: Halawi Exchange (NOF and NPRM issued in 2013); JSC CredexBank (NOF and NPRM issued in 2012); Kassem Rmeiti & Co. For Exchange (NOF and NPRM issued in 2013); Liberty Reserve S.A (NOF and NPRM issued in 2013).   *See* FinCEN Summary Chart of Section 311 Rulemakings, *available at* https://www.fincen.gov/statutes_regs/patriot/section311.html.   FinCEN manifestly intends the same fate for BPA.

discussions with the target.  Rather, because the NOF and NPRM have the same effect as a final

rule, as the GAO diplomatically put it, FinCEN "may lack incentive to finalize or withdraw such

rules."  GAO Rep. at 27.  Far from disputing GAO's conclusion, FinCEN expressly embraced it

in its official response to the GAO Report.  Then-Under Secretary of the Treasury Stuart A.

Levey stated:

> [T]he rulemaking action is not an end in itself.  The most successful exercise of
> Section 311 would be where the underlying threat is eliminated, making the final
> regulatory action itself unnecessary.

GAO Rep. at 38.  Nonetheless, FinCEN's ripeness argument asks this Court to embrace a kind of

judicial abdication – by electing not to issue a final rule (or by delaying doing so until long after

the target bank had collapsed), FinCEN effectively seeks to insulate its decision-making from

any judicial review.  This strategically constructed immunity serves neither the rationale of the

ripeness doctrine nor the public policy purposes of the Administrative Procedures Act.

Defendants' motion to dismiss simply ignores both the unique operation and finality of

Section 311 and FinCEN's deliberate strategy of letting the inertia of the administrative process

kill a target bank.  It would be more than futile to await the issuance of a final rule before

considering plaintiffs' claims; it would be wholly counterproductive.  In these circumstances,

defendants' quotation from *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998),

asserting that plaintiffs "will have ample opportunity . . . to bring [their] legal challenge at a time

when harm is more imminent and more certain," is strikingly cynical.

The futility of awaiting a final rule is underscored by the recent action taken by FinCEN

in relation to Lebanese Canadian Bank SAL ("LCB").  In February 2011, FinCEN issued an

NOF and NPRM proposing to impose the fifth special measure against LCB.  As a result of those

notices, LCB's banking license was revoked and its assets were liquidated.  In October 2015,

20

after more than four years of supposed rulemaking deliberation, FinCEN revoked its NPRM against LCB and advised that it would not issue a final rule because "LCB no longer exists as a foreign financial institution."   Withdrawal of the Proposed Rulemaking Against Lebanese Canadian Bank, 80 Fed. Reg. 60,575, 60,576 (Oct. 7, 2015).   As Under Secretary Levey stated, this is FinCEN's goal – a "successful exercise" of its Section 311 power – and its treatment of BPA is entirely consistent with it.

If the Court awaits further action from FinCEN, BPA will almost certainly suffer the same fate that LCB and numerous other financial institutions that have been targeted by FinCEN have suffered.   Meanwhile, FinCEN will be free to continue to violate its statutory obligations without having its conduct examined by the courts.   "[P]ractical common sense" thus dictates that the Court review FinCEN's actions now.   *State Farm*, 802 F.2d at 479.[8]

Finally, the Court should not be deterred from undertaking immediate review of FinCEN's conduct based on defendants' suggestion (Defs.' Mem. at 25) that FinCEN is "in the process of evaluating" the effect of the recent ruling in the FBME case[9] "upon ongoing rulemaking proceedings," including those relating to BPA.   An agency cannot "stave off judicial review of a challenged rule simply by initiating a new proposed rulemaking that would amend the rule in a significant way.   If that were true, a savvy agency could perpetually dodge review." *Am. Petroleum Inst.*, 683 F.3d at 388.   FinCEN is, if nothing else, a savvy dodger of review.   The Court should reject this latest ploy.

---

[8] Defendants argue that the NOF and NPRM are not ripe under the APA because incurring costs in preparation for a final rule is not justification for court action.   (Defs.' Mem. at 22-23) (citing *In re Murray Energy Corp.*, 788 F.3d 330, 335 (D.C. Cir. 2015)).   That argument is entirely beside the point.   Plaintiffs are not seeking to recover or avoid their costs in preparing for a final rule.   Rather, plaintiffs have been injured because third parties have acted on the NOF and NPRM, exactly as intended by defendants.   Compl. ¶¶ 45-46.

[9] *FBME Bank Ltd. v. Lew*, No. 15-cv-01270 (CRC), 2015 WL 5081209 (D.D.C. Aug. 27, 2015).

## II.     Plaintiffs Have Standing to Assert Their Claims.

In order to satisfy the constitutional requirements for standing, plaintiffs must allege that they have suffered "actual or threatened injury" traceable to FinCEN's conduct which is "likely to be redressed by a favorable decision." *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.,* 493 U.S. 331, 335 (1990); *Ams. for Safe Access v. DEA*, 706 F.3d 438, 442 (D.C. Cir. 2013).  In this case, this standard is fully met.

### A.     Plaintiffs' Injuries Are Traceable to Defendants' Issuance of the NOF and NPRM and Are Redressable in This Proceeding.

