**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RAMON CICERO, *et al.*,

    Plaintiffs,

        v.

JACOB J. LEW, *et al.*,

    Defendants.

Civil Action No.  15-1641 (JEB)

## MEMORANDUM OPINION

Plaintiffs Ramon and Higini Cicero, along with two associated corporations, are the majority shareholders of a privately held Andorran Bank, Banca Privada d'Andorra S.A. (BPA), which has recently found itself in a bit of a pickle.  An arm of the U.S. Treasury Department, the Financial Crimes Enforcement Network (FinCEN), developed concerns that BPA was facilitating – or was willfully blind to – various money-laundering transactions happening under its roof.  Relying on authority provided by the 2001 USA PATRIOT Act, FinCEN in early 2015 started a process that, had it been completed, would have effectively required all U.S. banks to stop transacting with BPA.  In pursuit of this goal, FinCEN published both a Notice of Finding and a Notice of Proposed Rulemaking in the Federal Register, stating its reasons for suspecting that BPA was of "primary money laundering concern" and proposing regulations that would limit U.S. banks' involvement with the accused.

Before FinCEN promulgated a final rule, however, Plaintiffs sued in this Court in October 2015, seeking to vacate those Notices and enjoin Treasury from proceeding any further. Plaintiffs believe that FinCEN's actions set into motion a chain of events that will (soon and irrevocably) lead to BPA's demise.  In particular, after the Notices issued, U.S. banks voluntarily

ceased U.S. dollar transactions with BPA.  Even worse, the Andorran government took control of

BPA and has recently developed plans for its liquidation.  Given this turn of events, FinCEN

recently changed course, withdrawing its Notice of Finding and NPRM in early 2016 because it

believes that BPA, on account of its Andorran receivership, is no longer of "primary money

laundering concern."  Pointing to those withdrawals, the government has now moved to dismiss,

arguing that any controversy that once existed between the parties has been rendered moot.  The

Court agrees and will grant Defendants' Motion.

## I.    Background

### A.  Statutory Background

Beginning at least with the enactment of the Bank Secrecy Act in 1970, Pub. L. 91-508,

Tit. II, 84 Stat. 1118, Congress has given the Secretary of the Treasury authority to impose

various regulations on domestic banks to reduce the "use of banks and other institutions as

financial intermediaries by persons engaged in criminal activity."  Ratzlaf v. United States, 510

U.S. 135, 138 (1994).  Following the terrorist attacks on September 11, 2011, Congress amended

the Act in Title III of the 2001 USA PATRIOT Act, Pub. L. 107-56, 115 Stat. 272, in an effort to

"prevent, detect, and prosecute international money laundering and the financing of terrorism."

Id. § 302(b)(1).  Relevant here, § 311 of the PATRIOT Act, codified at 31 U.S.C. § 5318A, gave

the government authority to impose any of five "special measures" on domestic financial

institutions, provided the Secretary "finds that reasonable grounds exist for concluding" that a

foreign bank – i.e., one "operating outside the United States" –  is "of primary money laundering

concern."  31 U.S.C. § 5318A(a)(1).

The first four of the "special measure[s]" allow the Secretary, by way of FinCEN, to

require domestic banks to keep records and report on specific types of transactions.  Id.

§ 5318A(b); see also § 310 (establishing FinCEN as a "a bureau in the Department of the Treasury" and enumerating its authorities). Those measures, which are not at issue here, may be imposed by Treasury "by regulation, order, or otherwise as permitted by law." § 5318A(a)(2)(B).

The fifth special measure, in contrast – which is the one FinCEN believed was warranted for BPA – represents a more severe imposition on domestic banks. If the Secretary finds a foreign banking institution to be "of primary money laundering concern," he may, "in consultation with the Secretary of State, the Attorney General, and the Chairman of the Board of Governors of the Federal Reserve System, . . . prohibit, or impose conditions upon, the opening or maintaining in the United States of a correspondent account or payable-through account by any domestic financial institution or domestic financial agency for or on behalf of a foreign banking institution." Id. § 5318A(b)(5). Unlike the other four measures, which may be imposed "as permitted by law," this measure "may be imposed only by regulation." § 5318A(a)(2)(B), (C); see 5 U.S.C. § 553 (describing procedures for agency rulemaking).