Defendants argue that plaintiffs lack standing because their injuries are not "traceable" to the NOF and NPRM, and it is mere speculation that prevailing in this action will remedy plaintiffs' injuries.[10]  Defs.' Mem. at 9-11.  This argument rests on the implicit proposition that U.S. banks and the Government of Andorra (whose own banking system is dependent on the ability to transact business in U.S. dollars) may ignore what FinCEN says about whether or not a particular bank poses a significant risk of money laundering.  This is apparently a proposition that FinCEN is willing to voice only in this Court.  When the issue arose in respect of the GAO Report, FinCEN had a different perspective, touting its power to influence U.S. banks and foreign governments to take immediate action on its Section 311 notices even without formal rulemaking.  As alleged in the complaint, far from being speculative, FinCEN knows, intends, and relies on the immediate reaction of U.S. banks to its pronouncements concerning money laundering risk.  Compl. ¶¶ 1, 2, 44.  FinCEN also anticipated and intended that the Government of Andorra would take action against BPA.  *Id.* ¶¶ 6, 88.  And the Andorran authorities have

---

[10] As the D.C. Circuit has noted, traceability and redressability often overlap as "two sides of a causation coin" and merge into a single analytical inquiry.  *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997); *Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of Treasury*, 545 F.3d 4, 11 (D.C. Cir. 2008).

acknowledged that their actions were prompted by FinCEN and that their willingness to take redressable actions depends on whether it is consistent with FinCEN's views and policies.[11]

**Traceability.**  There can be little doubt that the issuance of the NOF and NPRM was "at least a substantial factor motivating the third parties' actions." *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001); *see also Block v. Meese*, 793 F.2d 1303, 1308 (D.C. Cir. 1986).  Courts have long recognized that such third-party responses to agency action are not "truly independent" where there are economic and other incentives for them to act in accordance with the agency's intent and desired effect.  *Bennett v. Donovan*, 703 F.3d 582, 587-88 (D.C. Cir. 2013); *see also Ams. for Safe Access*, 706 F.3d at 449; *Tozzi*, 271 F.3d at 309; *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 6 (D.C. Cir. 2005).  As alleged in the complaint, this is precisely the case here.  When the government agency charged with policing financial institutions' compliance with anti-money laundering principles identifies a foreign bank as a "primary" money laundering risk, there can be "no serious doubt" as to what actions the U.S. banks subject to that agency's jurisdiction will take.  *Bennett v. Donovan*, 703 F.3d at 589.[12] Equally, when a small foreign country's entire banking system is dependent on its banks' ability to utilize the U.S. dollar clearing system (Compl. ¶ 27), that country, too, can be expected to take

---

[11] Pls.' Mem. Supp. Partial Summ. J. at 8-9; SOF ¶ 31; SOF Ex. 18.

[12] *See also Natural Res. Def. Council v. EPA*, 755 F.3d 1010, 1017 (D.C. Cir. 2014) (once EPA promulgated exclusion, it was "'a hardly-speculative exercise in naked capitalism' to predict that facilities would take advantage of it to burn hazardous-waste-derived fuels rather than more expensive fossil fuels") (quoting *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 248 (D.C. Cir. 2013) (inferring that "motor carriers would respond to the hours-increasing provisions by requiring their drivers to use them and work longer days")); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1065 (D.C. Cir. 2015) (improper to evaluate empirical accuracy of economic theory at pleadings stage where plaintiffs may rely on certain economic assumptions about supply and demand, which are provable at trial and "routinely credited by courts in a variety of contexts") (citing *United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (allegations "founded on economic principles," while "perhaps not as reliable as allegations based on the laws of physics, are at least more akin to demonstrable facts than are predictions based only on speculation")).

action in conformance with the U.S. agency's pronouncements.  As a practical matter, FinCEN's use of "the hammer" against BPA could easily be extended to the entire Andorran financial sector if Andorra does not do FinCEN's bidding.  And that is precisely what FinCEN threatened to do.  It is not surprising that Andorran officials have stated that they intend to follow FinCEN's directives to the letter.

Where, as here, an agency makes the decision to apply a pejorative label to a company, product, or publication, courts have not hesitated to trace the injury to that labeling.  For example, in *Tozzi,* the court held that the application of an "inherently pejorative and damaging" term such as "carcinogen" to a product was likely to cause economic harm and that tracing of such harm to the agency's action was "not at all speculative."  271 F.3d at 309.  *See also Ams. for Safe Access*, 706 F.3d at 447 (classification of marijuana as Schedule I drug was "inherently pejorative"); *Block*, 793 F.2d at 1308  (labeling of film as political propaganda).  In those cases, defendants argued that they were not responsible for the reaction of purportedly independent third parties.  Defendants' arguments were rejected there and should be rejected here.[13]  In the financial context, it is difficult to conceive of a more pejorative statement than that a financial institution is "of primary money laundering concern."

**Redressability.**  Where, as here, an agency's action is intended to have a particular effect on third parties, courts routinely recognize that a changed agency ruling likewise would have an

---

[13] The cases that defendants rely on are inapposite.  *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004), and *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267 (D.C. Cir. 2007), both involve challenges to regulatory structures in which the regulated entities have numerous choices, including safe harbor choices, as to how to reach a regulatory requirement.  In those cases, the courts rightly questioned the plaintiffs' assumption that the regulated entities would use a particular path to regulatory compliance.  Here, there is no choice.  Banks are regulated entities, FinCEN is the enforcer of anti-money laundering compliance, and FinCEN has labeled BPA a bank of "primary money laundering concern."

effect on those very same third parties, thereby establishing redressability.  *See, e.g., Tozzi*, 271

F.3d at 309; *Ams. for Safe Access*, 706 F.3d at 448-49; *Town of Barnstable v. Fed. Aviation

Admin.*, 659 F.3d 28, 34 (D.C. Cir. 2011) (changed agency ruling "'doubtless would significantly

affect' the state decision") (quoting *Nat'l Parks Conservation Ass'n*, 414 F.3d at 7).   Although

defendants urge this Court to require some higher level of certainty to demonstrate redressability,

plaintiffs need only plead that a favorable decision "would yield 'a significant increase in the

likelihood that [they] would obtain relief that directly redresses the injur[ies] suffered.'"  *Town of

Barnstable,* 659 F.3d at 31 (citation omitted).[14]