B. Factual and Procedural Background

1. *The Two Notices*

In March 2015, FinCEN publicly announced that it had "found that reasonable grounds exist for concluding that [BPA] is a financial institution operating outside of the United States of primary money laundering concern." Notice of Finding That Banca Privada d'Andorra Is a Financial Institution of Primary Money Laundering Concern ("Notice of Finding"), 80 Fed. Reg. 13464, 13464 (March 13, 2015). Basing this assessment on various factors, it concluded that: (a) "[s]everal of BPA's high-level management have facilitated financial transactions on behalf of TPMLs [third-party money launderers]"; and (b) BPA has weak anti-money-laundering (AML)

controls and "allow[s] its customers to conduct transactions through the U.S. financial system
that disguise the origin and ownership of the funds." Id. at 13465-66. FinCEN acknowledged
that while BPA may offer services for some "legitimate business purposes," distinguishing
between legitimate and illegitimate services was "difficult to assess on the information
available . . . ." Id. at 13466. On the basis of these findings, FinCEN concluded that imposition
of the fifth special measure under § 311 was appropriate, suggesting that doing so

> would guard against [] international money laundering and other
> financial crimes described above directly by restricting the ability of
> BPA to access the U.S. financial system to process transactions, and
> indirectly by public notification to the international financial
> community of the risks posed by dealing with BPA and TPMLs.

Id. at 13466.

On the same day it published its Notice of Finding, FinCEN also published in the Federal
Register a Notice of Proposed Rulemaking "to propose the imposition of [the fifth] special
measure against BPA." Imposition of Special Measure against Banca Privada d'Andorra as a
Financial Institution of Primary Money Laundering Concern (NPRM), 80 Fed. Reg. 13304,
13304 (March 13, 2015). In addition to setting forth what the rule would require from U.S.
financial institutions and justifying Treasury's use of the fifth special measure, the government
also observed that "[o]ther countries or multilateral groups have not yet taken action similar to
the action proposed in this rulemaking," – i.e., blocking the domestic use of correspondent bank
accounts maintained for BPA and screening out BPA-related transactions. Id. at 13305. It
therefore "encourage[d] other countries to take similar action based on the information contained
in this NPRM and the Notice of Finding." Id. It also informed the public that the deadline for
submitting any comments regarding the NPRM was May 12, 2015. Id. at 13304-05.

Plaintiffs took advantage of the public-comment period, filing on May 6, 2015, a comment that "described (1) numerous steps the Bank had taken for years prior to FinCEN's Notice to evaluate its AML and compliance program, (2) the results of those evaluations, and (3) evidence showing the Andorran government's certification of BPA's AML program." Complaint, ¶ 66. The comment did not specifically respond to FinCEN's allegations contained in the Notice of Finding because, according to Plaintiffs, "[t]he characteristic lack of specificity in the NOF made it impossible" to do so. Id. ¶ 70. Plaintiffs also wrote letters to FinCEN before the comment period closed, asking for it to "provide additional specificity or a complete file of unclassified underlying documents that served as the evidentiary basis for the charges, in order to afford Plaintiffs the opportunity to provide a comprehensive response before the closure of the Notice and Comment period on May 6, 2015." Id., ¶ 71. FinCEN, however, never responded. Id.

Notwithstanding their ongoing attempts to change Treasury's mind, Plaintiffs allege that the Notice of Finding and NPRM had an "immediate impact" on BPA's business. See id., ¶ 43. Specifically, they believe the Notices "directly caused the Andorran government to seize BPA." Id. In addition, "BPA's U.S. correspondent banks immediately froze BPA's accounts and refused further banking services, thus cutting BPA off from the U.S. dollar market. BPA's non-U.S. dollar banking relationships worldwide also were immediately terminated." Id.