     As this Circuit previously found in *Block* and *Tozzi*, there is a substantial likelihood that

relief would redress plaintiffs' injuries here – which is all plaintiffs need show – if FinCEN were

to rescind its NOF and NPRM that BPA is "of primary money laundering concern."  Given the

interconnectedness of our global financial system and the role and effect that FinCEN plays

within that system, FinCEN's publication of a retraction of its labeling of BPA as a money

launderer would be expected to significantly affect the decisions of such third parties as U.S.

correspondent banks, which then would be free to conduct business with BPA, or the Andorran

government, which would view the U.S. government as having been appeased.   Andorran

officials have represented to plaintiffs that they are following the policies of FinCEN and

suggested they will not act against the will of FinCEN.  Compl. ¶¶ 26-27.  In all events, plaintiffs

have alleged on well-pleaded facts that such redress is likely to result if this Court issues an order

---

[14] There is, in fact, a certain tension between defendants' arguments concerning ripeness and
their arguments concerning redressability.  In their ripeness argument, defendants hold out the
hope that FinCEN could change its mind or modify its proposed rule in a way that could
ameliorate plaintiffs' injuries and obviate judicial review.  Defs.' Mem. at 19.  But that statement
is fundamentally at odds with defendants' redressability argument which suggests that the
vacatur of the NOF and NPRM, signaling a change in defendants' position concerning whether
BPA is of "primary money laundering concern," would not redress plaintiffs' injuries.

vacating the NOF and NPRM, and defendants have no basis to refute that allegation on a motion to dismiss.

Finally, defendants seem to argue that plaintiffs lack standing because "FinCEN indisputably retains the ability to impose the fifth special measure on BPA." Defs.' Mem. at 10-11. This statement is astonishing. Plaintiffs' complaint is premised on their allegation that FinCEN improperly labeled BPA as a foreign bank "of primary money laundering concern" and proposed imposition of the fifth special measure *without following the statute and without considering the mandatory factor of the extent of BPA's legitimate business and the effect of the proposed action on that business.* Defendants' threat that FinCEN "indisputably" could reimpose the fifth special measure on BPA notwithstanding an order by this Court invalidating the NOF and NPRM suggests that FinCEN may have pre-judged the outcome of its consideration of the statute's mandatory factors. But whatever this threat may mean, it cannot possibly deprive the plaintiffs of standing to challenge FinCEN's actions to date. In any event, defendants simply misstate the law. Plaintiffs are not required to show that "correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest." *Mendoza v. Perez,* 754 F.3d 1002, 1010 (D.C. Cir. 2014) (citing *Ctr. for Law & Educ. v. Dep't of Educ.,* 396 F.3d 1152, 1160 (D.C. Cir. 2005)); *see also Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) (if party claiming deprivation of right to notice-and-comment rulemaking had to show that its comment would have altered agency's rule, that requirement "would be a dead letter"). Standing can be established even though there is no binding legal mechanism by which the challenged action might be redressed. *Town of Barnstable*, 659 F.3d at 34 (finding it likely, not speculative, that Department of Interior would "rethink" approval of offshore wind farm project if faced with FAA non-binding determination

that project posed unmitigable hazard); *Bennett v. Spear*, 520 U.S. at 170 (finding standing despite noting that ultimate decision-maker was "technically free to disregard" the challenged opinion).  Furthermore, a plaintiff need only show that a favorable decision "'will relieve a discrete injury to himself'" and "'need not show that a favorable decision will relieve his *every* injury.'"  *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1297 (D.C. Cir. 2015) (emphasis added by court) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

Plaintiffs seek nothing more here than a judicial decision that FinCEN's NOF and NPRM against BPA were contrary to law and invalid.  Such a decision invalidating the NOF and NPRM will almost certainly remediate the injury to the Ciercos to a material extent and is reasonably likely to cause Andorra to react to the removal of the FinCEN sword of Damocles over its financial system.  The prospect that FinCEN may subsequently issue a new NOF and NPRM that reach the same result cannot preclude plaintiffs' standing to challenge the NOF and NPRM.

**B.     The Complaint Alleges Both Direct and Derivative Injury.**

The complaint alleges alternative bases for standing: (i) individual and direct standing for injuries to plaintiffs caused by the expropriation of their BPA stock; and (ii) derivative and indirect standing to assert claims on behalf of BPA for shutting down its correspondent bank accounts with U.S. banks.  Perhaps sensing an easier target, defendants go after plaintiffs' allegation of derivative standing and all but ignore their direct standing claim.  In fact, both bases for standing are properly alleged.

**C.     Direct Standing**

Direct standing arises from defendants' improper conduct resulting in the *loss* of plaintiffs' BPA shares.  By their own admission, defendants used the NOF and NPRM as a "hammer" to coerce the Andorran government to take action which included the taking of

27

plaintiffs' ownership stake in BPA through a "resolution" process.  Compl. ¶ 27.  Plaintiffs'

direct standing thus does not rest on indirect injury in the form of diminished share value; it rests

on direct injury to plaintiffs individually due to the conversion of their ownership interest in

BPA.[15]  This injury is a classic instance of direct standing.

Shares of stock are personal property.  *See* 11 Fletcher Cyc. Corp. § 5096; *AFP Imaging*

*Corp. v. Ross,* 780 F.2d 202, 204 (2d Cir. 1985) (majority American rule treats shares of stock as

personal property of shareholders).  Misappropriation of stock is a direct injury, for which the

shareholder has a cause of action.  *See, e.g., Bingham v. Zolt,* 66 F.3d 553, 561-62 (2d Cir. 1995)

("[W]here the individual owns property – cash, real estate, or shares of stock – and that property

is stolen, the individual suffers an injury personal to him and no other.").  This is equally true in

Andorra.  *See* Jaume Bartumeu Cassany Decl., attached as Exhibit 1, ¶ 3.[16]  Accordingly, there is

no meaningful conflict between Andorran and U.S. law on this issue.