### 2.    *Plaintiffs' Lawsuit & Subsequent Developments*

Seven months after issuance of the Notice of Finding and NPRM, six months after the Andorran government seized BPA, and five months after the public-comment period closed, Plaintiffs – who are the Bank's shareholders and not BPA itself – filed a six-count suit in this Court. See Compl. (filed Oct. 7, 2015). Counts I and II levied substantive and procedural

challenges to the Notices under the Administrative Procedure Act, insisting, *inter alia*, that FinCEN's fact finding was flawed, that such flaws yielded an erroneous finding that BPA was "of primary money laundering concern," and that the information set forth in the Notices were too vague to allow BPA to adequately respond in its comments.  See id., ¶¶ 97-112.  Count III alleged a violation of the Due Process Clause; by causing U.S. banks to close BPA's correspondent bank accounts, Plaintiffs allege that Treasury "effectively deprived BPA of the right to its property, including its U.S. property – the correspondent accounts," which, in turn, unconstitutionally "deprived the Plaintiffs of [their] property interests as directors and shareholders of BPA" and "caused BPA and Plaintiffs substantial and irreparable reputational harm."  Id., ¶¶ 116-17 (emphases added).  Counts IV and V largely overlap with Counts I and II, contending that FinCEN exceeded its statutory authority under § 311 – first, by failing to thoroughly examine "the extent of BPA's legitimate business operations," id., ¶ 123, and second, by failing to "provide adequate notice and a meaningful opportunity for the Plaintiffs to comment before BPA was labeled an institution of 'primary money laundering concern.'"  Id., ¶ 130.  Finally, Count VI sought a writ of mandamus that would order Treasury "to issue a Final Order within thirty days of service of this Complaint so that its conduct can then be subject to full judicial review."  Id., ¶ 133.

Moving to their prayer for relief, Plaintiffs asked the Court to "hold[] unlawful and rescind[] the NOF and set[] aside the NPRM" and "enjoin[] FinCEN from promulgating a Final Rule."  Id. at 43.  In the alternative, they asked for "an order requiring FinCEN to provide Plaintiffs with the documents underlying its decision to issue the NOF and NPRM" or, in the event the Court concluded that the NOF and NPRM "d[id] not constitute final agency action, an order requiring FinCEN to either withdraw the NOF and NPRM or issue a final rule within thirty

days of service of the complaint." Id.  As a final, catch-all request, they sought "[a] grant of such additional or different relief as the Court deems just and proper." Id. at 44.

In November 2015, Plaintiffs moved for partial summary judgment. See ECF No. 15.  In response, the government moved to stay briefing, arguing that they had failed to effect proper service, which, if it had been accomplished, would have precipitated a motion to dismiss. See ECF No. 17.  After convening a hearing in January 2016, the Court agreed to stay briefing on the summary-judgment motion, but ordered the government to quickly file a motion to dismiss by the end of that month. See Minute Order of Jan. 15, 2016.

One day after docketing their reply brief on the dismissal motion, see ECF No. 32, Defendants filed a notice informing the Court that FinCEN had just submitted withdrawals of both the Notice of Finding and NPRM. See ECF No. 33 at 1-2.  Given those recent developments, the government contended that, in addition to the arguments it had made in its motion to dismiss, "the complaint . . . should also be dismissed as moot." Id. at 2.  (The withdrawals were published on March 4, 2016, at 81 Fed. Reg. 11648 and 81 Fed. Reg. 11496, respectively.)

To justify its about-face, FinCEN pointed to the steps taken by the Andorran government that had rendered BPA effectively moribund, which meant that FinCEN no longer considered the Bank "of primary money laundering concern." 81 Fed. Reg. at 11648.  In particular, FinCEN noted that the Andorran regulator of financial institutions, Institut Nacional Andorrà de Finances (INAF), had seized BPA in March 2015 and ousted its leadership. See 81 Fed. Reg. at 11648.  The following month, the Andorran parliament also created a new government agency and gave it the authority to restructure and supervise resolution of banks – the Agència Estatal de Resolució d'Entitats Bancàries (AREB) – which then took control of BPA. Id.  AREB

subsequently "instituted a process by which BPA's 'good assets' would be stripped from it and transferred to a new financial institution – Vall Banc – which would be owned by the Andorran government.  Vall Banc would then be sold for the financial benefit of the Andorran government."  Opp. at 1.  Although Plaintiffs agree that these steps have transpired and that Vall Banc has already "been established," they insist that all hope is not lost, as "the asset transfer has not yet taken place."  Id.  Even so, FinCEN for its part is satisfied that "the steps taken by the authorities in Andorra sufficiently protect the U.S. financial system from the money laundering risks previously associated with BPA," 81 Fed. Reg. at 11649, and that the imposition of § 311 special measures is no longer justifiable.  Id.