Plaintiffs agree with defendants' thesis that the test for distinguishing direct from

derivative claims is governed by two questions: "(1) who suffered the alleged harm (the

corporation or the suing stockholders, individually); and (2) who would receive the benefit of

any recovery or other remedy (the corporation or the stockholders, individually)?"  *Tooley v.*

*Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1033 (Del. 2004).  Here, it was plaintiffs,

individually, who lost their personal property in the form of their ownership of BPA, and it is

plaintiffs, individually, who stand to receive the benefit of the remedy sought here: vacating the

---

[15] The cases cited by defendants are not to the contrary.  The motion to dismiss relies entirely on cases involving injuries to share value and depletion of corporate assets, and not total loss or conversion of shares.

[16] Under Andorran law, shares in a corporation are considered the personal property of the shareholder.  Ex. 1 ¶ 3.  Wrongfully depriving a shareholder of his shares is considered an injury to the shareholder individually and can be redressed through a civil action to recover the shares. *Id.* ¶¶ 3-4.

NOF, withdrawing the NPRM, and thereby removing the "hammer" that FinCEN has poised over Andorra's head.  Such removal creates the real prospect of the return of plaintiffs' property. In the absence of court intervention, one thing is certain – the Andorran government will accede to FinCEN's intense pressure and transfer plaintiffs' shares it expropriated to the shareholders of a new Andorran bank, and plaintiffs' investment in BPA will be lost.

### D.    Derivative Standing

While plaintiffs' allegations of direct standing are by themselves sufficient to confer jurisdiction for the remedies they seek, their allegations of derivative standing are also proper. Plaintiffs' derivative claims on behalf of BPA allege that FinCEN's NOF and NPRM "damaged BPA by improperly interfering with its contractual relationships with U.S. banks, depriving it of access to the U.S. financial market and U.S. banking services, and causing it to suffer in its business and reputation, and to be downgraded by rating agencies."  Compl. ¶ 25.

Defendants do not contest that plaintiffs, as BPA's majority shareholders, are appropriate parties to bring a derivative action.  Instead, defendants contend that plaintiffs fail to allege that a derivative action exists as a matter of Andorran law.[17]  They also argue that plaintiffs have not adequately alleged their efforts to persuade the Andorran administrator who currently exercises control over BPA to bring the claims plaintiffs here assert or, alternatively, that they have failed to allege that such efforts would have been futile.

Under U.S. law, these issues are governed by Fed. R. Civ. P. 23.1, which states in relevant part:

---

[17] Defendants simply object to the *absence* of an affirmative allegation by plaintiffs on the subject of Andorran law.  Defendants do not assert the negative – that a derivative action does not exist under Andorran law, and they offer no evidence of Andorran law.  As indicated in the Cassany Declaration, Andorran law does not preclude an action by a company's shareholders. Ex. 1 ¶ 4.

> The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association. . . .
>
> The complaint must . . . state with particularity: [] any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and [] the reasons for not obtaining the action or not making the effort.

Rule 23.1 does not itself create a demand requirement.  *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96 (1991).  Rather, the contours of the demand requirement and corresponding futility exception are typically governed by the laws of the state of incorporation.  *Id.* at 101, 103.[18]  Yet defendants make no showing that Andorran law differs from U.S. law on this subject.  They do not contend that shareholder derivative actions are precluded under Andorran law; they suggest, but do not actually offer any legal support, that Andorran law, like U.S. law, requires the shareholder bringing the action to first request that the corporation's board of directors bring the suit or to allege that any such request would be futile.

It is unsurprising that a small jurisdiction like Andorra does not have a developed body of law on this complex subject. Much like the District of Columbia has historically looked to Maryland law to fill in gaps in its jurisprudence, *Hull v. Eaton Corp.*, 825 F.2d 448, 453-54 (D.C. Cir. 1987), Andorran courts look to French and Spanish law.[19]  Both Spain and France permit shareholders to bring derivative suits.  *See* Martin Gelter, *Why Do Shareholder Derivative Suits Remain Rare in Continental Europe?*, 37:3 Brook. J. Int'l L. 843, 859 (2012).  Under French law, shareholder derivative suits are seen as an individual right of shareholders.  *Id.* at

---

[18] Pursuant to Fed. R. Civ. P. 44.1, plaintiffs are hereby giving notice that they would like the Court to consider foreign law.  Under the Rule, in considering foreign law, the Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

[19] *See* International Business Publications, USA, *Andorra Business Law Handbook* 11 (6th ed, 2008).

854 (citing Code de Commerce [Commercial Code] art. L. 225-252 (Fr.); Loi du 24 juillet 1867

sur les Sociétés [Law of July 24, 1867 on Companies], arts. 17, 39 (Fr.) (permitting a minority of

5% to bring derivative suit)).  In France, although it is usually assumed that a derivative suit can

only be brought if the corporation fails to sue, there is no formal demand requirement.  *Id.* at

n.48.   Similarly, in Spain, shareholders owning 5% or more of the corporation can bring a

derivative suit if (i) the board refuses to hold a shareholders meeting after one is requested; (ii)

the company does not bring a suit within a month after shareholders have voted to bring a suit; or

(iii) the remaining shareholders decide not to bring a suit.  *Id.* at 854-55 n.50 (citing Ley de

Sociedades Anónimas art. 134.4 (B.O.E. 1989, 1564) (Spain)).  Accordingly, under either French

or Spanish law, plaintiffs have sufficient shares in BPA to serve as plaintiffs in a derivative

action.