After being notified of those new developments in February 2016, the Court convened yet another status conference and ordered supplemental briefing on the issue of mootness.  See Minute Order of Feb. 26, 2016.  That briefing now complete, the Court considers the parties' arguments below.

## II.      Legal Standard

In evaluating Defendants' supplemental Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."); Walker v. Jones, 733 F.2d 923, 925–26 (D.C. Cir. 1984) (same).  The Court need not

accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006).

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 & n.3 (2006); Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001), which includes the obligation to consider issues of mootness.  See Mine Reclamation Corp. v. FERC, 30 F.3d 1519, 1522 (D.C. Cir. 1994).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Grand Lodge, 185 F. Supp. 2d at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1350 (2d ed. 1987)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction. . . ."  Jerome Stevens Pharm., 402 F.3d at 1253.

Although the Court must "address the issue [of mootness] *sua sponte* because [it] goes to the jurisdiction of this court," Mine Reclamation Corp., 30 F.3d at 1522, the party asserting mootness – here, the government – generally bears the burden of establishing that a case is moot in the first instance.  See Honeywell Int'l, Inc. v. NRC, 628 F.3d 568, 576 (D.C. Cir. 2010).  The party opposing a mootness challenge, in turn, "bears the burden of showing an exception [to the mootness doctrine] applies."  Id. (internal quotation marks omitted).

### III.     Analysis

Article III of the Constitution limits federal courts' jurisdiction to "actual, ongoing controversies."  Honig v. Doe, 484 U.S. 305, 317 (1988).  If "events have so transpired that [a judicial] decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," the case is moot, and this Court lacks jurisdiction to entertain the suit.  Abdelfattah v. U.S. Dep't of Homeland Sec., 787 F.3d 524, 534 (D.C. Cir. 2015) (internal citation and quotation marks omitted); see Nat'l Black Police Assoc. v. Dist. of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997) ("[A] federal court has no power to render advisory opinions or decide questions that cannot affect the rights of litigants in the case before [it].") (internal citations, alterations, and quotation marks omitted).  The Court separately discusses two facets of the mootness doctrine: the issue of voluntary cessation and the capable-of-repetition-yet-evading-review question.

### A.   Voluntary Cessation

In making its case that "events have so transpired" as to render this controversy moot, the government relies on its decision to withdraw the two Notices that Plaintiffs, in their Complaint, sought to have "rescind[ed]" or "set[] aside."  Compl. at 43.  In these circumstances, where the "intervening event arguably ending any live controversy between [the parties]" is the government's own decision to end the challenged conduct, "voluntary cessation analysis governs [the] mootness inquiry."  Nat'l Black Police Assoc., 108 F.3d at 349.

To succeed in demonstrating the case is moot under such circumstances, the government must show "that (1) 'there is no reasonable expectation that the alleged violation will recur,' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'"  Id. (quoting Cty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)).  The Court

will take each prong in turn, concluding that Defendants have established that the case is moot.

1. *No Reasonable Expectation of Recurrence*

As a general matter, "executive action rescinding . . . a regulation can moot a challenge to its validity." Gulf Oil Corp. v. Brock, 778 F.2d 834, 840 (D.C. Cir. 1985); see Center for Science in the Public Interest v. Regan, 727 F.2d 1161, 1164-65 (D.C. Cir. 1984) (case moot when agency rescinded challenged regulation and promulgated new one).  In this case, the withdrawal notices themselves convincingly establish that the "alleged violation" – *i.e.*, FinCEN's issuance of Notices as a prerequisite to imposing § 311 special measures against BPA – is not likely to recur.  As a reminder, FinCEN is without power to impose the fifth special measure unless the Secretary finds that "reasonable grounds exist for concluding" that the target foreign bank is "of primary money laundering concern."  31 U.S.C. § 5318A(a)(1).  In contrast to the position Treasury took when it issued the challenged Notices, it has now formally published its conclusion that "BPA no longer operates in a manner that poses a money laundering threat to the U.S. financial system" – given its seizure by INAF and proposed liquidation by AREB.  See 81 Fed. Reg. at 11497; 81 Fed. Reg. at 11649.  Treasury therefore presently lacks any basis for proposing and then promulgating a rule that would impose special measures against U.S. banks that do business with BPA.