Defendants' arguments concerning demand and futility fare no better.  At the time of the

filing of the complaint, the Andorran government had initiated the "resolution" process, whereby

the government assumed ownership of BPA, ousted BPA's prior Board of Directors, including

the Cierco brothers, and the bank was being managed by the Andorran government-appointed

Administrator AREB.  Compl. ¶¶ 22, 24-25.  Despite the Ciercos' repeated requests for dialogue

with AREB with respect to the wrongful actions taken in closing BPA, AREB has flatly refused

to discuss how BPA's legal interests could be protected or how to maximize the value of the

company for all of the stakeholders.  *Id.* ¶ 26.  Andorran regulators, too, have expressly refused

to discuss the interests of BPA with the Ciercos and told the Ciercos that Andorra had adopted a

policy to cooperate fully with FinCEN (doubtless to prevent wider use of "the hammer") and to

refuse to take actions to defend BPA.  *Id.* ¶¶ 26-27.  Thus, the complaint fairly alleges that

plaintiffs have requested the assistance of BPA's administrator in enforcing the rights of BPA

and that the administrator has refused to engage with the Ciercos, claiming that the government of Andorra will do nothing to challenge FinCEN's action. *See* 16 Fletcher Cyc. Corp. § 7783.50 ("If the conduct of a receiver is equivalent to a refusal to sue, a shareholder may sue without requesting the receiver to sue."). There is little question that any formal request that the administrator bring the instant action would have been futile, and it is well established that the law does not demand a futile act as a prerequisite to filing suit. *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992); *Houghton v. Shafer*, 392 U.S. 639, 640 (1968); *Robbins v. Kleindienst*, 383 F. Supp. 239, 242 n.1 (D.D.C. 1974).

Defendants next argue that under U.S. law the usual rules for shareholder standing to bring derivative actions do not apply as between shareholders of a corporation in receivership and a receiver. In support, defendants rely on *Perry Capital LLC v. Lew,* 70 F. Supp. 3d 208 (D.D.C. 2014), but that decision is not controlling here. In *Perry Capital*, the court considered whether an exception should be made to the explicit statutory bar on derivative suits contained in the Housing and Economic Recovery Act ("HERA") due to a purported conflict of interest between the Federal Housing Finance Agency and the Department of Treasury. *Id.* at 230. The court analyzed the HERA statute and specifically the statute's bar on derivative suits and ultimately concluded that creating an exception to the statutory bar on derivative suits would contravene the plain language of the statute. *Id.* at 231. *Perry Capital* does not stand for the broad proposition that shareholders of a corporation that is in receivership can never bring a derivative suit. In fact, the law is to the contrary.

It is generally recognized that a shareholder can bring a derivative suit, even though a receiver has been appointed, where the facts allege that it would have been useless to make a demand on the receiver or "[i]f the conduct of the receiver is equivalent to a refusal to sue." 16

Fletcher Cyc. Corp. § 7783.50; *see also Suess v. United States,* 33 Fed. Cl. 89, 96 (1995); *Branch v. FDIC*, 825 F. Supp. 384, 404-05 (D. Mass. 1993).   Defendants make no showing that Andorran law is different.   Whether under U.S. law or Andorran law, plaintiffs are entitled to bring a derivative action on the facts alleged in the complaint because AREB, as BPA's current managing authority, manifestly will not.

Under either test for standing – individual direct injury due to the seizure of plaintiffs' shares or derivative shareholder injury due to losses to BPA itself – the instant action is proper.

**III.   Defendants Violated Plaintiffs' Due Process Rights.**

> **A.    Plaintiffs Are Entitled to Due Process Given Their Substantial Presence and Property in the United States.**

When a foreign plaintiff owns property in the United States or has substantial connections with this country, he is entitled to due process protections.  *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201 (D.C. Cir. 2001) (aliens who establish "substantial connections with this country" are entitled to constitutional protections); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 27 (D.D.C. 2012) (plaintiff may raise constitutional challenges provided he has "some property here").   Here, the complaint alleges that both BPA and the Ciercos have substantial connections with the United States to give rise to constitutional rights. As to BPA, the complaint alleges that it has substantial connection with the U.S. through its significant correspondent banking relationships here and its meaningful compliance with all legal and regulatory requirements to do banking here.  Compl. ¶¶ 38-40.  With respect to plaintiffs, the complaint alleges that the Ciercos brothers own significant real property in the United States.  *Id.* ¶ 41.  These assertions, which must be taken as true for purposes of considering defendants'

motion to dismiss, allege substantial contacts that are more than sufficient to bring plaintiffs within the due process protections of the Constitution.[20]

There are a variety of ways in which the "substantial connections" requirement can be satisfied.  The plaintiff in *Nat'l Council of Resistance of Iran* had sufficient presence in the United States to benefit from the Due Process Clause where it had offices at the National Press Building and a "small" bank account.  251 F.3d at 201.  The plaintiff in *Al-Aqeel v. Paulson*, 568 F. Supp. 2d 64, 70 (D.D.C. 2008), had sufficient presence in the United States where he alleged that he was an officer of a U.S. company and the chairman, director general, and president of its parent company, and he traveled to the U.S. for company business and assisted the U.S. company in acquiring U.S. property.  In *United States v. Sum of $70,990,605*, No. 12-cv-1905(RDM), 2015 WL 5331923, at *10 (D.D.C. Sept. 14, 2015), the court found sufficient U.S. presence where claimant foreign bank maintained a U.S. correspondent bank account.