Reinforcing this conclusion is Plaintiffs' own failure to argue that the government will impose the fifth special measure on BPA in the future.  See Larsen v. U.S. Navy, 525 F.3d 1, 4 (D.C. Cir. 2008) ("[B]ecause plaintiffs never allege that the Navy is likely to or even considering reinstituting the [challenged policy], there is no reasonable expectation that the alleged violation will recur.") (internal citation and quotation marks omitted).  On the contrary, they candidly admit that "BPA [itself] may not be a future victim" of Treasury's actions, but weakly suggest

that Plaintiffs must be allowed to proceed in order to save <u>other</u> banks from suffering the same

fate.  <u>See</u> Opp. at 15.  They would, of course, have no standing to protest such action.

Defendants have thus established that there is "no reasonable expectation" that the alleged

violations as to Plaintiffs will recur.

### 2.    *Effects of Violation Eradicated by Intervening Events*

While their first argument may be cursory, it is on the second condition – that "interim

relief or events have completely and irrevocably eradicated the effects of the alleged violation,"

<u>Davis</u>, 440 U.S. at 631 – that Plaintiffs believe that Defendants have fallen short. They insist that

Andorra's seizure and forthcoming dissolution of BPA was caused by FinCEN's Notices, and

that the "Court's intervention" will ameliorate those continuing injuries.  Here, too, however, the

government has the better argument.

"The determination whether sufficient effects [of the alleged violation] remain to justify

decision often will turn on the availability of meaningful relief." 13C Charles Alan Wright,

Arthur R. Miller & Edward H. Cooper, <u>Fed. Prac. & Proc.</u>, § 3533.3.1, at 104-05 (3d ed. 2008).

On one hand, "a case is not moot if a court can provide an effective remedy." <u>Larsen</u>, 525 F.3d

at 4 (D.C. Cir. 2008).  At the same time, courts may not decide a controversy where post-filing

events "make[] it impossible for the court to grant 'any <u>effectual</u> relief whatever' . . . ." <u>Church</u>

<u>of Scientology of Cal. v. United States</u>, 506 U.S. 9, 12 (1992) (emphasis added); <u>see also</u>

<u>Conservation Force, Inc. v. Jewell</u>, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (case rendered moot

"when, among other things, the court can provide no effective remedy because a party has

already 'obtained all the relief that [it has] sought'") (quoting <u>Monzillo v. Biller</u>, 735 F.2d 1456,

1459 (D.C. Cir. 1984)); <u>Kennecott Utah Copper Corp. v. U.S. Dep't of Interior</u>, 88 F.3d 1191,

1207 (D.C. Cir. 1996) (a party "no longer suffer[s] a legally cognizable injury traceable to the alleged violations" where "the court can no longer provide . . . any meaningful relief").

The government's argument that the Court can grant no meaningful remedy is a simple one: Plaintiffs have principally asked for equitable relief in the form of *vacatur* of the two Notices.  Since the government's own withdrawal of those Notices yields the same outcome as a *vacatur* ordered by this Court, Plaintiffs have obtained what they asked for, and no live controversy remains.  See Monzillo, 735 F.2d at 1459 (dismissing as moot claim for equitable and declaratory relief where "appellees obtained all the relief that they sought"); Midcoast Fisherman's Ass'n v. Blank, 948 F. Supp. 2d 4, 8 (D.D.C. 2013) (dismissing case as moot where "the [defendant] agency's subsequent actions have given plaintiffs the most they would be entitled to if they won this case").

A close examination of Plaintiffs' carefully drafted and circumscribed prayer for relief confirms the soundness of the government's argument.  In the Complaint, Plaintiffs request in full:

> A. An order holding unlawful and rescinding the NOF and setting aside the NPRM.
>
> B. An order enjoining FinCEN from promulgating a Final Rule.
>
> C. Should the Court decline to rescind the NOF and set aside the NPRM, an order requiring FinCEN to provide Plaintiffs with the documents underlying its decision to issue the NOF and NPRM.
>
> D. Should the Court decline to rescind the NOF and set aside the NPRM on the grounds that they do not constitute final agency action, an order requiring FinCEN to either withdraw the NOF and NPRM or issue a final rule within thirty days of service of the complaint.
>
> E. An award of costs and attorneys' fees under any applicable statute or authority.