Until FinCEN issued the NOF and NPRM, BPA maintained substantial U.S. dollar correspondent banking relationships with four different U.S. banks, and it transacted significant business in the U.S. through these accounts.  Compl. ¶ 39.  In order to maintain these correspondent banking relationships, BPA was required to and did comply with a range of U.S. laws and regulatory requirements and assigned a U.S. agent to receive service of process.  *Id.*

---

[20] Defendants cite no authority to support their argument that a plaintiff is required to catalogue its U.S. property holdings in the complaint.  Plaintiffs' assertion that they own substantial real property in the U.S. is sufficient at the pleading stage.  *See 32 Cnty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (foreign entity entitled to due process if it possesses a "controlling interest in property located within the United States"); *see also Nat'l Council of Resistance of Iran*, 251 F.3d at 204 ("colorable allegation" of U.S. property sufficient to support due process claims).  To the extent that the Court views the existing allegations as insufficient to plead substantial connections to the United States, plaintiffs could amend the complaint to include the following allegations: Plaintiffs Ramon Cierco and Higini Cierco beneficially own between five and ten million dollars' worth of real estate in Florida.  The property is owned by Florida and Delaware corporations.  They employ a managing agent in Florida to deal with management of the real property and the payment of taxes.

¶¶ 39-40.  By meeting these ongoing legal and regulatory requirements and transacting business through these accounts, BPA maintained a significant presence in the United States.

It is precisely this property that was taken from BPA without satisfying due process requirements, as FinCEN's actions caused these correspondent bank accounts to be closed.  As the D.C. Circuit has held, "a foreign organization that acquires or holds property in this country may invoke the protections of the Constitution when that property is placed in jeopardy by government intervention."  *Nat'l Council of Resistance of Iran*, 251 F.3d at 204.

Defendants cite only one case to support their argument that plaintiffs' connections with the United States are insufficient.  First, that case is "not to be cited as precedent" under D.C. Circuit Rule 32.1(b)(1)(A), and, in any case, it is entirely distinguishable.  In *Arbelaez v. Newcomb*, 1 F. App'x 1 (D.C. Cir. 2001), out of twenty-one plaintiffs, four plaintiffs held two bank accounts in the U.S. together worth less than $2,000.  As this Court noted, these miniscule accounts were insufficient to demonstrate "substantial" connections with this country.  *See Arbelaez v. Newcomb*, No. 98-cv-02813(LFO) (D.D.C. May 16, 2000), ECF No. 25, at 5-6.  Likewise, defendants' analogy to civil forfeiture cases is misplaced.  The doubts expressed by the courts in both cases cited by defendants arise in the context of forfeiture proceedings relating to property located *outside* the United States.  *See United States v. All Assets Held in Account No. XXXXXXX*, 83 F. Supp. 3d 360 (D.D.C. 2015); *United States v. Sum of $70,990,605*, 2015 WL 5331923, at *10.  The courts' concerns in these cases do not apply to U.S. property like BPA's commercial relationships with U.S. banks.

Defendants further suggest that even to the extent that plaintiffs do have sufficient contacts with the U.S. such that due process protections would attach, plaintiffs only obtain constitutional rights relating to their U.S. property.  They cite no case law supporting this

proposition, which is belied by the manner in which the courts evaluate substantial contacts for the purpose of determining whether a litigant is entitled to rights under the Constitution.  For example, in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court considered whether the defendant, a citizen of Mexico, had sufficient voluntary contacts with the United States to invoke the protections of the Fourth Amendment.  According to the Court, although the protections of that amendment could be claimed by an alien with substantial connections to the United States, the defendant's involuntary presence in the country did not satisfy that test.  Nowhere did the Supreme Court suggest that the *type* of substantial connection was relevant to the inquiry or the particular constitutional rights that could be claimed.  Indeed, following from *Verdugo-Urquidez,* courts have considered all manner of  "substantial contacts" with the United States as part of a determination whether a party is permitted the protection of the Constitution.  *See, e.g., Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (plaintiff's frequent voluntary visits to the U.S. constitute contacts sufficient to provide her with constitutional protection and standing to assert *Bivens* claim).

Defendants' suggestion that the Court should apply an analysis similar to that undertaken to evaluate long-arm jurisdiction has been rejected by this Court.  *See Al-Aqeel*, 568 F. Supp. 2d at 70; *Kadi*, 42 F. Supp. 3d at 27.  In *Kadi*, in the context of plaintiff's challenge to a Specially Designated Global Terrorist ("SDGT") designation by Treasury's Office of Foreign Asset Control ("OFAC"), this Court noted that although the Southern District of New York had dismissed claims against plaintiff relating to the September 11 terrorist attacks for lack of personal jurisdiction, that did not resolve the question of whether plaintiff "has substantial connections sufficient to raise his constitutional claims;" the "substantial connections" requirement is satisfied where a plaintiff has "some property here." *Id.* Likewise, in *Al-Aqeel*,

this Court concluded that plaintiff had standing to raise constitutional claims against the government even though he had argued against another U.S. court's exercise of personal jurisdiction over him. 568 F. Supp. 2d at 70 (distinguishing personal jurisdiction and due process "sufficient connections" inquiries). In any event, defendants' argument ignores the fact that it was BPA's U.S. property, *i.e.*, its U.S. correspondent banking accounts, that were impacted by FinCEN's actions.

Finally, the legislative history of Section 311 makes clear that, as a statutory matter, Congress intended for all FinCEN targets to enjoy due process protections. In amending Section 311 in 2003 to authorize the use of classified information, Congress explained that it intended courts to assure "due process of law" to all parties against whom classified evidence is offered. H.R. Conf. Rep. 108-381, at 55 (2003). Section 311 is a provision that addresses foreign banks. Therefore, even if there were any question of due process as a matter of pure constitutional law, it is clear that the statute contemplates that persons affected by adverse agency action under Section 311 are entitled to equivalent rights to challenge governmental action.

**B.    The Complaint Sufficiently Pleads a Deprivation by the Government.**

Plaintiffs allege that FinCEN's actions in issuing the NOF and NPRM deprived them of their liberty and property interests without due process of law. In particular, FinCEN's actions deprived BPA of its property right to its U.S. correspondent accounts and caused it substantial reputational harm. FinCEN's actions also deprived BPA of liberty interests by encouraging government entities, including Andorran regulators, to take action against BPA and by preventing BPA from doing business in the United States or elsewhere. Compl. ¶¶ 116-17.