>    F. A grant of such additional or different relief as the Court deems
>    just and proper.

Compl. at 43-44.

   With the Notice of Finding and NPRM now withdrawn, Plaintiffs have obtained precisely

the relief they sought under paragraphs A and B, which, as drafted, represent their first-order

priorities.  See Cueto v. Dir., Bureau of Immigration & Customs Enf't, 584 F. Supp. 2d 147,

149-50 (D.D.C. 2008) (case moot when plaintiff "obtain[s] all the relief he or she sought in the

complaint").  The Court cannot "hold unlawful and rescind" already-withdrawn notices, and, as

explained above, FinCEN cannot promulgate a Final Rule where the government concedes that it

no longer has cause to do so.  See supra Section III.A.1.

   As to paragraphs C and D, they offer in-the-alternative requests that come into play only

if the relief sought in paragraph A is not obtained.  But, as just pointed out, that relief has been

obtained.  Such a conclusion is reinforced by Plaintiffs' decision to ignore remedial requests C

and D in their Opposition.  Finally, Paragraph E seeks only costs and fees and has no bearing on

mootness, and Paragraph F provides a general, catch-all request for any other relief deemed "just

and proper."  Taking all of these requests together and evaluating them against Defendants'

recent actions, it is manifest that Plaintiffs have "obtained all the relief that [they] sought."

Conservation Force, Inc., 733 F.3d at 1204 (internal citation and quotation marks omitted).

   Loath to throw in the towel, Plaintiffs rejoin that the consequences of Defendants'

allegedly unlawful Notices continue to haunt them, and that the Court can help eliminate the

specter of that past illegality.  Specifically, Plaintiffs' equity in BPA is frozen in limbo, given the

Bank's receivership and impending liquidation.  They attribute this state of affairs to FinCEN's

Notices, see Opp. at 16 ("[T]he Andorran government has stated publicly that its actions to seize

and dissolve BPA were prompted by FinCEN's notices and not by any independent concern

about BPA."), and thus argue that a declaratory judgment that FinCEN acted improperly <u>in the past</u> will help them recover their assets from the Andorran government going forward.  <u>See</u> Opp. at 13.

As a preliminary matter, Plaintiffs seem to be moving the goalpost in an effort to avoid mootness.  In opposing the government's initial motion to dismiss – which was briefed before the Notices were withdrawn – Plaintiffs asserted that the rescinding of FinCEN's Notices <u>would</u> redress their injuries.  <u>See</u> ECF No. 31 (Opp. to Gov. Mot. to Dismiss) at 25 ("[T]here is a substantial likelihood that [judicial] relief would redress plaintiffs' injuries here – which is all plaintiffs need show – if FinCEN were to rescind its NOF and NPRM that BPA is 'of primary money laundering concern.'"); <u>id.</u> at 3 ("The withdrawal of the NOF and NPRM meet the standard for redress[ing]" their "harm," consisting of the Andorran government's "depriv[ation] of personal property – that is[, Plaintiffs'] ownership of shares in BPA and their positions as Chairmen of its Board.").

Now that Treasury has withdrawn those Notices, however, Plaintiffs have changed their tune, arguing instead that "[t]he relief plaintiffs actually seek in this action is a <u>judicial determination</u> that the NOF and NPRM are unlawful and were issued in violation of the requirements of Section 311," which they argue "would significantly increase the likelihood that Andorra would suspend and ultimately reverse course on the dismemberment of BPA."  Opp. at 13 (emphasis in original).  But Plaintiffs' own allegations in their Complaint contradict this unsupported assertion.  That pleading specifically identifies two preconditions that Plaintiffs assert must be satisfied for Andorra to reverse course on dismantling BPA.  First is the removal of the two Notices.  <u>See</u> Compl., ¶ 46 ("If these baseless and facially defective Notices were rescinded or found to have been improperly issued, BPA <u>could</u> be returned to its shareholders

who <u>could</u> resurrect the portions of its business that are still viable.") (emphases added).  That

step, of course, has been completed.  According to Plaintiffs, however, that alone is insufficient.