Defendants acknowledge that the government may cause a due process deprivation through a third party. Defs.' Mem. at 27 (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40,

52 (1999)).  As this Circuit observed in *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 946 (D.C. Cir. 1988), due process protections extend to actions of a private party if its conduct is "instigated by . . . the exercise of governmental authority."  Defendants' contention that there was no deprivation by FinCEN here because the NOF and NPRM had no coercive effect is contrary to the well-pleaded allegations of the complaint.  Defendants now argue that the NOF is merely "the information supporting the NPRM" and the NPRM is only a "proposal" (Defs.' Mem. at 27), but these after-the-fact characterizations are both belied by the text of the documents themselves and contrary to the complaint's allegations – which is impermissible on a motion to dismiss.  The NOF was undeniably a final determination that BPA is "of primary money laundering concern," and the NPRM advised U.S. banks and foreign regulators to take action against BPA based on that determination.  Compl. ¶ 1.  The goal of both Notices was to immediately prevent BPA from continuing in the banking business.  This is the epitome of third party action "instigated by" the U.S. government.[21]

Moreover, the complaint alleges that FinCEN directly caused BPA reputational harm by issuing the NOF, which branded BPA "of primary money laundering concern."  BPA had a "liberty interest in avoiding the damage to its reputation and business" that this "stigmatizing" finding caused.  *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993); *see also Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643-44 (D.C. Cir. 2003) ("we have held on several occasions that government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due

---

[21] That Andorra is a foreign sovereign is irrelevant to the analysis.  Plaintiffs do not ask the Court to issue any order to the Andorran government.  Rather, plaintiffs challenge the actions of the U.S. government in instigating Andorra's actions.

Process Clause."); *PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 9-10 (D.D.C. 2004).  Defendants fail to challenge the sufficiency of these allegations of direct deprivation.

### C.     FinCEN's Actions Violated Due Process Requirements.

Due process mandates both effective notice of an adverse governmental action and a meaningful opportunity to be heard before it is imposed.  FinCEN's procedures culminating in the issuance of the NOF and NPRM afforded neither.  It is "elementary and fundamental" that the notice of a deprivation must convey sufficient information to afford interested parties "an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  It is also fundamental that the person receive an "opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Except in extraordinary circumstances, the notice and opportunity to be heard must be afforded "*before* [an individual] is deprived of any significant property interest."  *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis added).

Plaintiffs' first notice of the NOF and NPRM was their publication.  Those Notices caused, and were intended by FinCEN to cause, U.S. banks to cancel their existing correspondent accounts with BPA and thereby prevent BPA from engaging in international banking.  Plaintiffs indisputably were afforded no opportunity to respond to either notice until *after* they were put into effect and had already caused BPA's loss of its correspondent banking contracts.  Had plaintiffs received the notice and opportunity for meaningful comment that due process requires before the issuance of the NOF and NPRM, they could have responded to FinCEN's accusations and thus had a chance to persuade FinCEN not to label BPA as of "primary money laundering concern."  In particular, plaintiffs could have advised FinCEN that BPA had retained two of the world's foremost auditing firms to conduct annual AML audits for the twelve years prior to the

issuance of the NOF and NPRM, that none of the audits reflected systemic AML issues, and that the handful of incidents FinCEN cited as support for the finding had been self-reported by BPA and addressed through judicial proceedings a year before FinCEN's actions.

Defendants argue that plaintiffs were afforded adequate notice because the NOF provided "more than enough information."  Defs.' Mem. at 32.  Yet defendants ignore the essential fact that, even if the NOF *had* provided "more than enough information" – which it did not – that information was provided too late.

Defendants cite the absence of pre-deprivation notice by OFAC when it designates an entity as an SDGT as justification for FinCEN's actions here.  The circumstances are in no sense parallel.  SDGT designations "present[] an extraordinary situation in which postponement of notice and hearing until after seizure d[oes] not deny due process."  *Islamic Am. Relief Agency v. Unidentified FBI Agents,* 394 F. Supp. 2d 34, 49 (D.D.C. 2005), *aff'd in part and remanded sub nom. Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007) (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679-80 (1974)).  OFAC is authorized to designate SDGTs pursuant to an Executive Order declaring a national emergency with respect to acts of terrorism pursuant to the International Emergency Economic Powers Act ("IEEPA").  SDGT designations are assigned to those whose "property or interests in property should be blocked because they 'act for or on behalf of' or are 'owned or controlled by' designated terrorists, or because they 'assist in, sponsor, or provide . . . support for' or are 'otherwise associated' with designated terrorists."  *Id.* at 42 (quoting IEEPA § 1).  OFAC's power to block a terrorist organization's assets is effective in fighting terrorist threats only if it is invoked without notice, before the SDGT has a chance to transfer its assets outside the United States and beyond OFAC's reach.  In recognition of the fact that prior notice to SDGTs would

render asset freezing ineffectual, the Executive Order states: "[F]or these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination pursuant to this order." *Id.* (quoting Exec. Order 13,224 § 10, 66 Fed. Reg. 49,079, 49,081 (Sept. 23, 2001)).

Notwithstanding the extraordinary SDGT example, pre-deprivation notice is the rule, not the exception, and it applies to any agency action without regard to whether it is expressly set out in the enabling statute.   As this Court has ruled in a case cited by defendants, in order to postpone notice and the opportunity for meaningful comment because of an "extraordinary situation," the government must satisfy three requirements: "(1) the deprivation was necessary to secure an important governmental interest; (2) there has been a special need for very prompt action; and (3) the party initiating the deprivation was a government official responsible for determining, under the standard of a narrowly drawn statute, that it was necessary and justified in the particular instance." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 76 (D.D.C. 2002) (citing *Calero-Toledo*, 416 U.S. at 679-80).