In addition, the "Andorran regulators have told [Plaintiffs] that" returning BPA to its

shareholders would also "<u>require the approval of FinCEN</u>."  <u>Id.</u> (emphasis added).  To remedy

Plaintiffs' continuing harm, then, it is not enough for the Court declare those Notices unlawful;

FinCEN <u>itself</u> would have to proactively register its approval – to the Andorran government –

that BPA be resurrected.

      Plaintiffs have never asked for such extensive relief, however, and the Court is not

obliged to keep the case afloat both by ignoring their own prayer and by envisaging what relief

they might have sought – but did not – in their Complaint.  <u>See</u> <u>Finca Santa Elena, Inc. v. U.S.</u>

<u>Army Corps of Eng'rs</u>, 62 F. Supp. 3d 1, 5 (D.D.C. 2014) ("'[T]heoretically' available relief

sufficient to defeat mootness does not include 'imagined possibilities beyond those requested in

the complaint, but rather' involves 'giv[ing] the plaintiff the benefit of the doubt as to whether

certain <u>requested relief</u> would in fact ease or correct the alleged wrong.'") (quoting <u>Bayou</u>

<u>Liberty Ass'n, Inc. v. U.S. Army Corps of Eng'rs</u>, 217 F.3d 393, 397 (5th Cir. 2000) (emphasis

in <u>Fincal Santa Elena</u>).  More important, even if Plaintiffs had asked the Court to order FinCEN

to approve the return of BPA to Plaintiffs, they offer no argument as to why they would be

lawfully or equitably entitled to such a remedy.  <u>Cf.</u> <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d

1077, 1084 (D.C. Cir. 2001) (where plaintiff "prevails on its APA claim, it is entitled to relief

under that statute, which normally will be a *vacatur* of the agency's order").

      In addition, the D.C. Circuit has indicated that where a plaintiff seeks both declaratory

and injunctive relief pertaining to unlawful agency action, and where the latter has been mooted,

an outstanding request for the former will not operate to bar mootness: "If a plaintiff has made

no challenge to some ongoing underlying policy, but merely attacks an isolated agency action, then the mooting of the specific claim moots any claim for a declaratory judgment that the specific action was unlawful, unless the specific claim fits the" two exceptions to mootness – *i.e.*, voluntary cessation or capable of repetition yet evading review.  City of Houston, Tex. v. Dep't of Hous. & Urban Dev., 24 F.3d 1421, 1429 (D.C. Cir. 1994).  This is so because any such order "declaring [the agency's past conduct] illegal would accomplish nothing—amounting to exactly the type of advisory opinion Article III prohibits."  Larsen, 525 F.3d at 4; accord Transwestern Pipeline Co. v. FERC, 897 F.2d 570, 575 (D.C. Cir. 1990) ("A case is moot if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.") (emphasis added).  Plaintiffs have not argued that a declaration of invalidity would itself alter the relationship between the parties to this suit – as opposed to Plaintiffs' speculation that it might have an impact on a third-party sovereign government – meaning any such declaration would amount to an impermissible advisory opinion.  See Spivey v. Barry, 665 F.2d 1222, 1235 (D.C. Cir. 1981) (dismissing case as moot where "a grant of declaratory relief would not achieve any useful objective").

Because the Court cannot grant Plaintiffs any meaningful relief, Defendants have met their "heavy" burden of showing that the case is moot.  See Honeywell, 628 F.3d at 576.  For these reasons, the Court will not address Plaintiffs' extended digression on why a causal connection between FinCEN's Notices and Andorra's actions might suffice to give Plaintiffs standing to sue.  See Opp. at 16-19 & n.11.  Such arguments simply do not address the related (but distinct) question of whether this Court, given what has transpired in the interim, now has the power to order any meaningful remedy.  See, e.g., Judicial Watch, INC v. Kerry, No. 15-785, 2016 WL 126349, at *3 (D.D.C. Jan. 11, 2016) ("[A] standing inquiry is concerned with the

17

presence of injury, causation, and redressability at the time a complaint is filed, while a mootness

inquiry scrutinizes the presence of these elements after filing – *i.e.*, at the time of a court's

decision.").