In sharp contrast to the SDGT cases, there was no immediate national security concern here that necessitated immediate action.[22]   The NOF contains no allegation that BPA accounts were used in connection with terror financing, SDGTs, weapons proliferation, or state sponsors of terrorism, much less that there was a danger that they would be so used in the immediate future unless blocked by FinCEN.   Compl. ¶¶ 47, 55.   Instead, the NOF recited that BPA had years earlier processed a handful of transactions with a potential connection to money

---

[22] Any suggestion of urgency in this case would, in any event, be belied by defendants' repeated assertions in this Court that the NOF and NPRM were merely informational and proposed and therefore had no immediate consequences.   It is unclear why defendants would be unable to provide pre-deprivation notice for an action that, according to defendants, has no immediate effect.

laundering, corruption, and bribery.  *Id.*  Those transactions were disclosed by BPA itself in accordance with applicable law more than a year before and were all subject to proceedings against those customers.  *Id.* ¶ 77.  Far from presenting an imminent threat, BPA had acted as a prudent bank in reporting suspicious transactions.  *Id.*  Defendants have made no attempt to show any urgency in this case, and there was none.

That the SDGT cases are the rare exception to notice and comment due process requirements is clear when they are compared with cases involving designations by the Department of State of foreign terrorist organizations ("FTOs").  This Circuit has held that pre-deprivation notice and a meaningful opportunity to be heard *are* required in those cases.  *See, e.g., Nat'l Council of Resistance of Iran*, 251 F.3d 192.  Where there is "neither a declaration of war . . . nor a Presidentially declared national emergency . . . the absence of notice and an opportunity to be heard" cannot be justified even in cases involving foreign terrorist organizations.  *Holy Land Found.*, 219 F. Supp. 2d at 76, *aff'd* 333 F.3d 156 (D.C. Cir. 2003).  FinCEN's actions under Section 311 do not flow from a declaration of war or a national emergency, and there is no reasonable basis for deprivation of notice and a meaningful opportunity to be heard.  Defendants seek to distinguish cases involving FTO challenges by arguing that FTO designations are not subject to a rulemaking procedure.  Defs.' Mem. at 32 n.14.  But neither is the NOF, nor effectively the NPRM, both of which were issued by FinCEN without any "back-and-forth between target and designating agency."  *Id.*

Quite apart from pre-deprivation notice, defendants have provided scant post-deprivation notice to plaintiffs as to FinCEN's reasons for issuing its NOF and NPRM.  Those Notices themselves contained only summary information, and now nearly a year after they were issued, defendants have yet to provide plaintiffs with access to the non-classified record on which the

NOF finding and the NPRM proposal were based. As a result, plaintiffs have still not had a meaningful opportunity to contest FinCEN's actions. As the D.C. Circuit has held, the opportunity to present evidence and interact with the agency "is plainly not enough to satisfy due process" where the plaintiff "never had the opportunity to tailor its submission to the [agency's] concerns or rebut the factual premises underlying [its] action." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 320 (D.C. Cir. 2014). The law requires that "an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Id.* at 319. The NOF does not provide sufficient notice first and foremost because it was published and made effective without first affording BPA any meaningful opportunity to be heard. In addition, it is not itself "evidence," nor does it detail the evidence that FinCEN considered or upon which it relied. As held in *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1121 (D.C. Cir. 1984), agencies are required to disclose underlying evidence in order to "allow[] the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it." FinCEN may protest to this Court that it is still considering meeting its obligations, Defs.' Mem. at 25, but a year later it has yet to do so, and in any event, the damage to plaintiffs and BPA is already done.

In any event, this Court has previously held that FinCEN must provide non-classified information on which it relies to a target prior to the "comment period" attached to the NPRM in order for the target to have "the opportunity to contest the veracity, credibility, or relevance of the information contained in these documents." *FBME Bank Ltd.*, 2015 WL 5081209, at *7.[23]

---

[23] FinCEN's reliance on classified information does not excuse FinCEN's failure to provide *any* underlying data to support its findings. *See id.* at *8.

The information provided must include "the data the agency used to develop [its] proposed rule." *Id.* at *8.  Although FinCEN has not yet issued – and may never issue – a final rule in this case, the comment period in the BPA matter has already closed.  Governing law confirms that an agency violates due process when, as here, it "permit[s] access to the unclassified portion of the record only *after* the decision was final."  *People's Mojahedin Org. of Iran v. Dep't of State*, 613 F.3d 220, 227 (D.C. Cir. 2010).  In light of this precedent, FinCEN's position that it is not required to provide the information it says underlies its findings unless and until it issues a final rule is untenable.

Quite apart from their statutory right of review of FinCEN's final agency action in stigmatizing BPA as a primary money laundering concern, defendants' violation of plaintiffs' due process rights is palpable and provides an independent basis for this Court's review.

## CONCLUSION

For the foregoing reasons, plaintiffs submit that defendants' motion to dismiss should be denied.

Respectfully submitted,

By: _/s/ Eric L. Lewis_____

Eric L. Lewis (DC Bar #394643)
*eric.lewis@lewisbaach.com*
A. Katherine Toomey (DC Bar #426658)
*katherine.toomey@lewisbaach.com*
LEWIS BAACH PLLC
1899 Pennsylvania Avenue, NW, Suite 600
Washington, DC 20006
(202) 833-8900

Aaron T. Wolfson *(pro hac vice)*
*aaron.wolfson@lewisbaach.com*
LEWIS BAACH PLLC
405 Lexington Avenue, 62nd Floor
New York, NY 10174
(212) 826-7001

Dated:    February 8, 2016          *Attorneys for Plaintiffs*