B.  Capable of Repetition Yet Evading Review

"[E]ven though the specific action that the plaintiff challenges has ceased, a claim for

declaratory relief will not be moot" if "the specific claim fits the exception for cases that are

capable of repetition, yet evading review . . . ."  Del Monte Fresh Produce Co. v. United States,

570 F.3d 316, 321 (D.C. Cir. 2009) (internal quotation marks omitted).  This exception "applies

where (1) the challenged action is in its duration too short to be fully litigated prior to cessation

or expiration; and (2) there is a reasonable expectation that the same complaining party will be

subject to the same action again."  FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 462 (2007)

(citation and internal quotation marks omitted).  The burden lies with the party invoking the

exception – here, Plaintiffs – "to show that these requirements are met."  S. Co. Servs. v. FERC,

416 F.3d 39, 43 (D.C. Cir. 2005).

The Court need not dwell long on this exception, however, as Plaintiffs make no attempt

to argue the second prong of this test.  "For there to be a 'reasonable expectation' that [Plaintiffs]

will be subjected to the same action again, that event must be a 'demonstrated probability.'"

Honig, 484 U.S. at 333 (quoting Murphy v. Hunt, 455 U.S. 478, 482-83 (1982)).  Plaintiffs do

not even suggest "that the same controversy will recur" and will "involv[e] the same

complaining party."  Murphy, 455 U.S. at 482.  On the contrary, as the Court noted above, they

concede that "BPA may not be a future victim" of FinCEN's allegedly unlawful behavior, see

Opp. at 15, and furnish neither argument nor evidence suggesting that FinCEN would attempt to

invoke the fifth special measure as to it at any time in the future.  Once again, they instead resort

to arguing that FinCEN's practices have allowed the government to "repeatedly to evade judicial review of its actions and to continue the same practices against <u>other banks</u>." <u>Id.</u>  Even if that is so, Plaintiffs' recognition that the same controversy is unlikely to ensnare BPA renders unavailing their appeal to the capable-of-repetition exception.

*   *   *

A brief coda.  In their Opposition, Plaintiffs spend considerable time arguing that Treasury's conduct here evinces "a textbook example of a defendant seeking to evade judicial oversight by appearing to voluntarily cease the complained of action before it has to answer for its conduct."  Opp. at 2.  According to them, Treasury knows that by issuing § 311 notices – such as those issued here – foreign governments will take action to dismantle a bank before FinCEN ever has to promulgate a final rule.  <u>See id.</u> at 9.  Once that government acts, FinCEN may then withdraw the notices to moot any subsequent challenge.  <u>Id.</u>  In this way, Treasury insulates its action both on the front end (lack of ripeness and no final agency action) and on the back end (mootness).  <u>Id.</u> at 9-10.

Troubling as these accusations may be in the abstract, the Court does not believe this characterization is correct, as Treasury does not always shield itself from judicial scrutiny. Indeed, another judge in this district recently granted a bank's preliminary-injunction challenge to FinCEN's final rule requiring imposition of the fifth special measure against a Tanzanian-chartered commercial bank operating in Cyprus.  <u>See FBME Bank Ltd. v. Lew</u>, 125 F. Supp. 3d 109, 129 (D.D.C. 2015).  In that case, the Court agreed that FinCEN had procedurally erred by promulgating its rule without disclosing "large portions of the unclassified record on which it relied" during notice and comment.  <u>Id.</u> at 122.  Unlike here, however, Treasury issued its final rule before the plaintiffs brought suit, and it did not withdraw that rule either before or after it

19

was challenged – a course of action that undermines Plaintiffs' belief that the government consistently acts to insulate its decisions from review.  In sum, although Plaintiffs may not act as foreign banks' standard bearer in this case, others may serve the same role in the future.

**IV.    Conclusion**

For these reasons, the court will grant Defendants' Supplemental Motion to Dismiss.  A separate Order so stating will issue this day.


                                        /s/ *James E. Boasberg*
                                        JAMES E. BOASBERG
                                        United States District Judge


Date:   May 18, 2016